U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

2023 JUL 25  AM 10: 46

CLERK

BY

**NATIONAL INSTITUTE OF
FAMILY AND LIFE ADVOCATES**;
**ASPIRE TOGETHER, INC., d/b/a
ASPIRE NOW; BRANCHES
PREGNANCY RESOURCE
CENTER, INC.,**

*Plaintiffs,*

v.

**CHARITY CLARK**, in her official
capacity as Attorney General of the
State of Vermont; **SARAH
COPELAND HANZAS**, in her official
capacity as Secretary of the State of
Vermont; **KEVIN RUSHING**, in his
official capacity as Director of the Office
of Professional Regulation; **MARK
LEVINE**, in his official capacity as the
Commissioner of Health of the State of
Vermont; **The Individual Members
of the VERMONT BOARD OF
MEDICAL PRACTICE**, in their
official capacities; **The Individual
Members of the VERMONT STATE
BOARD OF NURSING, in their
official capacities**; and **COURTNEY
BOWERS**, in her official capacity as
Naturopathic Physician Advisor,

*Defendants.*

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Case No. 2-23-CV-229

## COMPLAINT

NOW COME Plaintiffs National Institute of Family and Life Advocates
("NIFLA"), Aspire Together, Inc. ("Aspire"), and Branches Pregnancy Resources
Center ("Branches"), by and through their undersigned attorneys, for their Complaint

for Injunctive and Declaratory Relief against the Defendants Attorney General Charity Clark, Secretary of State Sarah Copeland Hanzas, Director of the Office of Professional Regulation Kevin Rushing, Commissioner of Health Mark Levine, the individual members of the Board of Medical Practice, the individual members of the State Board of Nursing, and Naturopathic Physician Advisor Courtney Bowers, in their official capacities, and allege as follows:

## INTRODUCTION

1.     This case is a challenge by pro-life pregnancy services centers and their membership organization to a state law that unconstitutionally restricts the centers' speech and provision of services. Pregnancy services centers in Vermont offer women both medical and non-medical information and services and do so free of charge. They empower women who are or may be pregnant to choose to give birth in circumstances where they wish to do so but feel they do not have the necessary resources or social support. They also provide support and resources for new mothers and families in need of assistance.

2.     On May 10, 2023, Governor Phil Scott signed Senate Bill No. 37 ("SB 37"), attached hereto as Exhibit A. That law impedes the ability of pro-life pregnancy centers to continue providing help and support to Vermont women and families in two ways: First, it censors the centers' ability to advertise their free services (Advertising Prohibition). Second, it precludes centers from offering non-medical services, information, and counseling unless provided by a licensed health care provider (Provider Restriction).

3.     Plaintiffs request that this Court issue declaratory and injunctive relief against the enforcement of SB 37 because it violates the First and Fourteenth Amendments to the U.S. Constitution by imposing vague and viewpoint-discriminatory laws that target speech and conduct and are not narrowly tailored to any asserted state interest.

## JURISDICTION AND VENUE

4.      This action arises under 42 U.S.C. section 1983 *et. seq.* (the "Civil Rights Act"); the First and Fourteenth Amendment to the U.S. Constitution.

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331, 1343, and 1367.

6.      The Court has jurisdiction to issue the requested declaratory relief pursuant to 28 U.S.C. sections 2201 and 2202, and Federal Rule of Civil Procedure 57.

7.      The Court has jurisdiction to award the requested injunctive relief under 5 U.S.C. sections 702 and 703, 20 U.S.C. section 1683, 28 U.S.C. section 1343(a)(3), and Federal Rule of Civil Procedure 56.

8.      The Court has jurisdiction to award reasonable attorneys' fees and costs under 42 U.S.C. section 1988.

## PARTIES

### *Plaintiff National Institute of Family and Life Advocates*

9.      Plaintiff National Institute for Family and Life Advocates (NIFLA) is a religious not-for-profit corporation duly incorporated under the laws of Virginia, with its principal place of business at 5610 Southpoint Ct. Blvd., # 103, Fredericksburg, VA 22407.

10.     NIFLA comprises member pregnancy centers from across the nation.

11.     NIFLA has seven member facilities in Vermont, including Aspire and Branches, that are regulated by SB 37.

12.     NIFLA provides its pregnancy center members with legal resources and counsel, with the aim of developing a network of life-affirming ministries in every community across the nation, in order to achieve an abortion-free America.

3

13.    NIFLA's mission is to empower the choice for life by equipping pregnancy centers with legal counsel and support, enabling pregnancy centers to convert to and maintain medical clinic status, and energizing pregnancy centers with a renewed vision for the future.

14.    NIFLA members do not provide or refer for abortions or emergency contraception.

15.    NIFLA's Vermont members offer free services, such as pregnancy tests, counseling and information concerning pregnancy options, and material support to new mothers.

16.    Some of NIFLA's Vermont members also provide medical services, such as ultrasounds or sonograms.

17.    The Vermont members of NIFLA that offer medical services, including limited obstetric ultrasounds, do so under the direction of a licensed Vermont physician serving as medical director of the facility.

18.    NIFLA's Vermont members advertise their services through handouts and brochures, newspaper or magazine ads, television commercials, social media, and other online ads.

19.    None of NIFLA's Vermont members condition their employees' compensation on the number of clients obtained through advertising.

20.    NIFLA asserts organizational standing on behalf of its Vermont members, whose ability to advertise and provide services, counseling, and information are impeded by SB 37. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

21.    These members have standing to sue in their own right.

22.    And the interests that NIFLA seeks to protect are germane to NIFLA's purposes, including supporting pro-life pregnancy center members and enabling

them to carry out their missions consistent with their pro-life and religious viewpoints.

23.    Neither the claims asserted nor the relief requested requires the participation of all of NIFLA's individual members in Vermont, but can be awarded to those NIFLA members as a group.

***Plaintiff Aspire Now***

24.    Plaintiff Aspire Together, Inc., d/b/a Aspire Now ("Aspire") is a faith-based not-for-profit corporation duly incorporated under the laws of Vermont.

25.    Aspire operates a pregnancy services center located at 5399 Williston Rd. Suite 207, Williston, VT 05495. It also operates a mobile unit that travels around Franklin, Chittenden, and Washington Counties.

26.    Aspire's primary purpose is to offer life-affirming alternatives to abortion and compassionate counsel to those who face unexpected pregnancy, abortion-related issues, or decisions concerning sexual relationships by educating and supporting them through the process of making informed choices.

27.    Aspire offers free services to pregnant women, including STD testing, pregnancy testing, ultrasounds, pregnancy options counseling, parenting classes, post-abortion support, sexual risk avoidance counseling, and healthy relationship coaching, along with material support, such as diapers, wipes, diaper bags, layettes, and gift cards.

28.    Aspire also provides financial assistance to clients who need help with rent, housing, or transportation.

29.    Aspire does not provide abortions or so-called "emergency contraception." Nor does it provide referrals to clients for abortions or "emergency contraception."

30.    Aspire currently advertises its services through television commercials and social media.

31.     In the past, it has also advertised its services through newspapers, magazines, and the University of Vermont student planner.

32.     Aspire also distributes handouts and brochures from both its pregnancy center and its mobile clinic.

33.     Aspire operates a website located at https://aspire-now.org/.

34.     That website includes a disclaimer that states: "We do not refer or perform any services that harm the viability of life."

35.     Aspire's website advertises "professional health care for women" and includes a link to schedule an appointment at its health center.

36.     The website also includes information about abortion generally, the abortion pill, at-home abortion, adoption, and parenting.

37.     Aspire does not condition its employees' compensation on the number of clients obtained through advertising.

38.     Licensed nurses provide all pregnancy tests, ultrasounds, and STD tests at Aspire.

39.     Aspire's Medical Director Dr. Jessica Whelan, a naturopathic physician licensed in Vermont, reviews all ultrasounds and meets with at-risk patients and patients who are interested in learning about natural family planning.

40.     Non-medical staff and volunteers provide peer counseling, support, and well-pregnancy and parenting education at Aspire.

41.     Aspire asserts standing on behalf of itself and on behalf of its staff and volunteers.

### *Plaintiff Branches Pregnancy Center, Inc.*

42.     Plaintiff Branches Pregnancy Resource Center ("Branches") is a faith-based not-for-profit corporation duly incorporated under the laws of Vermont and is located at 26 Birge Street, Brattleboro, VT 05301.

43.     Branches' primary purpose is to provide free, confidential, practical, emotional, educational, and spiritual support to women, men, and children who are facing pregnancy- and abortion-related concerns.

44.     Branches offers free services to pregnant women, including pregnancy tests, peer counseling, information about abortion procedures and risks, information about abortion alternatives, abstinence education, post-abortion support, parenting classes, free baby and maternity items, help for victims of human trafficking, and other related programs and services.

45.     Branches does not provide abortions or so called "emergency contraception." Nor does it provide referrals to clients for abortion or emergency contraception.

46.     Branches advertises its services through brochures, social media, and its website.

47.     Branches distributes brochures concerning its services, pregnancy generally, drug use and pregnancy, the morning-after pill, the abortion pill, healthy relationships, domestic violence, and human trafficking both at its center and around the community. Branches also distributes the "healthy relationships" brochure at a local high school and at local churches.

48.     Branches operates a website located at https://branchesprc.com/.

49.     That website includes a disclaimer that states: "Branches Pregnancy Resource Center does not offer or refer for pregnancy terminations or birth control. Information is provided as an educational service and should not be relied on as a substitute for professional and/or medical advice."

50.     Branches' website invites women experiencing an unexpected pregnancy to "[c]all us to empower yourself with knowledge and make your best decision," and includes a phone number that potential clients may call to make an appointment.

51.   The website also includes information concerning pregnancy, "emergency contraception," abortion, adoption, and parenting.

52.   Branches does not condition its employees' compensation on the number of clients obtained through advertising.

53.   Branches is not currently a medical clinic and does not provide medical services, including ultrasounds, sonograms, or prenatal care.

54.   Branches is in the process of becoming a medical clinic, but that transition will not happen until 2025.

55.   Branches has an ultrasound machine, but it does not currently use that machine, and it stores that machine in a room that is not accessible to its clients.

56.   Branches also has a closet in which it hopes to store medical supplies in the future, but that closet is currently empty.

57.   No one at Branches wears medical attire or uniforms, and Branches does not have examination tables.

58.   Nor does Branches share space with any medical provider or medical facility.

59.   However, Branches does offer over-the-counter urine pregnancy tests, which are facilitated by its non-medical staff and volunteers. When a client at Branches believes she may be pregnant, a staff member or volunteer will hand her a pregnancy test. The client will take the pregnancy test alone in the center's bathroom. When she finishes, the client reads the results of the test herself, and if the test is positive, a Branches staff member or volunteer will discuss her options with her.

60.   Branches' staff and volunteers also provide information to women concerning their pregnancy options and talk with and offer counsel to women about their decision.

61.   Branches collects pregnancy-related information from its clients, including the date of the client's last period, whether she has had previous

pregnancies and how many, whether she has had previous miscarriages and how many, and whether she has had previous abortions and how many. This information helps Branches' staff and volunteers to be more sensitive to their clients' needs by tailoring their counseling and other services to a client's particular situation.

62.     Branches asserts standing on behalf of itself and its staff and volunteers.

### Defendant Attorney General Clark

63.     Defendant Charity Clark is named in her official capacity as Attorney General of the State of Vermont.

64.     The Attorney General has the "authority to make rules, conduct civil investigations, and bring civil actions" with respect to violations of SB 37's Advertising Prohibition. 9 V.S.A. § 2493(c).

### Defendant Secretary of State Hanzas

65.     Defendant Sarah Copeland Hanzas is named in her official capacity as Secretary of State of the State of Vermont.

66.     The Secretary of State oversees the Office of Professional Regulation, which licenses naturopathic physicians and nurses. 3 V.S.A. § 122.

67.     The licensing boards and advisors contained within the Office of Professional Regulation have the power to enforce SB 37's Provider Restriction. *Id.* § 129a; 9 V.S.A. § 2493(b).

### Defendant Director of the Office of Professional Regulation Rushing

68.     Defendant Kevin Rushing is named in his official capacity as the Director of Vermont's Office of Professional Regulation.

69.     The Office of Professional Regulation licenses many Vermont professionals, including naturopathic physicians and nurses. 3 V.S.A. § 122.

70.    Director Rushing, along with the licensing boards and advisors contained within the Office of Professional Regulation, has the power to enforce SB 37's Provider Restriction. *Id.* § 129a; 9 V.S.A. § 2493(b).

### Defendant Commissioner of Health Levine

71.    Defendant Mark Levine is named in his official capacity as the Commissioner of Health of the State of Vermont.

72.    The Commissioner of Health oversees Vermont's Department of Health, 18 V.S.A. § 4, which has the power to "supervise and direct the execution of all laws relating to public health," *id.* § 1.

73.    The Department of Health houses Vermont's Board of Medical Practice, 26 V.S.A. § 1351(c), which has the power to enforce SB 37's Provider Restriction against medical doctors (M.D.s). 9 V.S.A. § 2493(b); 26 V.S.A. § 1354.

### Defendants Members of the Board of Medical Practice

74.    The individual members of Vermont's Board of Medical Practice are named in their official capacities: Richard Bernstein, Richard Clattenburg, David Coddaire, Gail Falk, Matthew Greenberg, Rick A. Hildenbrant, Patricia Hunter, Suzanne Jones, Leo LeCours, David Liebow, Stephanie Lorentz, Sarah McClain, Christine Payne, Marga Sproul, Margaret Tandoh, and Robert E. Tortolani.

75.    The Board of Medical practice licenses medical doctors (M.D.s), 26 V.S.A. § 1353, and has the power to enforce SB 37's Provider Restriction against medical doctors (M.D.s). 9 V.S.A. § 2493(b); 26 V.S.A. § 1354.

### Defendants Members of the State Board of Nursing

76.    The individual members of Vermont's State Board of Nursing are named in their official capacities: Jennifer Lyon, Daniel Coane, Matthew Choate, Ginger Gillette-Kent, Jennifer Laurent, Kelly Sinclair, Krystal Bernier, Luana Tredwell, William "Jamie" Floyd, and Deborah Belcher.

77.     The State Board of Nursing licenses nurses, 3 V.S.A. § 129, and has the power to enforce SB 37's provider restriction, *id.* § 129a; 9 V.S.A. § 2493(b).

### *Defendant Naturopathic Physician Advisor Bowers*

78.     Defendant Courtney Bowers is named in her official capacity as Vermont's Naturopathic Physician Advisor.

79.     The Naturopathic Physician Advisor has the power to assist the Director of the Office of Professional Regulation in investigating alleged violations of SB 37's Provider Restriction by naturopathic physicians. 3 V.S.A. §§ 129, 129a; 9 V.S.A. § 2493(b).

## FACTUAL BACKGROUND

### I.     Pregnancy Services Centers

80.     Thousands of pro-life pregnancy centers across the country provide free services, resources, information, and emotional and professional support to women and families facing unexpected pregnancies—no matter what choice they ultimately make.

81.     Many of these centers also provide medical services, such as ultrasounds or STD testing and treatment, as well as post-abortion healing and counseling and adoption services.

82.     Often pregnancy centers also provide training and support for fathers so that women will be supported by their partners and children by both parents.

83.     In 2019 alone, 2,700 U.S. pregnancy centers served roughly two million women, men, and youth with services valued at over $266 million.[1]

---

[1] Moira Gaul, *Fact Sheet: Pregnancy Centers – Serving Women and Saving Lives (2020 Study)*, Charlotte Lozier Institute (July 19, 2021), https://lozierinstitute.org/fact-sheet-pregnancy-centers-serving-women-and-saving-lives-2020/.

84.     Vermont is home to eight pro-life pregnancy centers, including Aspire and Branches. Seven of those centers are NIFLA members, including Aspire and Branches.

85.     In 2022, Vermont pro-life pregnancy centers served over 476 male and female clients, performed 176 ultrasounds, 183 pregnancy tests, 59 STD/STI tests, and 617 educational classes, saving the community over $395,770.00.[2]

86.     Unlike abortion clinics, which have a financial interest in performing as many abortions as possible, most pro-life pregnancy centers, including Aspire and Branches, charge nothing for their services, meaning that they do not financially benefit from any choice a woman makes.

87.     The medical journal *Contraception* published a study showing that pro-life pregnancy centers offer more efficient help at a lower cost than abortion facilities.[3] It found that pro-life pregnancy centers have shorter wait times and are more available for same-day care. It also states that abortion facilities almost always charge for pregnancy tests and ultrasounds—while pro-life centers almost always offer these services for free.

88.     For both Care Net and Heartbeat International (two pregnancy center associations representing about 2,100 centers), client exit surveys show a 99% satisfaction rate.[4]

89.     Aspire is an affiliate of both Care Net and Heartbeat International.

90.     Branches is an affiliate of Care Net.

---

[2] Pregnancy Center Coalition of Northern New England, 2022 Impact Report for Vermont.

[3] Kavita Vinekar, et al., *Early pregnancy confirmation availability at crisis pregnancy centers and abortion facilities in the United States*, 117 Contraception 30, 30–35 (2023), available at https://www.sciencedirect.com/science/article/abs/pii/S0010782422002451.

[4] *Supra* n.1.

91.     In the six months following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), which overturned *Roe v. Wade*, an estimated 32,000 additional babies have been saved from abortions, compared to the expected number had *Roe* not been overturned.[5]

92.     Consequently, the role of pro-life pregnancy centers has become *even more* important to support the mothers and families of these babies.

**II.     Senate Bill No. 37**

93.     On May 10, 2023, Governor Phil Scott signed Senate Bill No. 37 (attached as Exhibit A), "[a]n act relating to access to legally protected health care activity and regulation of health care providers," into law.

94.     Section 8 of SB 37 adds a subchapter to Title IX of the Vermont Statutes, which deals with commerce and trade, regulating "pregnancy services centers."

95.     The legislature stated in its subsection on findings and legislative intent in Section 8 of SB 37 that "[c]enters that seek to counsel clients against abortion . . . have become common across the country, including in Vermont" and that "[f]alse and misleading advertising by centers that do not offer or refer clients for abortion is of special concern to the State." 9 V.S.A. § 2491(a)(1), (3).

96.     The legislative findings further accuse pregnancy centers of "provid[ing] confusing and misleading information to pregnant individuals contemplating abortion by leading those individuals to believe that their facilities offer abortion services and unbiased counseling" and "promot[ing] patently false or biased medical claims about abortion, pregnancy, contraception, and reproductive health care providers." *Id.* § 2491(a)(2).

---

[5] Deidre McPhillips, *There were 32,000 fewer legal abortions in the US in the six months after the Dobbs decision, new analysis suggests*, CNN (April 11, 2023, 3:01 pm), https://www.cnn.com/2023/04/11/health/abortion-decline-post-roe/index.html.

97.    The state interest that Section 8 asserts is "ensur[ing] that the public is provided with accurate, factual information about the types of health care services that are available to pregnant individuals in [Vermont]." *Id.* § 2491(b)(1).

98.    "Pregnancy services center" is defined broadly to mean "a facility, including a mobile facility, where the primary purpose is to provide services to individuals who are or may be pregnant and that either offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant individuals or has the appearance of a medical facility." 9 V.S.A. § 2492(6).

99.    A facility "has the appearance of a medical facility if two or more of the following factors are present:" (1) "[t]he center offers pregnancy testing or pregnancy diagnosis, or both"; (2) "[t]he center has staff or volunteers who wear medical attire or uniforms"; (3) "[t]he center contains one or more examination tables"; (4) "[t]he center contains a private or semiprivate room or area containing medical supplies or medical instruments"; (5) "[t]he center has staff or volunteers who collect health information from clients"; or (6) "[t]he center is located on the same premises as a State-licensed medical facility or provider or shares facility space with a State-licensed medical provider." *Id.*

100.    While the definition of pregnancy center is broad, the operative regulations in Section 8 single out pro-life pregnancy care centers applying only to "limited-services pregnancy centers."

101.    A "limited-services pregnancy center" is defined as "a pregnancy services center that does not directly provide, or provide referrals to clients for, abortions or emergency contraception." *Id.* § 2492(5). Section 8 imposes two unlawful regulations on "limited-services pregnancy centers": (1) the Advertising Prohibition and (2) the Provider Restriction. 9 V.S.A. § 2493 ("the Unfair and Deceptive Act" or "the Act").

### A.    The Advertising Prohibition

102.    First, the Act prohibits "any limited-services pregnancy center" from "disseminat[ing] or caus[ing] to be disseminated to the public any advertising about the services or proposed services performed at that center that is untrue or clearly designed to mislead the public about the nature of services provided." *Id.* § 2493(a) ("the Advertising Prohibition").

103.    The Advertising Prohibition explicitly targets pro-life pregnancy centers by limiting its scope to cover "limited-services pregnancy center[s]," which are those pregnancy centers that do not provide or refer for abortion or "emergency contraception." 9 V.S.A. §§ 2492(5), 2493(a).

104.    "Advertising" is defined as "representations made directly to consumers; marketing practices; communication in any print medium, such as newspapers, magazines, mailers, or handouts; and any broadcast medium, such as television or radio, telephone marketing, or advertising over the Internet such as through websites and web ads." 9 V.S.A. § 2493(a).

105.    The Advertising Prohibition does not define "misleading." However, Section 8's legislative findings suggest that the legislature was concerned that some pregnancy centers may not "openly acknowledge in their advertising, on their websites, and at their facilities that they neither provide abortions nor refer clients to other providers of abortion services." *Id.* § 2491(a)(2). The legislative "findings" in the Act also state without evidence that "[s]ome limited-services pregnancy centers have promoted patently false or biased medical claims about abortion, pregnancy, contraception, and reproductive health care providers." *Id.*

106.    The Advertising Prohibition also provides that "advertising or the provision of services by a limited-services pregnancy center" as "an act in commerce" for purposes of Vermont law, even though Aspire, Branches, and the other NIFLA members in Vermont do not charge for their goods or services. 9 V.S.A. § 2493(a).

15

107.   The Advertising Prohibition is enforced by the attorney general, *id.* § 2493(c), who "may bring an action in the name of the State against" any person who "is . . . or is about to" violate the Advertising Prohibition "to restrain by temporary or permanent injunction" that violation "in the Superior Court" of the county in which [the violator] resides. *Id.* § 2458(a).

108.   The attorney general may also request a civil penalty of up to $10,000 for each violation, an order of restitution to consumers, and an order requiring reimbursement to the State for its expenses investigating and prosecuting the violation. *Id.* § 2458(b).

109.   Private consumers may also sue "for appropriate equitable relief" and may "recover from the . . . violator the amount of his or her damages, or the consideration or the value of the consideration given by the consumer, reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer." *Id.* § 2461(b).

110.   Aspire, Branches, and NIFLA's Vermont members are all limited-services pregnancy centers within the definition of SB 37 and thus subject to the Advertising Prohibition.

111.   The Advertising Prohibition provides no guidance as to how it should be applied to advertisements including medical information on which there is no medical consensus.

112.   The Advertising Prohibition is also unclear as to whether it requires a disclosure in all advertisements that the pregnancy center does not provide abortions or "emergency contraception."

113.   Requiring such a disclosure would compel the centers' speech.

114.   The Advertising Prohibition has chilled Plaintiffs' speech.

115.   For example, Aspire's medical director created a video about abortion pill reversal that Aspire would like to post on its website.

116.    Although abortion pill reversal—*i.e.*, reversing the effects of the first pill in a chemical abortion (mifepristone, a progesterone antagonist) through administration of progesterone—has ample scientific backing, it remains a controversial treatment opposed by abortion providers and abortion advocates.

117.    SB 37 elsewhere prohibits certain health care professionals from "[p]roviding or claiming to provide services or medications that are purported to reverse the effects of a medication abortion." 3 V.S.A. § 129a(a)(29). This suggests that the Advertising Prohibition's broad language might sweep in information about progesterone therapy for women who have taken mifepristone but now wish to continue their pregnancy.

118.    Aspire has not yet posted the video on its website due to fear that doing so may subject Aspire or its medical director to penalties under the Advertising Prohibition.

119.    Similarly, Branches used to distribute a contact card both at its center and to the public providing the phone number for the abortion pill reversal hotline (attached as Exhibit B).

120.    Branches has ceased distributing the abortion pill reversal contact card for fear that doing so may subject Branches to penalties under the Advertising Prohibition.

121.    Aside from chilling Plaintiffs' speech, the State has not explored other avenues, such as a public-information campaign, of advancing its supposed interests in the Advertising Prohibition of "ensur[ing] that the public is provide with accurate, factual information about the types of health care services that are available to pregnant individuals in this State." 9 V.S.A. § 2491(b)(1).

122.    In fact, Planned Parenthood of Northern New England's Vice President of Vermont Public Affairs, Ms. Lucy Leriche, encouraged the legislature not to include Section 8 of SB 37 during her testimony to the Senate Committee on Health

and Welfare for these very reasons. Ms. Leriche testified that "[w]hile we don't, we definitely don't, oppose this type of provision, we generally um, we generally advise that the benefit is relatively low and the risk of litigation is significant. We therefore encourage this committee to focus on alternative approaches to targeting Crisis Pregnancy Centers." *An Act Relating to Access to Legally Protected Health Care Activity and Regulation of Health Care Providers: Hearing on S.37 Before the S. Comm. on Health and Welfare* (Vt. 2023) (statement by witness Ms. Lucy Leriche). Ms. Leriche cautioned the legislature because Section 8 of SB 37 "align[ed]" with a Connecticut bill in which litigation ensued, based on concerns about free speech, free exercise, and other constitutional violations. *Id.* Ms. Leriche cautioned the legislature "to focus on alternative approaches" such as "a public awareness and education campaign." *Id.* Regardless, SB 37 was passed by the Vermont Legislature containing Section 8 and its "targeting" provisions. *Id.*

## B.     The Provider Restriction

123.     The Act also requires that "[h]ealth care providers certified, registered, or licensed under Title 26 of the Vermont Statutes Annotated who are employed by, contracted to provide services for or on behalf of, or volunteer to provide services at a limited-services pregnancy center shall be responsible for conducting and providing health care services, information, and counseling at the center." 9 V.S.A. § 2493(b) ("the Provider Restriction").

124.     It further provides that these licensed health care professionals must "conduct or [] ensure that health care services, information, and counseling at the limited-services pregnancy services center are conducted in accordance with State law and professional standards of practice." *Id.* In other words, if a violation of the Provider Restriction occurs, any licensed health care provider at the clinic could be professionally disciplined for that violation.

125.   A "health care provider" is "a person who provides professional health care services to an individual during that individual's medical care, treatment, or confinement." 26 V.S.A. § 1354(d)(2)(A).

126.   Health care providers licensed under Title 26 include, among others, medical doctors, nurses, physician assistants, osteopathic doctors, pharmacists, radiologists and radiology assistants, psychologists, clinical mental health counselors, marriage and family therapists, psychoanalysts, psychotherapists, naturopathic physicians, and midwives.

127.   The provider restriction does not define "health care services." However, the term is defined elsewhere in SB 37 as "services for the diagnosis, prevention, treatment, cure, or relief of a physical or mental health condition, including procedures, products, devices, and medications." 3 V.S.A. § 129a(f)(2)(B); 26 V.S.A. § 1354(d)(2)(B).

128.   The provider restriction defines "health information" as "any oral or written information in any form or medium that relates to . . . the past, present, or future physical or mental health or condition of a client." 9 V.S.A. § 2492(4).

129.   The provider restriction does not define "counseling" at all.

130.   Like the Advertising Prohibition, the provider restriction applies only to "limited-services pregnancy center[s]." 9 V.S.A. § 2493(b).

131.   The Board of Medical Practice, which is housed by the Department of Health, may investigate complaints against medical doctors (M.D.s) for violation of the provider restriction submitted by "[a]ny individual, organization, or public officer" or may "act on its own initiative without having received a complaint." 26 V.S.A. §§ 1353(2); 1370(a)(1).

132.   "If the investigative committee determines that an evidentiary hearing is warranted," the Board may enforce the provider restriction against a medical doctor (M.D.) by holding a disciplinary hearing. *Id.* §§ 1354(c), 1370(b)(3).

133.   If the State shows "by a preponderance of the evidence" that the doctor violated the provider restriction, *id.* § 1354(c), the Board may issue a formal reprimand; "condition, limit, suspend, or revoke" the doctor's license, or "impos[e] an administrative penalty of not more than $1,000" per violation, *id.* § 1374(b)(1)(A).

134.   The Office of Professional Regulation, which is housed by the Secretary of State, is responsible for enforcing the provider restriction against all other licensed health care providers. 3 V.S.A. § 129a.

135.   The Director of the Office of Professional Regulation or a board within the Office of Professional Regulation "shall receive complaints from any source" concerning violations of the provider restriction or "may investigate without receiving a complaint." *Id.* § 129(b).

136.   Christel Tonoki, a University of Vermont student, testified to the Senate Committee on Health and Welfare that she along with other students "excitedly" planned to "storm these [crisis pregnancy centers] . . . and kinda just drain them of their resources . . . and basically play their game... and take part [air quotes] in their services." *An Act Relating to Access to Legally Protected Health Care Activity and Regulation of Health Care Providers: Hearing on S.37 Before the S. Comm. on Health and Welfare* (Vt. 2023) (statement by witness Christel Tonoki).

137.   "Boards and administrative law officers" falling under the Office of Professional Regulation may hold a disciplinary hearing on alleged violations of the provider restriction. 3 V.S.A. § 129(c).

138.   If the State shows "by a preponderance of the evidence" that the health care provider violated the provider restriction, the board or administrative law officer may "impos[e] an administrative penalty not to exceed $5,000.00 for each professional conduct violation." *Id.* § 129a(c), (d)(1).

139.   The board or administrative law officer may also "issue warnings or reprimands, suspend, revoke, limit, condition, deny, or prevent renewal of licenses." *Id.* § 129(a)(3).

140.   It is unclear whether drug-store pregnancy tests, like those provided by Branches, fit into the Provider Restriction's definition of "health care services."

141.   It is also unclear whether "health care services" would include the collection of information from clients about the date of their last menstrual period, their sexual history, or their pregnancy symptoms.

142.   It is unclear whether "healthcare information" is broad enough to include *all* information about pregnancy, abortion, and childbirth, regardless of whether that information is medical.

143.   It is likewise unclear whether "health care services" would include a woman who visits Branches and obtains a free pregnancy test from staff to take and read the results alone in the bathroom to even confirm whether she is indeed pregnant.

144.   It is unclear whether "counseling" is meant to apply narrowly to informed consent or mental health counseling or broadly to any person at a pregnancy center who might talk with a woman about whether to have an abortion, or counsel her concerning pregnancy, pregnancy prevention, parenting, or childbirth.

145.   It is also unclear whether pregnancy, motherhood, or post-abortion support groups might qualify as services or counseling under the provider restriction.

146.   Under the provider restriction, if a pregnancy center staff member who is not a licensed healthcare provider so much as discusses a client's pregnancy (a health condition) with her, the unlicensed provider has arguably violated the law.

147.   It also arguably prohibits unlicensed providers from providing a client with a printed list of possible complications of chemical abortion (written information related to pregnancy).

148.    The provider restriction harms pregnancy centers by preventing their non-medical staff and volunteers from providing clients with information about their pregnancy options and counseling clients about those options.

149.    It also harms pregnancy centers by prohibiting peer counseling.

150.    The same standard does not apply to abortion clinics. Planned Parenthood of Northern New England's Vice President of Vermont Public Affairs, Ms. Lucy Leriche, testified that even Planned Parenthood staff that provide ultrasounds need only be "privileged" by their local Planned Parenthood. *An Act Relating to Access to Legally Protected Health Care Activity and Regulation of Health Care Providers: Hearing on S.37 Before the H. Comm. on Health Care* (Vt. 2023) (statement by witness Ms. Lucy Leriche).  In other words, these staff members need not be licensed medical providers.  *Id.*

151.    The provider restriction also prevents non-medical pregnancy centers, like Branches, from providing clients with information or counseling about pregnancy options without hiring medical staff.

152.    In practice, this means that all pregnancy centers—including those who, like Branches, do not provide medical services—will need to hire licensed health care providers to provide information and counseling on any aspect of pregnancy, childbirth, abortion, or other health issue clients wish to discuss.

153.    Under the Provider Restriction, Branches' non-medical staff and volunteers will be unable to continue counseling clients concerning their pregnancy-related concerns and decisions, or else be subject to penalties for violating the Provider Restriction. *See* 3 V.S.A. § 127 (providing that "[a] person practicing a regulated profession without authority or an employer permitting such practice may, upon the complaint of the Attorney General or a State's Attorney or an attorney assigned by the Office of Professional Regulation, be enjoined therefrom by the Superior Court . . . and may be assessed a civil penalty of not more than $5,000," or

22

"imprison[ed] for not more than one year, or both"); 26 V.S.A. § 1353(7) (giving the Board of Medical Practice the power to "[i]nvestigate all complaints of illegal practice of medicine and refer any substantiated" complaints to the attorney general).

## COUNT I

### The Advertising Prohibition Violates the Free Speech Clause of the First Amendment to the U.S. Constitution

154.    Plaintiffs incorporate by reference paragraphs 1 through 151.

155.    The Free Speech Clause of the First Amendment prohibits States from making any law "abridging the freedom of speech." U.S. Const. amend. I.

156.    Because Plaintiffs do not charge for their services, the Advertising Prohibition, 9 V.S.A. § 2493(a), regulates Plaintiffs' non-commercial speech.

157.    Because the Advertising Prohibition applies only to limited-services pregnancy centers, or those that do not provide or refer for abortion or "emergency contraception," it constitutes impermissible viewpoint discrimination.

158.    The Advertising Prohibition regulates the Plaintiffs' speech on the basis of its content.

159.    Content-based restrictions on speech can stand only if they survive strict scrutiny, which requires the State to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.

160.    The Advertising Prohibition is also unconstitutionally overbroad.

161.    The Advertising Prohibition does not advance any legitimate, much less compelling, state interest and fails any level of constitutional scrutiny.

162.    The Advertising Prohibition does not advance the State's interests in protecting maternal health and safety or in preserving the integrity of the medical profession.

163.    Nor is the Advertising Prohibition the least restrictive means of advancing the State's interests.

164.    The Advertising Prohibition is not narrowly tailored because it is both overinclusive and underinclusive.

165.    Therefore, the Advertising Prohibition violates the Free Speech Clause of the First Amendment both on its face and as applied to Plaintiffs.

## COUNT II

### The Provider Restriction Violates the Free Speech
### Clause of the First Amendment to the U.S. Constitution

166.    Plaintiffs incorporate by reference paragraphs 1 through 151.

167.    The Free Speech Clause of the First Amendment prohibits States from making any law "abridging the freedom of speech." U.S. Const. amend. I.

168.    Because Plaintiffs do not charge for their services, the Provider Restriction, 9 V.S.A. § 2493(b), regulates Plaintiffs' non-commercial speech.

169.    The Provider Restriction is a viewpoint- and content-based regulation of pure speech because it directly regulates speech about health-care-related "information" and "counseling" by "limited-services pregnancy centers," even when no medical treatment or procedure is involved. 9 V.S.A. § 2493(b).

170.    Because the Provider Restriction is not tied to a specific medical procedure or treatment that Plaintiffs perform, it is not an informed-consent requirement.

171.    The Provider Restriction is also unconstitutionally overbroad.

172.    Because "information" and "counseling" are pure speech, strict scrutiny applies.

173.    The Provider Restriction does not advance any legitimate, let alone compelling, state interest and fails any level of constitutional scrutiny.

174.    The Provider restriction is not narrowly tailored because it is both overinclusive and underinclusive.

24

175.   Therefore, the Provider Restriction violates the Free Speech Clause of the First Amendment both on its face and as applied to Plaintiffs.

## COUNT III

### The Advertising Prohibition Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution

176.   Plaintiffs reincorporate by reference paragraphs 1 through 151.

177.   The Fourteenth Amendment's Due Process Clause prohibits States from enacting vague laws.

178.   A statute is unconstitutionally vague in violation of the Due Process Clause if it (1) fails to provide a person of ordinary intelligence with fair notice of what is prohibited, or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement.

179.   The Advertising Prohibition, 9 V.S.A. § 2493(a), is unconstitutionally vague because it fails to define relevant terms, fails to provide Plaintiffs with fair notice of what is prohibited, and encourages discriminatory enforcement against pro-life viewpoints.

180.   The terms "cause to be disseminated," "proposed services," and "mislead" are unconstitutionally vague.

181.   Therefore, the Advertising Prohibition violates the Due Process Clause of the Fourteenth Amendment both on its face and as applied to Plaintiffs.

## COUNT IV

### The Provider Restriction Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution

182.   Plaintiffs reincorporate by reference paragraphs 1 through 151.

183.   The Fourteenth Amendment's Due Process Clause prohibits States from enacting vague laws.

184.   A statute is unconstitutionally vague in violation of the Due Process Clause if it (1) fails to provide a person of ordinary intelligence with fair notice of what is prohibited, or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement.

185.   The provider restriction, 9 V.S.A. § 2493, is unconstitutionally vague because it fails to define relevant terms, fails to provide Plaintiffs with fair notice of what is prohibited, and encourages discriminatory enforcement against pro-life viewpoints.

186.   The terms "health care services," "information," and "counseling" are unconstitutionally vague.

187.   Therefore, the provider restriction violates the Due Process Clause of the Fourteenth Amendment both on its face and as applied to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.   Accept jurisdiction in this case;

B.   Enter a declaratory judgment adjudging and declaring that 9 V.S.A. section 2493 violates the First and Fourteenth Amendments to the U.S. Constitution;

C.   Enter an injunction permanently enjoining Defendants and their agents from enforcing 9 V.S.A. section 2493 and 3 V.S.A. section 129a(a)(29).

D.   Issue the requested injunctive relief without condition of bond or other security being required of Plaintiffs;

E.   Award Plaintiffs attorney fees and costs against the Defendants pursuant to 42 U.S.C. section 1988; and

F.   Award such other and further relief as it deems equitable and just.

This 24th day of July, 2023.

_s/_ Michael Tierney
Michael Tierney
VT Bar No. 5275
Gretchen M. Wade*
NH Bar No. 273726
WADLEIGH, STAR & PETERS, P.L.L.C.
95 Market Street
Manchester, NH 03101
Telephone: (603) 669-4140
Facsimile: (603) 669-6018
mtierney@wadleighlaw.com
gwade@wadleighlaw.com

Denise M. Harle*
GA Bar No. 176758
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd, NE, Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
Facsimile: (770) 339-6744
dharle@ADFlegal.org

Julia C. Payne*
IN Bar No. 34728-53
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jpayne@ADFlegal.org

_Counsel for Plaintiffs_

*Motion for pro hac vice admission
   filed concurrently