UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; ASPIRE TOGETHER INC.; and BRANCHES PREGNANCY RESOURCE CENTER, INC., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   Civil No. 2:23-CV-00229-wks ) |
| CHARITY CLARK, in her official capacity as Attorney General of the State of Vermont; SARAH COPLAND HANZAS, in her official capacity as Secretary of the State of Vermont; KEVIN RUSHING, in his official capacity as Director of the Office of Professional Regulation; MARK LEVINE, in his official capacity as the Commissioner of Health of the State of Vermont; THE INDIVIDUAL MEMBERS OF THE VERMONT BOARD OF MEDICAL PRACTICE, in their official Capacities; THE INDIVIDUAL MEMBERS OF THE VERMONT BOARD OF NURSING, in their official capacities; and, COURTNEY BOWERS, in her official capacity as Naturopathic Physician Advisor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

Defendants hereby move to dismiss all claims against them with prejudice pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In support, Defendants submit the

following memorandum of law.

## **MEMORANDUM OF LAW**

Limited-services pregnancy centers, also known as crisis pregnancy centers, provide some services to pregnant people—such as pregnancy tests or ultrasounds—but do not provide or refer for abortion, generally out of ideological opposition to abortion. Some of these centers engage in false or deceptive advertising about their services. Some of these centers provide false or misleading information about abortion and other health care to their clients. Because these centers usually provide their services for free, they are not subject to Vermont's Consumer Protection Act, which prohibits most false and deceptive advertising. And because these centers rely on unlicensed volunteers and staff to provide many services, they are not subject to the standards that licensed health care professionals would be subject to in providing those services.

Recognizing the hazards these practices may pose to pregnant people and other consumers, the Vermont Legislature passed Act 15 in 2023. Doc. 1-1. As relevant here, the Act prohibits false and deceptive advertising by limited-services pregnancy centers about the services performed at that center (the "advertising provision"). The Act also states that, if a licensed health care professional works or volunteers at a limited-services pregnancy center, that professional must ensure that the services provided at the center comport with State law and their professional standards of practice (the "provider regulation").

Plaintiffs, two limited-services pregnancy centers and their member association, brought pre-enforcement claims arguing that the advertising provision and the provider regulation violate their First Amendment rights to free speech and are void for vagueness under the Due Process Clause. But Plaintiffs lack standing to challenge the advertising provision because they have not alleged that they would like to make any advertisements about the services performed at their centers, let alone false or deceptive advertisements. And they lack standing to challenge the

provider regulation because they have not alleged that their unlicensed staff do anything that would violate any laws or any health care professional's standard of practice.

In any event, Plaintiffs' First Amendment challenges fail. The advertising provision prohibits only false and misleading commercial speech, which the First Amendment does not protect. And the provider regulation is a valid regulation of professional conduct with only incidental effects on speech. The two provisions are also not overbroad because most of their applications fall into these plainly legitimate arenas. The provisions are content-neutral because their purpose is to protect consumers, not to suppress speech, and the provider regulation additionally serves to safeguard the legitimacy of the health care professions. And the provisions survive any level of scrutiny because the State's interest in protecting these consumers and these professions is compelling and the provisions are narrowly tailored to address the identified risks. Finally, the provisions are not unconstitutionally vague because, read as a whole, it is clear what conduct is prohibited and they are not susceptible to arbitrary enforcement.

## BACKGROUND

The advertising provision states:

> It is an unfair and deceptive act and practice in commerce and a violation of [the Consumer Protection Act] for any limited-services pregnancy center to disseminate or cause to be disseminated to the public any advertising about the services or proposed services performed at that center that is untrue or clearly designed to mislead the public about the nature of services provided.

Vt. Stat. Ann. tit. 9, § 2493(a). It also defines: "For purposes of this chapter, advertising or the provision of services by a limited-services pregnancy center is an act in commerce." *Id.*

Plaintiffs Aspire and Branches claim that their speech has been chilled by this provision because they would like to post or distribute information about so-called abortion pill reversal, but they are unsure if they are allowed to do so under the advertising provision. Compl. ¶¶ 115,

118-20. Neither center alleges that it provides abortion pill reversal, which they acknowledge is prohibited as unprofessional conduct for most licensed health care providers in Vermont. *Id.* ¶ 117 (citing Vt. Stat. Ann. tit. 3, § 129a(a)(29)). Both Aspire and Branches have some form of disclaimer on their websites stating that they do not perform or refer for abortions. *Id.* ¶¶ 34, 49.

> The provider regulation states:

> Health care providers certified, registered, or licensed under Title 26 of the Vermont Statutes Annotated who are employed by, contracted to provide services for or on behalf of, or volunteer to provide services at a limited-services pregnancy center shall be responsible for conducting and providing health care services, information, and counseling at the center. The failure of a health care professional certified, registered, or licensed under Title 26 of the Vermont Statutes Annotated to conduct or to ensure that health care services, information, and counseling at the limited-services pregnancy services center are conducted in accordance with State law and professional standards of practice may constitute unprofessional conduct under 3 V.S.A. § 129a and 26 V.S.A. § 1354.

Vt. Stat. Ann. tit. 9, § 2493(b). Plaintiffs appear to read this provision to state that only licensed providers may provide health care services, information, or counseling at their centers. Compl. ¶¶ 146-53. Branches may not currently have any licensed providers. *Id.* ¶¶ 151-53.

## ARGUMENT

### I.  Motion to dismiss standard

To survive a motion to dismiss under Rule 12(b)(1), a complaint must "allege[] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quotation omitted). Plaintiffs have the burden of proving subject-matter jurisdiction exists, and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation omitted). "In reviewing subject matter jurisdiction, the Court may look to matters beyond the pleadings." *Lakhani v. U.S. Citizenship & Immigration Servs.*, No. 2:12-CV-95, 2013 WL 3829624, at *2 (D. Vt. July 23, 2013).

Under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all factual assertions as true and draw all reasonable inferences in favor of Plaintiffs in assessing the adequacy of the complaint under Rule 12(b)(6). *See Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 128 (2d Cir. 2011). However, this presumption of truth "is inapplicable to legal conclusions," and the Court should not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## II.    Plaintiffs lack standing because the Act does not prohibit their desired speech.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An injury must be "'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Id.* at 158 (quoting *Lujan*, 504 U.S. at 560). For a facial challenge, a plaintiff "satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 159 (quotation omitted). The prudential standing requirement barring a party from asserting the rights of third parties is relaxed for First Amendment facial challenges alleging that a statute is unconstitutionally overbroad. *See Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006).

But the overbreadth doctrine does not excuse a plaintiff from showing an injury in fact. *United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019); *see also Virginia v. Am. Booksellers Assn.*, 484 U.S. 383, 392 (1988) (plaintiff must "establish at an irreducible minimum an injury in fact" in an overbreadth challenge). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). To have standing for a First Amendment challenge, then, a party's activity must come "within the ambit of the specific rule of law that she challenges." *Smith*, 945 F.3d at 737. If the law does not speak to a plaintiff's conduct, that plaintiff cannot show injury because they have no credible threat of prosecution. *Hedges v. Obama*, 724 F.3d 170, 193 (2d Cir. 2013).

Plaintiffs here have not alleged conduct prohibited by Vermont law. Plaintiffs challenge two parts of the statute: the "advertising provision," Vt. Stat. Ann. tit. 9, § 2493(a), and the "provider regulation," § 2493(b). Plaintiffs have not demonstrated standing for either challenge.

**A. Plaintiffs do not have standing to challenge the advertising provision.**

The advertising provision prohibits a limited-services pregnancy center from distributing "advertising about the services or proposed services *performed at that center* that is untrue or clearly designed to mislead the public *about the nature of services provided*." *Id.* § 2493(a) (emphasis added).

Plaintiffs have alleged two specific advertisements that they claim have been chilled by the advertising provision. Plaintiff Aspire alleges its "medical director created a video about abortion pill reversal that Aspire would like to post on its website" but has not done so for fear of prosecution. Compl. ¶¶ 115, 118. And Plaintiff Branches alleges it "used to distribute a contact card . . . providing the phone number for the abortion pill reversal hotline" but stopped doing so

for fear of prosecution. *Id.* ¶¶ 119-20. Neither Plaintiff claims that it directly provides so-called abortion pill reversal, or that the information it would like to disseminate is designed to mislead the public about whether it provides abortion pill reversal or any other service. Plaintiffs correctly note that Vermont defines unprofessional conduct for multiple health professions to include "[p]roviding or claiming to provide services or medications that are purported to reverse the effects of a medication abortion." Vt. Stat. Ann. tit. 3, § 129a(a)(29). But Plaintiffs do not challenge this definition of unprofessional conduct. Plaintiffs opt instead to assert their ability to discuss a procedure they presumably do not provide. Nothing in Vermont law prevents Plaintiffs from distributing information about services provided elsewhere, so long as they do not falsely claim to provide that service themselves.[1]

Plaintiffs also claim confusion about whether every advertisement "requires a disclosure . . . that the pregnancy center does not provide abortions or 'emergency contraception.'" Compl. ¶ 112. This fear, too, should be dispelled by the plain text of the statute. The advertising provision does not impose any affirmative, blanket disclosure requirements. All it requires is that advertising not be "untrue or clearly designed to mislead the public" about the actual services available at a center. Vt. Stat. Ann. tit. 9, § 2493(a).

Plaintiffs have not alleged that they would like to disseminate false or deliberately misleading advertisements about their own services. Plaintiffs lack standing to challenge the advertising provision.

---

[1] The safety and efficacy of abortion pill reversal is being litigated elsewhere, under other consumer protection statutes. *See* Complaint, *California v. Heartbeat International* (Ca. Super Ct. Sept. 21, 2023), available at https://oag.ca.gov/system/files/attachments/press-docs/FINAL%20-%20Complaint%20-%20Ppl%20v%20Heartbeat%20Intl%2C%20et%20al%20%28APR%29.pdf

**B. Plaintiffs do not have standing to challenge the provider regulation.**

The provider regulation states that licensed health care providers regulated by Vermont's Title 26 who work or volunteer for a limited-services pregnancy center "shall be responsible for conducting and providing health care services, information, and counseling at the center." Vt. Stat. Ann. tit. 9, § 2493(b). Such a health care provider may commit unprofessional conduct, with licensing consequences, where they fail "to conduct or to ensure that health care services, information, and counseling at the limited-services pregnancy services center are conducted in accordance with State law and professional standards of practice[.]" *Id.* The provider regulation does not regulate centers with no licensed health care provider volunteers or staff. The provider regulation also does not say that health care services may only be provided by licensed health care providers personally, without delegation. Instead, it says that any licensed health care provider working or volunteering for a center is considered responsible for health care services provided at that center and may incur licensing consequences if those services are illegal or in violation of standards of professional conduct.

Plaintiffs vastly overread the provider regulation. Plaintiffs seem to claim that the provider regulation requires that health care services at all limited-services pregnancy centers *only* be provided directly by a licensed provider. *See* Compl. ¶¶ 146-49, 151-53. Not so.

The provider regulation simply requires that, if a licensed medical provider works or volunteers at a clinic, they will be "responsible for" the provision of health care services at that center. "Responsible" has the plain meaning of "liable to be called on to answer," or "liable to legal review or in case of fault to penalties." *Responsible*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/responsible (last accessed Sept. 17, 2023). The legal definition of "responsible" is similar. The first definition in Black's Law Dictionary

7

includes "[m]orally or legally answerable for the discharge of a duty[.]" *Responsible*, Black's
Law Dictionary (11th ed. 2019). These definitions do not imply that the party "responsible for" a
certain outcome may not delegate or oversee other people in producing that outcome. Indeed,
one party being "responsible for" another's actions is a common use of the phrase. *See id.*;
*accord* Vt. Stat. Ann. tit. 18, § 1852 (requiring that every hospital patient "have an attending
physician who is responsible for coordinating a patient's care"); Vt. Stat. Ann. tit. 3,
§ 129a(a)(21) (prohibiting most licensed professionals from "[p]ermitting one's name or license
to be used by a person, group, or corporation when not actually in charge of or responsible for
the professional services provided"); Vt. Stat. Ann. tit. 26, § 1354(a)(21) (same, for physicians).

The provider regulation, read correctly, requires that any licensed health care provider
working or volunteering at a limited-services pregnancy center ensure that health care services at
the center, provided by anyone, follow State law and professional standards of practice.

Plaintiffs have not alleged that they, or any of their staff or volunteers, intend to violate
State law or professional standards of practice in providing health care services, information, or
counseling. Plaintiffs have alleged, under their erroneous reading of the provider regulation, that
many activities would "violate" the provider regulation which do not, in fact, violate the provider
regulation. For example, Plaintiffs allege that "if a pregnancy center staff member who is not a
licensed healthcare provider so much as discusses a client's pregnancy (a health condition) with
her, the unlicensed provider has arguably violated the law." Compl. ¶ 146. Not so. First, the
provider regulation only applies if there is a licensed provider working or volunteering at the
same center. And second, where the provider regulation does apply, an unlicensed provider can
continue to provide the services and counseling that Plaintiffs allege they already do—so long as
they stay within the licensed provider's rules of professional conduct. Providing over-the-counter

pregnancy tests and discussing a client's pregnancy, without more, do not violate any rules of professional conduct.

Plaintiffs have not alleged an injury under the provider regulation. Plaintiffs therefore lack standing to challenge the provider regulation.

**III.    The advertising provision prohibits only false and misleading commercial speech, which is not protected by the First Amendment.**

Even if Plaintiffs had alleged their intent to violate the advertising provision, their false or misleading advertisements would not be protected by the First Amendment. "[W]hile commercial speech is generally subject to intermediate scrutiny, the Constitution affords no protection to false or misleading commercial speech." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1271 (9th Cir. 2017) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980)).

The "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort*, 860 F.3d at 1272 (quotations omitted). Three characteristics combined "provide[] strong support" for the conclusion that speech is commercial: (1) the speech is an advertisement, (2) the speech refers to a specific product, and (3) the speaker has an economic motivation for making the speech. *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983). An "economic motivation" is not limited "to circumstances where clients pay for services." *First Resort*, 860 F.3d at 1273. It can include, for example, "the solicitation of a non-paying client base" which impacts the organization's "ability to fundraise and, in turn, to buy more advertisements." *Id.* And even without an economic motivation, courts have found commercial speech where "advertisements are placed in a commercial context and are directed at the providing of services

rather than toward an exchange of ideas." *Id.* (quoting *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176, 181 (N.D. 1986)).

The advertising provision at issue here restricts only commercial speech. First, the statute "identifies that the object of its regulation is 'advertising.'" *First Resort*, 860 F.3d at 1272. Second, the statute regulates only advertising "about the services or proposed services performed at" a limited-services pregnancy center, thus referring to a specific product. Vt. Stat. Ann. tit. 9, § 2493; *see Am. Academy of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (finding that "medical services" constitute "a specific product" under *Bolger* test). And third, the statute only "regulates advertising designed to attract a patient base in a competitive marketplace for commercially valuable services[.]" *First Resort*, 860 F.3d at 1274. Plaintiffs acknowledge that they provide commercially valuable services. Compl. ¶¶ 27, 44, 83, 85. And they acknowledge that they compete for clients with clinics that provide abortions. *Id.* ¶¶ 26, 43, 87, 91-92. The Vermont Legislature further confirmed: "For purposes of this chapter, advertising or the provision of services by a limited-services pregnancy center is an act in commerce." Vt. Stat. Ann. tit. 9, § 2493(a).

The advertising provision, by its plain terms, only prohibits advertising "that is untrue or clearly designed to mislead the public about the nature of services provided" at a limited-services pregnancy center. *Id.* It thus only prohibits false or misleading commercial speech.

Because the advertising provision only prohibits false or misleading commercial speech, it prohibits only speech that is not protected by the First Amendment. *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 108 (2d Cir. 2000) (quoting *Cent. Hudson*, 447 U.S. at 566). Plaintiffs' First Amendment challenge to the advertising provision must be dismissed.

**IV.     The provider regulation is a valid professional conduct regulation that only incidentally burdens speech.**

The State "bears a special responsibility for maintaining standards among members of the licensed professions" and "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 460 (1978). The First Amendment therefore does not prevent "regulations of professional conduct that incidentally burden speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2373 (2018) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). "While drawing the line between speech and conduct can be difficult," the Supreme Court has long done so. *Id.* Examples include "cases about malpractice, anticompetitive agreements, client solicitation, and informed consent." *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (citing *NIFLA*, 138 S. Ct. at 2372-73). Professional conduct regulations that incidentally burden speech receive intermediate scrutiny or less. *Id.* at 208-09; *see also Gray v. Dep't of Pub. Safety*, 2021 ME 19, ¶¶ 26-28, 248 A.3d 212.

A licensing scheme for dieticians and nutritionists qualifies as only incidentally burdening speech where it regulates only "occupational conduct," or "what a dietician or nutritionist does as part of her professional services[,]" even if those professional services involve some speech. *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022). Likewise, licensing standards for investigators that require "good character and competency in investigating matters, do not on their face prohibit or constrain speech" and therefore have only an incidental effect on speech. *Gray*, 2021 ME 19, ¶ 28.

A state licensing regulation "that restricts the practice of law to bar members and entities owned by bar members" is another such professional conduct regulation that incidentally burdens speech. *Cap. Associated Indus.*, 922 F.3d at 207. A trade association, owned by

11

nonlawyers, challenged this regulation because it wanted to provide legal advice to its members. The Fourth Circuit found that the regulation passed intermediate scrutiny. The state's "interest in regulating the legal profession to protect clients is at least substantial[,]" if not "even stronger[.]" *Id.* at 209. And allowing nonlawyers to supervise lawyers "could compromise professional judgment and generate conflicts between client interests and the corporation's interests." *Id.*; *accord Gray*, 2021 ME 19, ¶ 35 (government rationale that "goes to the heart of professional responsibility concerns and does not chill any speech other than that which would . . . violate [professional] standards of conduct" passes intermediate scrutiny).

The provider regulation here only incidentally burdens speech because it does not prohibit speech on its face and only regulates occupational conduct. Specifically, the provider regulation requires that a licensed health care provider working or volunteering to provide services at a limited-services pregnancy center ensure that services at that center comport with legal and professional standards. Vt. Stat. Ann. tit. 9, § 2493(b).

The provider regulation also passes intermediate scrutiny. The regulation protects the public by ensuring that health care professionals take care not to practice in settings where others are violating laws or professional standards. The regulation is targeted to impact only conduct or speech that would violate the law or the professional standards of health care providers, thereby "maintaining standards among members of the licensed professions." *Ohralik*, 436 U.S. at 456.

V.   **The Act is not substantially overbroad in relation to its plainly legitimate sweep.**

"[P]articularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. A substantially overbroad law violates the First Amendment because "the threat of enforcement of an overbroad law deters people from

engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects" *United States v. Williams*, 553 U.S. 285, 292 (2008). Thus, the Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*[.]" *Id.* "The overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quoting *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)).

"The first step in overbreadth analysis is to construe the challenged statute[.]" *Williams*, 553 U.S. at 293. Then the Court can determine if the properly construed statute presents "a lopsided ratio" of realistic lawful to unlawful applications. *United States v. Hansen*, 143 S. Ct. 1932, 1940 (2023). If not, "courts must handle unconstitutional applications as they usually do—case-by-case." *Id.*

As explained above in Part III, the properly construed advertising provision only prohibits false or misleading commercial speech. But even if the Court finds the statute reaches beyond false or misleading commercial speech, Plaintiffs have not alleged that it does so substantially overbroadly, because the vast majority of the advertising provision's applications are to false or misleading commercial speech.

Likewise, as described above in Part IV, the properly construed provider regulation only incidentally burdens speech in a way that is targeted to the State's interest in protecting the public by ensuring the integrity of health care professions and the informed decision making of their clients. To the extent that the provider regulation reaches beyond that legitimate application, Plaintiffs have not alleged that it does so substantially overbroadly.

13

**VI.     The Act does not constitute unlawful content or viewpoint discrimination.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination is "an egregious form of content discrimination" occurring only where "the government targets not subject matter [content], but particular views taken by speakers on a subject[.]" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination is also subject to strict scrutiny. *Turner Broad. Sys. Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994).

"The principal inquiry in determining whether a regulation is content-based or content-neutral 'is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys.'" *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (quoting *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 155 (2d Cir. 2013)). "[T]ypically, government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech." *Id.* (quotation omitted). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (quotation omitted).

The Supreme Court has repeatedly held that regulations are content neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464 (2014) (finding statute establishing buffer zones only at abortion clinics content neutral because violation of statute depended not "on what they say," but "simply on where they say it," and purpose of statute was public safety); *Renton v. Playtime Theatres*, 475 U.S. 41, 47-48 (1986) (zoning ordinance that applied only to theaters showing

sexually explicit material content neutral because not aimed at suppressing erotic speech but instead at crime and lowered property values that typically accompany such theaters).

A content-neutral regulation with incidental burdens on speech must satisfy intermediate scrutiny. *Id.* at 88. It does so "if it (1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Id.* (quotations omitted).

The advertising provision is content neutral. Whether the advertising provision "applies depends on the services offered, not on the particular views espoused or held by a clinic." *First Resort*, 860 F.3d at 1277. And the advertising provision regulates "false or misleading speech, irrespective of . . . viewpoint[]." *Id.* at 1277-78. Any false advertising about services provided at a center is restricted, regardless of what falsehood is espoused. Thus, the advertising provision "merely seeks to prevent [limited-services pregnancy centers] from harming women through false or misleading speech about their services and in no way restricts those entities from expressing their views about abortion to the public or their clients." *Id.* at 1278.

The provider regulation is also content neutral. It applies depending on the presence of licensed health care professionals working at a center, not on specific views held or communicated. It regulates only conduct and speech prohibited by other laws or professional conduct codes, again regardless of viewpoint. And Plaintiffs have not challenged any provision of law or professional conduct code incorporated by the provider regulation.

The Act is content neutral and must only satisfy intermediate scrutiny. However, the Act passes not just intermediate scrutiny, but also strict scrutiny, for the reasons explained below.

VII.     **The Act survives any level of scrutiny.**

Laws subject to strict scrutiny, including content-based laws, may be upheld if they are "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Whether a regulation is narrowly tailored turns on "the scope of its application relative to the government objectives being pursued." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 102 (2d Cir. 2006). For the reasons explained above, the Act does not rise to the level of strict scrutiny. Even if strict scrutiny is implicated, however, the Act is narrowly tailored to serve compelling state interests.

Both the advertising provision and provider regulation fall within the Vermont Consumer Protection Act. The Consumer Protection Act "protect[s] this state's citizens from unfair and deceptive business practices and . . . encourage[s] a commercial environment highlighted by integrity and fairness." *Gramatan Home Invs. Corp. v. Starling*, 470 A.2d 1157, 1162 (Vt. 1983); *see* Vt. Stat. Ann. tit. 9, § 2453. "The purpose of [the Act] is to protect the public and [the Act] is remedial in nature." *Fancher v. Benson*, 580 A.2d 51, 53 (Vt. 1990); *see also* Vt. Stat. Ann. tit. 9, § 2451.

It is within this consumer-protection framework that Vermont situated the advertising provision and the provider regulation, both of which are narrowly tailored to serve a compelling state interest. Specifically, the State has a compelling interest in ensuring that (1) consumers are protected against unfair and deceptive business practices, including false advertising, and (2) where a licensed provider is involved, patients can trust that health care services, information, and counseling is provided in accordance with State law and professional standards of practice.

**A.  The advertising provision is narrowly tailored to serve a compelling state interest.**

In passing the advertising provision, the Vermont Legislature was particularly concerned with false advertising by limited-services pregnancy centers, finding that some centers lead

people "to believe that their facilities offer abortion services and unbiased counseling" when they do not actually provide such services. Doc. 1-1 at 14. The Legislature found this practice to be "of special concern . . . because of the time sensitive and constitutionally protected nature of the decision to continue or terminate a pregnancy." *Id.* And "[a]ccurate information about the services that a limited-services pregnancy center performs . . . is essential to enable individuals in this State to make informed decisions about their care." *Id.* at 13. Thus:

> When a pregnant individual is misled into believing that a center offers services that it does not in fact offer or receives false or misleading information regarding health care options, the individual loses time crucial to the decision whether to terminate a pregnancy and may lose the option to choose a particular method or to terminate a pregnancy at all.

*Id.* at 14.

These Legislative findings are well supported in the public record. "False and misleading advertising by clinics that do not provide abortions, emergency contraception, or referrals to providers of such services has become a problem of national importance." *First Resort*, 860 F.3d at 1268; *see* Am. Coll. of Obstetricians & Gynecologists Government Affairs, *Issue Brief: Crisis Pregnancy Centers* (Oct. 2022)[2] (noting problem of deceptive advertising by some limited-services pregnancy centers and advocating for application of consumer protection laws); Amy G. Bryant & Jonas J. Swartz, *Why Crisis Pregnancy Centers Are Legal But Unethical*, 20 Am. Med. Assoc. J. of Ethics 3 (Mar. 2018)[3] ("detailed reviews of the centers' promotional materials and websites reveal that these centers give the [inaccurate] impression of being medical clinics or having medical expertise"); Melissa N. Montoya et al., *The Problems with Crisis Pregnancy Centers: Reviewing the Literature and Identifying New Directions for Future Research*, 14 Int'l

---

[2] https://www.acog.org/-/media/project/acog/acogorg/files/advocacy/cpc-issue-brief.pdf
[3] https://journalofethics.ama-assn.org/article/why-crisis-pregnancy-centers-are-legal-unethical/2018-03

J. of Women's Health 757, 758 (June 8, 2022)[4] (finding that limited-services pregnancy centers "engage in deliberately misleading practices"); *see also* Minority Staff of H. Comm. on Gov't Reform, Special Investigations Div., *False & Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers* (July 2006).

States have a strong interest in protecting consumers from deceptive and misleading advertising, generally. *See, e.g.*, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) (upholding government's "interest in preventing deception of consumers" under relaxed standard of review for misleading commercial speech); *1-800-411-Pain Referral Serv., LLC v. Tollefson*, 915 F. Supp. 2d 1032, 1053 (D. Minn. 2012) (finding "substantial governmental interest in protecting the public from misleading and false advertising" supported in legislative history); *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726 (9th Cir. 1994) (upholding government's substantial interest in prohibiting false advertising of specific consumer goods).

In addition, the State has an interest in ensuring that the choice to have or terminate a pregnancy is "well informed." *Gonzales v. Carhart*, 550 U.S. 124, 159 (2007); *Comprehensive Health of Planned Parenthood of Kansas & Mid-Missouri, Inc. v. Templeton*, 954 F. Supp. 2d 1205, 1221 (D. Kan. 2013) ("the state has a strong interest in ensuring that an abortion decision is well informed"). This interest is heightened in Vermont, where the State Constitution newly protects the right to reproductive liberty. Vt. Const. ch. I, Art. 22.

Prior to passage of the advertising prohibition, Vermont's Consumer Protection Act did not explicitly extend to organizations that did not charge for their services, such as limited-services pregnancy centers. *See Drake v. Allergan, Inc.*, 63 F. Supp. 3d 382, 393 (D. Vt. 2014) (describing elements of Consumer Protection Act claim to include misleading consumers); Vt.

---

[4] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9189146/pdf/ijwh-14-757.pdf

Stat. Ann. tit. 9, § 2451a(a) (defining "consumer" as one "who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services . . ."); *see also* Compl. ¶ 86 (alleging that most limited-services pregnancy centers "charge nothing for their services"). Other medical centers, such as pregnancy centers that provide abortions, generally charge for their services— which subjects them to the Consumer Protection Act. Compl. ¶ 87.

Licensed health care professionals are also prohibited from deceptive advertising of their services through licensing regulations. *See* Vt. Stat. Ann. tit. 3, § 129a(a)(2) (licensed professionals regulated by the Secretary of State prohibited from "[a]dvertising that is intended or has a tendency to deceive"); Vt. Stat. Ann. tit. 26, § 1354(a)(2) (same for doctors). But these laws do not apply to all limited-services pregnancy centers because some centers do not employ licensed health care professionals, and/or advertise services not performed by licensed health care professionals. *See* Compl. ¶¶ 53, 80-81, 151.

The advertising provision is narrowly tailored to address the Legislature's identified interest: consumer deception about reproductive services not covered by existing antifraud law. The advertising provision requires that advertising by limited-services pregnancy centers not be "untrue or clearly designed to mislead the public" regarding the center's available services. Vt. Stat. Ann. tit. 9, § 2493(a). The provision could not be more tailored.

**B.  The provider regulation is narrowly tailored to serve a compelling state interest.**

In passing the provider regulation, the Legislature identified that "[s]ome limited-services pregnancy centers have promoted patently false or biased medical claims[.]" Doc. 1-1 at 14. When a pregnant person "receives false or misleading information regarding health care options, the individual loses time crucial to the decision whether to terminate a pregnancy and may lose the option to choose a particular method or to terminate a pregnancy at all." *Id.* The Legislature

also spelled out its intent to respect an individual's "right to receive clear, honest, and nonmisleading information about the individual's [reproductive] options and to make informed, voluntary choices after considering all relevant information." *Id.* at 15.

These findings, too, are supported by the public record. *See* Am. Coll. of Obstetricians & Gynecologists, *supra* Part VII.A (noting that some limited-services pregnancy centers provide false or misleading medical information); Bryant & Swartz, *supra* Part VII.A (concluding that "both the lack of patient-centered care and deceptive practices make [some limited-services pregnancy centers] unethical"); Montoya et al., *supra* Part VII.A ("For patients who are considering pregnancy termination, [limited-services pregnancy centers may] not only misrepresent the health-risks of abortion but also may intentionally lie to their clients by reporting incorrect gestational ages of their pregnancies."); *see also* Minority Staff of H. Comm. on Gov't Reform, *supra* Part VII.A; Alison Novak, *Pro-Life Pregnancy Centers in Vermont Provide Misleading Information, Critics Charge*, Seven Days, July 27, 2022.[5]

The Legislature also recognized that "[t]elling the truth is how trained health care providers demonstrate respect for patients, foster trust, promote self-determination, and cultivate an environment where best practices in shared decision-making can flourish." Doc. 1-1 at 14; *see, e.g.*, Vt. Stat. Ann. tit. 26, § 1582(a)(3) (prohibiting nurses from "engaging in conduct of a character likely to deceive, defraud, or harm the public").

The State has a strong interest in protecting the legitimacy of its licensed professions. "[T]he States have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of

---

[5] https://www.sevendaysvt.com/vermont/pro-life-pregnancy-centers-in-vermont-provide-misleading-information-critics-charge/Content?oid=36110672

professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975); *see Gonzales*, 550 U.S. at 128 (government "undoubtedly has an interest in protecting the integrity and ethics of the medical profession" (quotation omitted)); *Calenda v. Rhode Island Bd. of Med. Rev.,* 565 F. Supp. 816, 819–20 (D.R.I. 1983) ("It is difficult to conjure up a state interest more compelling than oversight of the professional conduct of local health care providers…"). The public uniquely trusts licensed health care professionals based on their State-granted licenses and the State has a compelling interest in fulfilling that trust.

The provider regulation is narrowly tailored to address identified harms to patients and to professional integrity posed by unprofessional conduct by unlicensed providers at limited-services pregnancy centers. By holding licensed health care providers responsible for ensuring that their co-workers don't do anything the professional couldn't do, the State permissibly extended its licensing power to the extent possible to curb patient harms perpetrated by unlicensed providers.

**VIII.     The Act is not void for vagueness.**

Statutes are vague if they require "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "Thus, all vagueness challenges—whether facial or as-applied—require [a court] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006). Courts tolerate less clarity in a

21

civil than a criminal statute, "because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates*, 455 U.S. at 498-99.

In the Due Process context, "[a] facial vagueness challenge will succeed only when the challenged law can never be validly applied." *Vermont Rt. to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014). A party making a facial challenge must therefore show that a statute is vague "in the sense that no standard of conduct is specified at all. Such a provision simply has *no* core." *Village of Hoffman Estates*, 455 U.S. at 495 n.7.[6]

A vagueness challenge fails when it is "clear what the [statute] as a whole prohibits." *Human Life of Wash. Inc v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010). "[O]therwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity." *Id.* (quotation omitted). To interpret a statute, courts "begin by giving effect to the text's plain meaning, which is informed by, but does not turn solely on, dictionary definitions." *J.S. v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 76 F.4th 32, 38 (2d Cir. 2023) (quotation omitted). "[P]lain meaning draws on the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (quotation omitted).

## A.  The advertising provision is not unconstitutionally vague.

In the advertising provision, Plaintiffs take issue with the terms "mislead," "proposed services," and "cause to be disseminated." Compl. ¶ 180. Each of these terms has a clear dictionary definition and, in context, it is clear what the statute prohibits: false or deceptive advertising about the services at a limited-services pregnancy center.

---

[6] In the First Amendment context, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill*, 530 U.S. at 733. Plaintiffs have alleged vagueness under the Due Process Clause, not the First Amendment.

There is "nothing unclear" about "mislead." *People v. Witzerman*, 29 Cal. App. 3d 169, 179-80 (Cal. Ct. App. 1972). "To 'mislead' means to guide wrongly." *Id.* (citing The Random House Dictionary of the English Language 916 (Unabridged ed. 1966)). And courts across the country have upheld false advertising prohibitions against vagueness challenges. *See, e.g.*, *Ark. Hearing Instrument Dispenser Bd. v. Vance*, 197 S.W.3d 9495 (Ark. 2004) (upholding statute prohibiting "misleading or untruthful" advertising of hearing aids, noting that terms of statute "are susceptible to a plain understanding by the reasonable person"); *State v. Ralph Williams' Nw. Chrysler Plymouth*, 553 P.2d 423 (Wash. 1976) (holding phrases used in statute prohibiting "unfair or deceptive acts or practices" have a "sufficiently well-established meaning in common law and federal trade law to meet any constitutional challenge of vagueness"); *Carpets by Carload, Inc. v. Warren,* 368 F. Supp. 1075 (E.D. Wis. 1973) (upholding statute prohibiting "untrue, deceptive or misleading" advertising against vagueness challenge). In context, the phrase ". . . clearly designed to mislead the public about the nature of services provided" is likewise understandable to a person of ordinary intelligence. Vt. Stat. Ann. tit. 9, § 2493(a).

The term "proposed services" appears in the following phrase: ". . . advertising about the services or *proposed services* performed at that center . . ." Vt. Stat. Ann. tit. 9, § 2493(a). In this context, the adjective "proposed" takes the definition "intended or planned." *Proposed*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/proposed (last visited Sept. 19, 2023).[7] Without including "proposed services" in the statute, a center would be free to falsely advertise that it might provide a service in the future that it does not now provide.

---

[7] "[T]he word 'services' is, by and large, a word of common understanding and one that could not be used for selective or subjective enforcement." *Humanitarian L. Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1063 (C.D. Cal. 2006).

The term "cause to be disseminated" appears in many consumer protection statutes, including the Federal Trade Commission Act. *See* 15 U.S.C. § 52(a) ("It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated*,* any false advertisement."). Courts have found it to be plain and unambiguous in that context. *Mueller v. United States,* 262 F.2d 443, 446 (5th Cir. 1958) ("petitioners' contentions . . . that they did not personally disseminate any false advertisement do not constitute a defense" under the FTCA).[8] In the advertising provision, likewise, to "cause to be disseminated" simply means that the center is not directly distributing the advertising, but causing a third party to distribute its advertising, likely for a fee. Aspire and Branches alleged that they directly disseminate advertising, for instance by distributing "handouts and brochures" directly to clients. Compl. ¶ 32. They also allege that they cause advertising to be disseminated in other ways, for instance through television and newspapers. *Id.* ¶¶ 30-31. The advertising provision covers both.

**B.  The provider regulation is not unconstitutionally vague.**

In the provider regulation, Plaintiffs take issue with the terms "health care services," "information," and "counseling." Compl. ¶ 186. All three terms appear in the same two phrases and can be understood together, in context: First, licensed health care providers ". . . shall be responsible for conducting and providing health care services, information, and counseling at the center." Vt. Stat. Ann. tit. 9, § 2493(b). And second, the failure of a licensed health care provider "to conduct or to ensure that health care services, information, and counseling at the limited-services pregnancy services center are conducted in accordance with State law and professional standards of practice may constitute unprofessional conduct . . ."

---

[8] There is "nothing unclear" about "disseminate." *Witzerman*, 29 Cal. App. 3d at 180. "The word 'disseminate' means to scatter, spread widely, broadcast or disperse." *Id.* (citing The Random House Dictionary of the English Language, *supra*, at 415); *accord People v. Austin*, 2019 IL 123910, ¶ 115, 155 N.E.3d 439 (citing Webster's Third New International Dictionary 656 (1993)).

In this context, it is clear that "health care" modifies "services, information, and counseling." And together, "health care services, information, and counseling" generally refer to services that might be (a) provided by a limited-services pregnancy center and (b) regulated by a licensed health care provider's professional standards of practice and State law. If a center's services are not regulated by professional standards of practice, those services are not impacted by the provider regulation. The limiting factor to "health care services, information, and counseling" is therefore the scope of services regulated by a health care professional's standards.

"Health care services" is also explicitly defined as "services for the diagnosis, prevention, treatment, cure, or relief of a physical or mental health condition, including procedures, products, devices, and medications." Vt. Stat. Ann. tit. 26, § 1354. Courts have upheld even broader definitions. *See Kelley v. Apria Healthcare, LLC*, 232 F. Supp. 3d 983, 992 (E.D. Tenn. 2017) ("[H]ealth care services are services offered directly to a patient").

The Act is additionally not subject to arbitrary enforcement because it is part of the Consumer Protection Act, which requires an "objective probable cause standard" for any investigations by the Attorney General. *Diamond v. Vickrey*, 367 A.2d 668, 671 (Vt. 1976). And enforcement of the provider regulation is constrained by the relevant professional standards of practice. The Board of Medical Practice has "only those powers expressly conferred upon it by the Legislature" and Title 26, § 1354 sets out a detailed list of thirty-nine bases under which a physician may be held professionally responsible. *In re Porter*, 2012 VT 97, ¶ 16, 192 Vt. 601, 70 A.3d 915. Other licensed professionals are held to similar standards under Title 3, § 129.

## CONCLUSION

This Court should dismiss this case with prejudice.

DATED at Montpelier, Vermont, this 25th day of September 2023.

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By: */s/ Eleanor L.P. Spottswood*
  Eleanor L.P. Spottswood
  Solicitor General
  Sarah L.J. Aceves
  Assistant Attorney General
  Office of the Attorney General
  109 State Street
  Montpelier, VT 05609-1001
  802-793-1646
  eleanor.spottswood@vermont.gov