# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; ASPIRE TOGETHER, INC., d/b/a ASPIRE NOW; BRANCHES PREGNANCY RESOURCE CENTER, INC.,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**CHARITY CLARK**, in her official capacity as Attorney General of the State of Vermont; **SARAH COPELAND HANZAS**, in her official capacity as Secretary of the State of Vermont; **KEVIN RUSHING**, in his official capacity as Director of the Office of Professional Regulation; **MARK LEVINE**, in his official capacity as the Commissioner of Health of the State of Vermont; **The Individual Members of the VERMONT BOARD OF MEDICAL PRACTICE**, in their official capacities; **The Individual Members of the VERMONT STATE BOARD OF NURSING, in their official capacities**; and **COURTNEY BOWERS**, in her official capacity as Naturopathic Physician Advisor,<br><br>*Defendants.* | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Case No. 2:23-cv-00229-wks** |

## AMENDED COMPLAINT

NOW COME Plaintiffs National Institute of Family and Life Advocates ("NIFLA"), Aspire Together, Inc. ("Aspire"), and Branches Pregnancy Resources Center ("Branches"), by and through their undersigned attorneys, for their Complaint

for Injunctive and Declaratory Relief against the Defendants Attorney General Charity Clark, Secretary of State Sarah Copeland Hanzas, Director of the Office of Professional Regulation Kevin Rushing, Commissioner of Health Mark Levine, the individual members of the Board of Medical Practice, the individual members of the State Board of Nursing, and Naturopathic Physician Advisor Courtney Bowers, in their official capacities, and allege as follows:

## INTRODUCTION

1.      This case is a challenge by pro-life pregnancy services centers and their membership organization to a state law that unconstitutionally restricts the centers' speech and provision of services. Pregnancy services centers in Vermont offer women both medical and non-medical information and services and do so free of charge. They empower women who are or may be pregnant to choose to give birth in circumstances where they wish to do so but feel they do not have the necessary resources or social support. They also provide support and resources for new mothers and families in need of assistance.

2.      On May 10, 2023, Governor Phil Scott signed Senate Bill No. 37 ("SB 37"), attached hereto as Exhibit A. That law impedes the ability of pro-life pregnancy centers to continue providing help and support to Vermont women and families in two ways: First, it censors the centers' ability to advertise their free services (Advertising Prohibition). Second, it precludes centers from offering non-medical services, information, and counseling unless provided by a licensed health care provider (Provider Restriction).

3.      Plaintiffs request that this Court issue declaratory and injunctive relief against the enforcement of SB 37 because it violates the First and Fourteenth Amendments to the U.S. Constitution by imposing vague and viewpoint-discriminatory laws that target speech and conduct and are not narrowly tailored to any asserted state interest.

## JURISDICTION AND VENUE

4.     This action arises under 42 U.S.C. section 1983 *et. seq.* (the "Civil Rights Act"); the First and Fourteenth Amendment to the U.S. Constitution.

5.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331, 1343, and 1367.

6.     The Court has jurisdiction to issue the requested declaratory relief pursuant to 28 U.S.C. sections 2201 and 2202, and Federal Rule of Civil Procedure 57.

7.     The Court has jurisdiction to award the requested injunctive relief under 5 U.S.C. sections 702 and 703, 20 U.S.C. section 1683, 28 U.S.C. section 1343(a)(3), and Federal Rule of Civil Procedure 56.

8.     The Court has jurisdiction to award reasonable attorneys' fees and costs under 42 U.S.C. section 1988.

## PARTIES

### *Plaintiff National Institute of Family and Life Advocates*

9.     Plaintiff National Institute for Family and Life Advocates (NIFLA) is a religious not-for-profit corporation duly incorporated under the laws of Virginia, with its principal place of business at 5610 Southpoint Ct. Blvd., # 103, Fredericksburg, VA 22407.

10.     NIFLA comprises member pregnancy centers from across the nation.

11.     NIFLA has seven member facilities in Vermont, including Aspire and Branches, that are regulated by SB 37.

12.     NIFLA provides its pregnancy center members with legal resources and counsel, with the aim of developing a network of life-affirming ministries in every community across the nation, in order to achieve an abortion-free America.

13.    NIFLA's mission is to empower the choice for life by equipping pregnancy centers with legal counsel and support, enabling pregnancy centers to convert to and maintain medical clinic status, and energizing pregnancy centers with a renewed vision for the future.

14.    NIFLA members do not provide or refer for abortions or emergency contraception.

15.    NIFLA's Vermont members offer free services, such as pregnancy tests, counseling and information concerning pregnancy options, and material support to new mothers.

16.    Some of NIFLA's Vermont members also provide medical services, such as ultrasounds or sonograms.

17.    The Vermont members of NIFLA that offer medical services, including limited obstetric ultrasounds, do so under the direction of a licensed Vermont physician serving as medical director of the facility.

18.    NIFLA's Vermont members advertise their services through handouts and brochures, newspaper or magazine ads, television commercials, social media, and other online ads.

19.    None of NIFLA's Vermont members condition their employees' compensation on the number of clients obtained through advertising.

20.    NIFLA asserts organizational standing on behalf of its Vermont members, whose ability to advertise and provide services, counseling, and information are impeded by SB 37. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

21.    These members have standing to sue in their own right.

22.    And the interests that NIFLA seeks to protect are germane to NIFLA's purposes, including supporting pro-life pregnancy center members and enabling

them to carry out their missions consistent with their pro-life and religious viewpoints.

23.     Neither the claims asserted nor the relief requested requires the participation of all of NIFLA's individual members in Vermont, but can be awarded to those NIFLA members as a group.

***Plaintiff Aspire Now***

24.     Plaintiff Aspire Together, Inc., d/b/a Aspire Now ("Aspire") is a faith-based not-for-profit corporation duly incorporated under the laws of Vermont.

25.     Aspire operates a pregnancy services center located at 5399 Williston Rd. Suite 207, Williston, VT 05495. It also operates a mobile unit that travels around Franklin, Chittenden, and Washington Counties.

26.     Aspire's primary purpose is to offer life-affirming alternatives to abortion and compassionate counsel to those who face unexpected pregnancy, abortion-related issues, or decisions concerning sexual relationships by educating and supporting them through the process of making informed choices.

27.     Aspire offers free services to pregnant women, including STD testing, pregnancy testing, ultrasounds, pregnancy options counseling, parenting classes, post-abortion support, sexual risk avoidance counseling, and healthy relationship coaching, along with material support, such as diapers, wipes, diaper bags, layettes, and gift cards.

28.     Aspire also provides financial assistance to clients who need help with rent, housing, or transportation.

29.     Aspire does not provide abortions or so-called "emergency contraception." Nor does it provide referrals to clients for abortions or "emergency contraception."

30.     Aspire currently advertises its services through television commercials, Google ads, social media, and its website.

31.   In the past, it has also advertised its services through newspapers, magazines, and the University of Vermont student planner.

32.   Aspire also distributes handouts and brochures from both its pregnancy center and its mobile clinic.

33.   Aspire operates a website located at https://aspire-now.org/.

34.   That website includes a disclaimer that states: "We do not refer or perform any services that harm the viability of life."

35.   Aspire's website advertises "professional health care for women" and includes a link to schedule an appointment at its health center.

36.   The website also includes information about abortion generally, the abortion pill, at-home abortion, adoption, and parenting.

37.   Aspire does not condition its employees' compensation on the number of clients obtained through advertising.

38.   Licensed nurses provide all pregnancy tests, ultrasounds, and STD tests at Aspire.

39.   Aspire's Medical Director Dr. Jessica Whelan, a naturopathic physician licensed in Vermont, reviews all ultrasounds and meets with at-risk patients and patients who are interested in learning about natural family planning.

40.   Non-medical staff and volunteers provide peer counseling, support, and well-pregnancy and parenting education at Aspire.

41.   Aspire asserts standing on behalf of itself and on behalf of its staff and volunteers.

### Plaintiff Branches Pregnancy Center, Inc.

42.   Plaintiff Branches Pregnancy Resource Center ("Branches") is a faith-based not-for-profit corporation duly incorporated under the laws of Vermont and is located at 26 Birge Street, Brattleboro, VT 05301.

43.    Branches' primary purpose is to provide free, confidential, practical, emotional, educational, and spiritual support to women, men, and children who are facing pregnancy- and abortion-related concerns.

44.    Branches offers free services to pregnant women, including pregnancy tests, peer counseling, information about abortion procedures and risks, information about abortion alternatives, abstinence education, post-abortion support, parenting classes, free baby and maternity items, help for victims of human trafficking, and other related programs and services.

45.    Branches does not provide abortions or so called "emergency contraception." Nor does it provide referrals to clients for abortion or emergency contraception.

46.    Branches advertises its services through brochures, television commercials, social media, and its website.

47.    Branches distributes brochures concerning its services, pregnancy generally, drug use and pregnancy, the morning-after pill, the abortion pill, healthy relationships, domestic violence, and human trafficking both at its center and around the community. Branches also distributes the "healthy relationships" brochure at a local high school and at local churches.

48.    Branches operates a website located at https://branchesprc.com/.

49.    That website includes a disclaimer that states: "Branches Pregnancy Resource Center does not offer or refer for pregnancy terminations or birth control. Information is provided as an educational service and should not be relied on as a substitute for professional and/or medical advice."

50.    Branches' website invites women experiencing an unexpected pregnancy to "[c]all us to empower yourself with knowledge and make your best decision," and includes a phone number that potential clients may call to make an appointment.

7

51.     The website also includes information concerning pregnancy, "emergency contraception," abortion, adoption, and parenting.

52.     Branches does not condition its employees' compensation on the number of clients obtained through advertising.

53.     Branches is not currently a medical clinic and does not provide medical services, including ultrasounds, sonograms, or prenatal care.

54.     Branches is in the process of becoming a medical clinic, but that transition will not happen until 2025.

55.     Branches has an ultrasound machine, but it does not currently use that machine, and it stores that machine in a room that is not accessible to its clients.

56.     Branches also has a closet in which it hopes to store medical supplies in the future, but that closet is currently empty.

57.     No one at Branches wears medical attire or uniforms, and Branches does not have examination tables.

58.     Nor does Branches share space with any medical provider or medical facility.

59.     However, Branches does offer over-the-counter urine pregnancy tests, which are facilitated by its non-medical staff and volunteers. When a client at Branches believes she may be pregnant, a staff member or volunteer will hand her a pregnancy test. The client will take the pregnancy test alone in the center's bathroom. When she finishes, the client reads the results of the test herself, and if the test is positive, a Branches staff member or volunteer will discuss her options with her.

60.     Branches' staff and volunteers also provide information to women concerning their pregnancy options and talk with and offer counsel to women about their decision.

61.     Branches collects pregnancy-related information from its clients, including the date of the client's last period, whether she has had previous

pregnancies and how many, whether she has had previous miscarriages and how many, and whether she has had previous abortions and how many. This information helps Branches' staff and volunteers to be more sensitive to their clients' needs by tailoring their counseling and other services to a client's particular situation.

62.     Branches asserts standing on behalf of itself and its staff and volunteers.

### Defendant Attorney General Clark

63.     Defendant Charity Clark is named in her official capacity as Attorney General of the State of Vermont.

64.     The Attorney General has the "authority to make rules, conduct civil investigations, and bring civil actions" with respect to violations of SB 37's Advertising Prohibition. 9 V.S.A. § 2493(c).

### Defendant Secretary of State Hanzas

65.     Defendant Sarah Copeland Hanzas is named in her official capacity as Secretary of State of the State of Vermont.

66.     The Secretary of State oversees the Office of Professional Regulation, which licenses naturopathic physicians and nurses. 3 V.S.A. § 122.

67.     The licensing boards and advisors contained within the Office of Professional Regulation have the power to enforce SB 37's Provider Restriction. *Id.* § 129a; 9 V.S.A. § 2493(b).

### Defendant Director of the Office of Professional Regulation Rushing

68.     Defendant Kevin Rushing is named in his official capacity as the Director of Vermont's Office of Professional Regulation.

69.     The Office of Professional Regulation licenses many Vermont professionals, including naturopathic physicians and nurses. 3 V.S.A. § 122.

70.     Director Rushing, along with the licensing boards and advisors contained within the Office of Professional Regulation, has the power to enforce SB 37's Provider Restriction. *Id.* § 129a; 9 V.S.A. § 2493(b).

### Defendant Commissioner of Health Levine

71.     Defendant Mark Levine is named in his official capacity as the Commissioner of Health of the State of Vermont.

72.     The Commissioner of Health oversees Vermont's Department of Health, 18 V.S.A. § 4, which has the power to "supervise and direct the execution of all laws relating to public health," *id.* § 1.

73.     The Department of Health houses Vermont's Board of Medical Practice, 26 V.S.A. § 1351(c), which has the power to enforce SB 37's Provider Restriction against medical doctors (M.D.s). 9 V.S.A. § 2493(b); 26 V.S.A. § 1354.

### Defendants Members of the Board of Medical Practice

74.     The individual members of Vermont's Board of Medical Practice are named in their official capacities: Richard Bernstein, Richard Clattenburg, David Coddaire, Gail Falk, Matthew Greenberg, Rick A. Hildenbrant, Patricia Hunter, Suzanne Jones, Leo LeCours, David Liebow, Stephanie Lorentz, Sarah McClain, Christine Payne, Marga Sproul, Margaret Tandoh, and Robert E. Tortolani.

75.     The Board of Medical practice licenses medical doctors (M.D.s), 26 V.S.A. § 1353, and has the power to enforce SB 37's Provider Restriction against medical doctors (M.D.s). 9 V.S.A. § 2493(b); 26 V.S.A. § 1354.

### Defendants Members of the State Board of Nursing

76.     The individual members of Vermont's State Board of Nursing are named in their official capacities: Jennifer Lyon, Daniel Coane, Matthew Choate, Ginger Gillette-Kent, Jennifer Laurent, Kelly Sinclair, Krystal Bernier, Luana Tredwell, William "Jamie" Floyd, and Deborah Belcher.

77.     The State Board of Nursing licenses nurses, 3 V.S.A. § 129, and has the power to enforce SB 37's provider restriction, *id.* § 129a; 9 V.S.A. § 2493(b).

### *Defendant Naturopathic Physician Advisor Bowers*

78.     Defendant Courtney Bowers is named in her official capacity as Vermont's Naturopathic Physician Advisor.

79.     The Naturopathic Physician Advisor has the power to assist the Director of the Office of Professional Regulation in investigating alleged violations of SB 37's Provider Restriction by naturopathic physicians. 3 V.S.A. §§ 129, 129a; 9 V.S.A. § 2493(b).

## FACTUAL BACKGROUND

### I.     Pregnancy Services Centers

80.     Thousands of pro-life pregnancy centers across the country provide free services, resources, information, and emotional and professional support to women and families facing unexpected pregnancies—no matter what choice they ultimately make.

81.     Many of these centers also provide medical services, such as ultrasounds or STD testing and treatment, as well as post-abortion healing and counseling and adoption services.

82.     Often pregnancy centers also provide training and support for fathers so that women will be supported by their partners and children by both parents.

83.     In 2019 alone, 2,700 U.S. pregnancy centers served roughly two million women, men, and youth with services valued at over $266 million.[1]

---

[1] Moira Gaul, *Fact Sheet: Pregnancy Centers – Serving Women and Saving Lives (2020 Study)*, Charlotte Lozier Institute (July 19, 2021), https://lozierinstitute.org/fact-sheet-pregnancy-centers-serving-women-and-saving-lives-2020/.

84.   Vermont is home to eight pro-life pregnancy centers, including Aspire and Branches. Seven of those centers are NIFLA members, including Aspire and Branches.

85.   In 2022, Vermont pro-life pregnancy centers served over 476 male and female clients, performed 176 ultrasounds, 183 pregnancy tests, 59 STD/STI tests, and 617 educational classes, saving the community over $395,770.00.[2]

86.   Unlike abortion clinics, which have a financial interest in performing as many abortions as possible, most pro-life pregnancy centers, including Aspire and Branches, charge nothing for their services, meaning that they do not financially benefit from any choice a woman makes.

87.   The medical journal *Contraception* published a study showing that pro-life pregnancy centers offer more efficient help at a lower cost than abortion facilities.[3] It found that pro-life pregnancy centers have shorter wait times and are more available for same-day care. It also states that abortion facilities almost always charge for pregnancy tests and ultrasounds—while pro-life centers almost always offer these services for free.

88.   For both Care Net and Heartbeat International (two pregnancy center associations representing about 2,100 centers), client exit surveys show a 99% satisfaction rate.[4]

89.   Aspire is an affiliate of both Care Net and Heartbeat International.

90.   Branches is an affiliate of Care Net.

---

[2] Pregnancy Center Coalition of Northern New England, 2022 Impact Report for Vermont.

[3] Kavita Vinekar, et al., *Early pregnancy confirmation availability at crisis pregnancy centers and abortion facilities in the United States*, 117 Contraception 30, 30–35 (2023), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0010782422002451.

[4] *Supra* n.1.

91.     In the six months following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), which overturned *Roe v. Wade*, an estimated 32,000 additional babies have been saved from abortions, compared to the expected number had *Roe* not been overturned.[5]

92.     Consequently, the role of pro-life pregnancy centers has become *even more* important to support the mothers and families of these babies.

## II.     Senate Bill No. 37

93.     On May 10, 2023, Governor Phil Scott signed Senate Bill No. 37 (attached as Exhibit A), "[a]n act relating to access to legally protected health care activity and regulation of health care providers," into law.

94.     Section 8 of SB 37 adds a subchapter to Title IX of the Vermont Statutes, which deals with commerce and trade, regulating "pregnancy services centers."

95.     The legislature stated in its subsection on findings and legislative intent in Section 8 of SB 37 that "[c]enters that seek to counsel clients against abortion . . . have become common across the country, including in Vermont" and that "[f]alse and misleading advertising by centers that do not offer or refer clients for abortion is of special concern to the State." 9 V.S.A. § 2491(a)(1), (3).

96.     The legislative findings further accuse pregnancy centers of "provid[ing] confusing and misleading information to pregnant individuals contemplating abortion by leading those individuals to believe that their facilities offer abortion services and unbiased counseling" and "promot[ing] patently false or biased medical claims about abortion, pregnancy, contraception, and reproductive health care providers." *Id.* § 2491(a)(2).

---

[5] Deidre McPhillips, *There were 32,000 fewer legal abortions in the US in the six months after the Dobbs decision, new analysis suggests*, CNN (April 11, 2023, 3:01 pm), https://www.cnn.com/2023/04/11/health/abortion-decline-post-roe/index.html.

97.     The state interest that Section 8 asserts is "ensur[ing] that the public is provided with accurate, factual information about the types of health care services that are available to pregnant individuals in [Vermont]." *Id.* § 2491(b)(1).

98.     "Pregnancy services center" is defined broadly to mean "a facility, including a mobile facility, where the primary purpose is to provide services to individuals who are or may be pregnant and that either offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant individuals or has the appearance of a medical facility." 9 V.S.A. § 2492(6).

99.     A facility "has the appearance of a medical facility if two or more of the following factors are present:" (1) "[t]he center offers pregnancy testing or pregnancy diagnosis, or both"; (2) "[t]he center has staff or volunteers who wear medical attire or uniforms"; (3) "[t]he center contains one or more examination tables"; (4) "[t]he center contains a private or semiprivate room or area containing medical supplies or medical instruments"; (5) "[t]he center has staff or volunteers who collect health information from clients"; or (6) "[t]he center is located on the same premises as a State-licensed medical facility or provider or shares facility space with a State-licensed medical provider." *Id.*

100.    While the definition of pregnancy center is broad, the operative regulations in Section 8 single out pro-life pregnancy care centers applying only to "limited-services pregnancy centers."

101.    A "limited-services pregnancy center" is defined as "a pregnancy services center that does not directly provide, or provide referrals to clients for, abortions or emergency contraception." *Id.* § 2492(5). Section 8 imposes two unlawful regulations on "limited-services pregnancy centers": (1) the Advertising Prohibition and (2) the Provider Restriction. 9 V.S.A. § 2493 ("the Unfair and Deceptive Act" or "the Act").

14

### A.    The Advertising Prohibition

102.   First, the Act prohibits "any limited-services pregnancy center" from "disseminat[ing] or caus[ing] to be disseminated to the public any advertising about the services or proposed services performed at that center that is untrue or clearly designed to mislead the public about the nature of services provided." *Id.* § 2493(a) ("the Advertising Prohibition").

103.   The Advertising Prohibition explicitly targets pro-life pregnancy centers by limiting its scope to cover "limited-services pregnancy center[s]," which are those pregnancy centers that do not provide or refer for abortion or "emergency contraception." 9 V.S.A. §§ 2492(5), 2493(a).

104.   "Advertising" is defined as "representations made directly to consumers; marketing practices; communication in any print medium, such as newspapers, magazines, mailers, or handouts; and any broadcast medium, such as television or radio, telephone marketing, or advertising over the Internet such as through websites and web ads." 9 V.S.A. § 2493(a).

105.   The Advertising Prohibition does not define "misleading." However, Section 8's legislative findings suggest that the legislature was concerned that some pregnancy centers may not "openly acknowledge in their advertising, on their websites, and at their facilities that they neither provide abortions nor refer clients to other providers of abortion services." *Id.* § 2491(a)(2). The legislative "findings" in the Act also state without evidence that "[s]ome limited-services pregnancy centers have promoted patently false or biased medical claims about abortion, pregnancy, contraception, and reproductive health care providers." *Id.*

106.   The Advertising Prohibition also provides that "advertising or the provision of services by a limited-services pregnancy center" as "an act in commerce" for purposes of Vermont law, even though Aspire, Branches, and the other NIFLA members in Vermont do not charge for their goods or services. 9 V.S.A. § 2493(a).

15

107.   The Advertising Prohibition is enforced by the attorney general, *id.* § 2493(c), who "may bring an action in the name of the State against" any person who "is . . . or is about to" violate the Advertising Prohibition "to restrain by temporary or permanent injunction" that violation "in the Superior Court" of the county in which [the violator] resides. *Id.* § 2458(a).

108.   The attorney general may also request a civil penalty of up to $10,000 for each violation, an order of restitution to consumers, and an order requiring reimbursement to the State for its expenses investigating and prosecuting the violation. *Id.* § 2458(b).

109.   Private consumers may also sue "for appropriate equitable relief" and may "recover from the . . . violator the amount of his or her damages, or the consideration or the value of the consideration given by the consumer, reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer." *Id.* § 2461(b).

110.   Aspire, Branches, and NIFLA's Vermont members are all limited-services pregnancy centers within the definition of SB 37 and thus subject to the Advertising Prohibition.

111.   The Advertising Prohibition provides no guidance as to how it should be applied to advertisements including medical information on which there is no medical consensus.

112.   The Advertising Prohibition is also unclear as to whether it requires disclosures in some or all advertisements that the pregnancy center does not provide or refer for abortions or "emergency contraception."

113.   At the April 6, 2023, hearing before the House Health Care Committee, an Assistant Attorney General from the office's Consumer Protection Division testified that "[w]hile oftentimes, websites will have a disclaimer that they do not provide abortion services or abortion referrals, there are crisis pregnancy centers that

do not have that language on their websites, and when you google abortion in Vermont, their centers do come up and it can be misleading in that respect."[6]

114.    Requiring such a disclosure would compel the centers' speech.

115.    Nor is it clear from the text of the Advertising Provision whether such a disclosure would be a sufficient defense to liability under the Act.

116.    At the same hearing, one representative opined that Aspire's website was not "particularly clear that [Aspire] do[es]n't have [abortion] services," merely because it advertises "abortion *information*" (emphasis added), even though Aspire's website contains a disclaimer stating that it does "not refer or perform any services that harm the viability of life."[7]

117.    Aspire also advertises on its website that "[a]t your appointment, you can learn more about abortion methods, adoption types, pregnancy services, and parenting resources and talk through your choices without any coercion or cost involved. We believe every woman deserves a place she can ask questions and get information without a sales pitch. Because we do not charge for any of our services, we do not profit from you or any decision you make."[8]

118.    Aspire states in one of its Google ads that "[b]ecause we do not profit from any decision you make, you can talk through your options without pressure or coercion." *See* Exhibit C.

119.    Another of Aspire's Google ads states that "If you think you may be pregnant or have had a positive home test, contact us today for free consultations and reproductive health services." *Id.* A third Google ad states that "we can explore your

---

[6] Vt. House Comm. on Healthcare, *House Health Care 4-6-2023 – 9:00AM*, YouTube, at 55:08 (April 6, 2023), https://www.youtube.com/watch?v=Say_S_zYIIs.

[7] *Id.* at 33:00.

[8] AspireNow, *Options Consultation*, https://aspire-now.org/services/options-consultation/ (last visited Oct. 25, 2023).

next steps, including why having an ultrasound matters, information on abortion and reproductive health choices, adoption, parenthood, and more." *Id.*

120.    Branches includes similar language on its website, stating that "[o]ur confidential, cost-free services include . . . [a]bortion [i]nformation."[9]

121.    Branches also states on its website that "our desire is for you to leave our office feeling empowered to make the best choice regarding your pregnancy. We never financially benefit off of your decision and can discuss your options with absolutely no pressure."[10]

122.    It is unclear whether these true and accurate statements by Aspire and Branches might be deemed violations of the Advertising Prohibition if the attorney general decides the statements "mislead[] . . . individuals to believe that their facilities offer abortion services and unbiased counseling." 9 V.S.A. § 2491(a)(2).

123.    Thus, Plaintiffs face a credible threat of enforcement under the Advertising Prohibition as to their current advertisements.

124.    The Advertising Prohibition has also chilled Plaintiffs' speech.

125.    For example, Aspire's medical director created a video about the effectiveness of abortion pill reversal that Aspire would like to post on its website.

126.    Aspire would also like to run a Google ad stating  the following: "Even if an abortion has already begun, give us a call. We can still help you talk through your options and give you information on abortion pill reversal protocols if you choose to continue your pregnancy. No one should take away your reproductive choices." Exhibit C.

---

[9] Branches Pregnancy Resource Center, *Services,* https://branchesprc.com/services/ (last visited Oct. 25, 2023).

[10] Branches Pregnancy Resource Center, *Pregnancy Options*, https://branchesprc.com/pregnancy-options/ (last visited Oct. 25, 2023).

127.   Although abortion pill reversal—*i.e.*, reversing the effects of the first pill in a chemical abortion (mifepristone, a progesterone antagonist) through administration of progesterone—has ample scientific backing, it remains a treatment opposed by abortion providers and advocates.

128.   SB 37 elsewhere prohibits certain health care professionals from "[p]roviding or claiming to provide services or medications that are purported to reverse the effects of a medication abortion." 3 V.S.A. § 129a(a)(29).

129.   While Aspire has no intention of violating that provision by providing or claiming to provide abortion pill reversal treatment itself, given that SB 37 deems abortion pill reversal illegal, the Advertising Prohibition's broad language might sweep in advertisements offering information or counseling about APR, i.e., progesterone therapy for women who have taken mifepristone but now wish to continue their pregnancy, or stating that such treatment is safe and effective.

130.   Aspire has not yet posted the video on its website or run its Google ad due to fear that doing so may subject Aspire or its medical director to penalties under the Advertising Prohibition.

131.   Similarly, although Branches has never performed or claimed to provide abortion pill reversal, Branches previously distributed a contact card both at its center and to the public providing the phone number for the abortion pill reversal hotline (attached as Exhibit B), which in turn connects clients with out-of-state providers of abortion pill reversal.

132.   After SB 37 was enacted, Branches ceased distributing the abortion pill reversal contact card for fear that doing so might have subjected Branches to penalties under the Advertising Prohibition.

133.   In their motion to dismiss, Defendants took the position that "[n]othing in Vermont law prevents Plaintiffs from distributing information about services provided elsewhere, so long as they do not falsely claim to provide that service

themselves." ECF No. 39 at 6. However, Defendants did not disclaim enforcement of the Advertising Provision more generally.

134.   Branches has since resumed distributing the abortion pill reversal contact card. Thus, Branches now faces a credible threat of enforcement under the Advertising Provision as to its distribution of the contact card. *See Bella Health & Wellness v. Weiser*, No. 1:23-cv-00939, slip op. at 23–24 (D. Colo. Oct. 21, 2023).

135.   Aside from chilling Plaintiffs' speech, the State has not explored other avenues, such as a public-information campaign, of advancing its supposed interests in the Advertising Prohibition of "ensur[ing] that the public is provided with accurate, factual information about the types of health care services that are available to pregnant individuals in this State." 9 V.S.A. § 2491(b)(1).

136.   In fact, Planned Parenthood of Northern New England's Vice President of Vermont Public Affairs, Ms. Lucy Leriche, encouraged the legislature not to include Section 8 of SB 37 during her testimony to the Senate Committee on Health and Welfare for these very reasons. Ms. Leriche testified that "[w]hile we don't, we definitely don't, oppose this type of provision, we generally um, we generally advise that the benefit is relatively low and the risk of litigation is significant. We therefore encourage this committee to focus on alternative approaches to targeting Crisis Pregnancy Centers." *An Act Relating to Access to Legally Protected Health Care Activity and Regulation of Health Care Providers: Hearing on S.37 Before the S. Comm. on Health and Welfare* (Vt. 2023) (statement by witness Ms. Lucy Leriche). Ms. Leriche cautioned the legislature because Section 8 of SB 37 "align[ed]" with a Connecticut bill in which litigation ensued, based on concerns about free speech, free exercise, and other constitutional violations. *Id.* Ms. Leriche cautioned the legislature "to focus on alternative approaches" such as "a public awareness and education campaign." *Id.* Regardless, SB 37 was passed by the Vermont Legislature containing Section 8 and its "targeting" provisions. *Id.*

20

**B.      The Provider Restriction**

137.    The Act also requires that "[h]ealth care providers certified, registered, or licensed under Title 26 of the Vermont Statutes Annotated who are employed by, contracted to provide services for or on behalf of, or volunteer to provide services at a limited-services pregnancy center shall be responsible for conducting and providing health care services, information, and counseling at the center." 9 V.S.A. § 2493(b) ("the Provider Restriction").

138.    It further provides that these licensed health care professionals must "conduct or [] ensure that health care services, information, and counseling at the limited-services pregnancy services center are conducted in accordance with State law and professional standards of practice." *Id.*

139.    It is unclear whether these provisions require a health care provider to personally "conduct[] and provid[e] health care services, information, and counseling at the center," as the first sentence suggests, or merely to supervise non-licensed health care professionals to "ensure that health care services, information, and counseling . . . are conducted in accordance with State law and professional standards of practice," as the second sentence implies. *Id.*

140.    If a violation of the Provider Restriction occurs, any licensed health care provider at the clinic could be professionally disciplined for that violation, whether or not that health care provider has supervisory authority. *Id.*

141.    A "health care provider" is "a person who provides professional health care services to an individual during that individual's medical care, treatment, or confinement." 26 V.S.A. § 1354(d)(2)(A).

142.    Health care providers licensed under Title 26 include, among others, medical doctors, nurses, physician assistants, osteopathic doctors, pharmacists, radiologists and radiology assistants, psychologists, clinical mental health

counselors, marriage and family therapists, psychoanalysts, psychotherapists, naturopathic physicians, and midwives.

143.   The provider restriction does not define "health care services." However, the term is defined elsewhere in SB 37 as "services for the diagnosis, prevention, treatment, cure, or relief of a physical or mental health condition, including procedures, products, devices, and medications." 3 V.S.A. § 129a(f)(2)(B); 26 V.S.A. § 1354(d)(2)(B).

144.   The provider restriction defines "health information" as "any oral or written information in any form or medium that relates to . . . the past, present, or future physical or mental health or condition of a client." 9 V.S.A. § 2492(4).

145.   The provider restriction does not define "counseling" at all.

146.   Like the Advertising Prohibition, the provider restriction applies only to "limited-services pregnancy center[s]." 9 V.S.A. § 2493(b).

147.   The Board of Medical Practice, which is housed by the Department of Health, may investigate complaints against medical doctors (M.D.s) for violation of the provider restriction submitted by "[a]ny individual, organization, or public officer" or may "act on its own initiative without having received a complaint." 26 V.S.A. §§ 1353(2); 1370(a)(1).

148.   "If the investigative committee determines that an evidentiary hearing is warranted," the Board may enforce the provider restriction against a medical doctor (M.D.) by holding a disciplinary hearing. *Id.* §§ 1354(c), 1370(b)(3).

149.   If the State shows "by a preponderance of the evidence" that the doctor violated the provider restriction, *id.* § 1354(c), the Board may issue a formal reprimand; "condition, limit, suspend, or revoke" the doctor's license, or "impos[e] an administrative penalty of not more than $1,000" per violation, *id.* § 1374(b)(1)(A).

150.    The Office of Professional Regulation, which is housed by the Secretary of State, is responsible for enforcing the provider restriction against all other licensed health care providers. 3 V.S.A. § 129a.

151.    The Director of the Office of Professional Regulation or a board within the Office of Professional Regulation "shall receive complaints from any source" concerning violations of the provider restriction or "may investigate without receiving a complaint." *Id.* § 129(b).

152.    "Boards and administrative law officers" falling under the Office of Professional Regulation may hold a disciplinary hearing on alleged violations of the provider restriction. 3 V.S.A. § 129(c).

153.    If the State shows "by a preponderance of the evidence" that the health care provider violated the provider restriction, the board or administrative law officer may "impos[e] an administrative penalty not to exceed $5,000.00 for each professional conduct violation." *Id.* § 129a(c), (d)(1).

154.    The board or administrative law officer may also "issue warnings or reprimands, suspend, revoke, limit, condition, deny, or prevent renewal of licenses." *Id.* § 129(a)(3).

155.    It is unclear whether drug-store pregnancy tests, like those provided by Branches, fit into the Provider Restriction's definition of "health care services."

156.    It is also unclear whether "health care services" would include the collection of information from clients about the date of their last menstrual period, their sexual history, or their pregnancy symptoms.

157.    It is unclear whether "healthcare information" is broad enough to include *all* information about pregnancy, abortion, and childbirth, regardless of whether that information is medical.

158.    It is likewise unclear whether "health care services" would include a woman who visits a pregnancy center and obtains a free pregnancy test from staff to

take and read the results alone in the bathroom to even confirm whether she is indeed pregnant.

159.   It is unclear whether "counseling" is meant to apply narrowly to informed consent or mental health counseling or broadly to any person at a pregnancy center who might talk with a woman about whether to have an abortion, or counsel her concerning pregnancy, pregnancy prevention, parenting, or childbirth.

160.   It is also unclear whether pregnancy, motherhood, or post-abortion support groups might qualify as services or counseling under the provider restriction.

161.   Under the provider restriction, if a pregnancy center staff member who is not a licensed healthcare provider so much as provides a pregnancy test (a health care service), discusses a client's pregnancy with her (counseling about a health condition), or provides her with a list of possible complications of abortion (health care information), any licensed provider at that center may be subject to professional discipline for not personally "conducting and providing health care services, information, and counseling at the center" or for not ensuring that only licensed providers conduct and provide such services, counseling, and information . 9 V.S.A. § 2493(b).

162.   Christel Tonoki, a University of Vermont student, testified to the Senate Committee on Health and Welfare that she along with other students "excitedly" planned to "storm these [crisis pregnancy centers] . . . and kinda just drain them of their resources . . . and basically play their game… and take part [air quotes] in their services." *An Act Relating to Access to Legally Protected Health Care Activity and Regulation of Health Care Providers: Hearing on S.37 Before the S. Comm. on Health and Welfare* (Vt. 2023) (statement by witness Christel Tonoki).

163.

24

164.    Thus, Aspire's medical staff (and the medical staff of other NIFLA members that have medical staff) face a credible threat of enforcement under the provider restriction  if they continue to allow their non-medical staff and volunteers from providing clients with information about their pregnancy options and counseling clients about those options.

165.    The same standard does not apply to abortion clinics. Planned Parenthood of Northern New England's Vice President of Vermont Public Affairs, Ms. Lucy Leriche, testified that even Planned Parenthood staff that provide ultrasounds need only be "privileged" by their local Planned Parenthood. *An Act Relating to Access to Legally Protected Health Care Activity and Regulation of Health Care Providers: Hearing on S.37 Before the H. Comm. on Health Care* (Vt. 2023) (statement by witness Ms. Lucy Leriche). In other words, these staff members need not be licensed medical providers. *Id.*

166.    The provider restriction is also unclear as to whether non-medical pregnancy centers, like Branches, from providing clients with information or counseling about pregnancy options without hiring medical staff.

167.    In practice, this would mean that all pregnancy centers—including those who, like Branches, do not provide medical services—will need to hire licensed health care providers to provide information and counseling on any aspect of pregnancy, childbirth, abortion, or other health issue clients wish to discuss.

168.    Under the Provider Restriction, Branches' non-medical staff and volunteers may be subject to punishment for continuing to provide over-the-counter pregnancy tests, to counsel clients concerning their pregnancy-related concerns and decisions, and to provide clients with information related to their pregnancy, or else be subject to penalties for violating the Provider Restriction. *See* 3 V.S.A. § 127 (providing that "[a] person practicing a regulated profession without authority or an employer permitting such practice may, upon the complaint of the Attorney General

25

or a State's Attorney or an attorney assigned by the Office of Professional Regulation, be enjoined therefrom by the Superior Court . . . and may be assessed a civil penalty of not more than $5,000," or "imprison[ed] for not more than one year, or both"); 26 V.S.A. § 1353(7) (giving the Board of Medical Practice the power to "[i]nvestigate all complaints of illegal practice of medicine and refer any substantiated" complaints to the attorney general).

## COUNT I

### The Advertising Prohibition Violates the Free Speech Clause of the First Amendment to the U.S. Constitution

169.    Plaintiffs incorporate by reference paragraphs 1 through 165.

170.    The Free Speech Clause of the First Amendment prohibits States from making any law "abridging the freedom of speech." U.S. Const. amend. I.

171.    Because Plaintiffs do not charge for their services, the Advertising Prohibition, 9 V.S.A. § 2493(a), regulates Plaintiffs' non-commercial speech.

172.    Because the Advertising Prohibition applies only to limited-services pregnancy centers, or those that do not provide or refer for abortion or "emergency contraception," it constitutes impermissible viewpoint discrimination.

173.    The Advertising Prohibition regulates the Plaintiffs' speech on the basis of its content.

174.    Content-based restrictions on speech can stand only if they survive strict scrutiny, which requires the State to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.

175.    The Advertising Prohibition is also unconstitutionally overbroad.

176.    The Advertising Prohibition does not advance any legitimate, much less compelling, state interest and fails any level of constitutional scrutiny.

177.   The Advertising Prohibition does not advance the State's interests in protecting maternal health and safety or in preserving the integrity of the medical profession.

178.   Nor is the Advertising Prohibition the least restrictive means of advancing the State's interests.

179.   The Advertising Prohibition is not narrowly tailored because it is both overinclusive and underinclusive.

180.   Therefore, the Advertising Prohibition violates the Free Speech Clause of the First Amendment both on its face and as applied to Plaintiffs.

## <u>COUNT II</u>

### The Provider Restriction Violates the Free Speech Clause of the First Amendment to the U.S. Constitution

181.   Plaintiffs incorporate by reference paragraphs 1 through 165.

182.   The Free Speech Clause of the First Amendment prohibits States from making any law "abridging the freedom of speech." U.S. Const. amend. I.

183.   Because Plaintiffs do not charge for their services, the Provider Restriction, 9 V.S.A. § 2493(b), regulates Plaintiffs' non-commercial speech.

184.   The Provider Restriction is a viewpoint- and content-based regulation of pure speech because it directly regulates speech about health-care-related "information" and "counseling" by "limited-services pregnancy centers," even when no medical treatment or procedure is involved. 9 V.S.A. § 2493(b).

185.   Because the Provider Restriction is not tied to a specific medical procedure or treatment that Plaintiffs perform, it is not an informed-consent requirement.

186.   The Provider Restriction is also unconstitutionally overbroad.

187.   Because "information" and "counseling" are pure speech, strict scrutiny applies.

188.   The Provider Restriction does not advance any legitimate, let alone compelling, state interest and fails any level of constitutional scrutiny.

189.   The Provider restriction is not narrowly tailored because it is both overinclusive and underinclusive.

190.   Therefore, the Provider Restriction violates the Free Speech Clause of the First Amendment both on its face and as applied to Plaintiffs.

## COUNT III

**The Advertising Prohibition Violates the Due Process Clause
of the Fourteenth Amendment to the U.S. Constitution**

191.   Plaintiffs reincorporate by reference paragraphs 1 through 165.

192.   The Fourteenth Amendment's Due Process Clause prohibits States from enacting vague laws.

193.   A statute is unconstitutionally vague in violation of the Due Process Clause if it (1) fails to provide a person of ordinary intelligence with fair notice of what is prohibited, or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement.

194.   The Advertising Prohibition, 9 V.S.A. § 2493(a), is unconstitutionally vague because it fails to define relevant terms, fails to provide Plaintiffs with fair notice of what is prohibited, and encourages discriminatory enforcement against pro-life viewpoints.

195.   The term "mislead" is undefined and unconstitutionally vague.

196.   Therefore, the Advertising Prohibition violates the Due Process Clause of the Fourteenth Amendment both on its face and as applied to Plaintiffs.

## COUNT IV

**The Provider Restriction Violates the Due Process Clause of the
Fourteenth Amendment to the U.S. Constitution**

197.   Plaintiffs reincorporate by reference paragraphs 1 through 153.

198.   The Fourteenth Amendment's Due Process Clause prohibits States from enacting vague laws.

199.   A statute is unconstitutionally vague in violation of the Due Process Clause if it (1) fails to provide a person of ordinary intelligence with fair notice of what is prohibited, or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement.

200.   The provider restriction, 9 V.S.A. § 2493, is unconstitutionally vague because it fails to define relevant terms, fails to provide Plaintiffs with fair notice of what is prohibited, and encourages discriminatory enforcement against pro-life viewpoints.

201.   The terms "health care services," "information," and "counseling" are unconstitutionally vague.

202.   The Provider Restriction is also vague because it is unclear whether it requires licensed health care providers to personally provide or conduct all health care services, information, and counseling.

203.   Finally, the Provider Restriction is vague because it is unclear whether it subjects pregnancy centers without any licensed providers to penalties for providing over-the-counter pregnancy tests, publicly available health care information about health conditions such as pregnancy, childbirth, abortion, or sexually transmitted diseases, and peer counseling about topics such as pregnancy options or post-abortion recovery.

204.   Therefore, the provider restriction violates the Due Process Clause of the Fourteenth Amendment both on its face and as applied to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.      Accept jurisdiction in this case;

B.      Enter a declaratory judgment adjudging and declaring that 9 V.S.A. section 2493 violates the First and Fourteenth Amendments to the U.S. Constitution;

C.      Enter an injunction permanently enjoining Defendants and their agents from enforcing 9 V.S.A. section 2493.

D.      Issue the requested injunctive relief without condition of bond or other security being required of Plaintiffs;

E.      Award Plaintiffs attorney fees and costs against the Defendants pursuant to 42 U.S.C. section 1988; and

F.      Award such other and further relief as it deems equitable and just.

This 25th day of October, 2023.

s/ Michael Tierney
_____

Michael Tierney
VT Bar No. 5275
Gretchen M. Wade
NH Bar No. 273726
WADLEIGH, STAR & PETERS, P.L.L.C.
95 Market Street
Manchester, NH 03101
Telephone: (603) 669-4140
Facsimile: (603) 669-6018
mtierney@wadleighlaw.com
gwade@wadleighlaw.com

Julia C. Payne*
IN Bar No. 34728-53
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jpayne@ADFlegal.org

*Counsel for Plaintiffs*

*Admitted pro hac vice*

# EXHIBIT A

**No. 15.  An act relating to access to legally protected health care activity and regulation of health care providers.**

(S.37)

It is hereby enacted by the General Assembly of the State of Vermont:

* * * Definitions * * *

Sec. 1.  1 V.S.A. § 150 is added to read:

§ 150.  LEGALLY PROTECTED HEALTH CARE ACTIVITY

(a)  "Gender-affirming health care services" means all supplies, care, and services of a medical, behavioral health, mental health, surgical, psychiatric, therapeutic, diagnostic, preventative, rehabilitative, or supportive nature, including medication, relating to the treatment of gender dysphoria and gender incongruence.  "Gender-affirming health care services" does not include conversion therapy as defined by 18 V.S.A. § 8351.

(b)(1)  "Legally protected health care activity" means:

(A)  the exercise and enjoyment, or attempted exercise and enjoyment, by any person of rights to reproductive health care services or gender-affirming health care services secured by this State;

(B)  any act or omission undertaken to aid or encourage, or attempt to aid or encourage, any person in the exercise and enjoyment, or attempted exercise and enjoyment, of rights to reproductive health care services or gender-affirming health care services secured by this State, provided that the provision of such a health care service by a person duly licensed under the laws of this State and physically present in this State shall be legally protected

if the service is permitted under the laws of this State, regardless of the

patient's location; or

(C)  the provision, issuance, or use of, or enrollment in, insurance or

other health coverage for reproductive health care services or gender-affirming

health care services that are legal in this State, or any act to aid or encourage,

or attempt to aid or encourage, any person in the provision, issuance, or use of,

or enrollment in, insurance or other health coverage for those services,

regardless of the location of the insured or individual seeking insurance or

health coverage, if the insurance or health coverage is permitted under the laws

of this State.

(2)  Except as provided in subdivision (3) of this subsection, the

protections applicable to "legally protected health care activity" shall not apply

to a lawsuit; judgment; or civil, criminal, or administrative action that is based

on conduct for which an action would exist under the laws of this State if the

course of conduct that forms the basis for liability had occurred entirely in this

State.

(3)  Notwithstanding subdivision (2) of this subsection, the provision of a

health care service by a person duly licensed under the laws of this State and

physically present in this State shall be legally protected if the service is

permitted under the laws of this State, regardless of the patient's location or

whether the health care provider is licensed in the state where the patient is

located at the time the service is rendered.

(c)(1)  "Reproductive health care services" means all supplies, care, and

services of a medical, behavioral health, mental health, surgical, psychiatric,

therapeutic, diagnostic, preventative, rehabilitative, or supportive nature,

including medication, relating to pregnancy, contraception, assisted

reproduction, pregnancy loss management, or the termination of a pregnancy.

(2)  "Reproductive health care services" includes medication that was

approved by the U.S. Food and Drug Administration (FDA) for termination of

a pregnancy as of January 1, 2023, regardless of the medication's current FDA

approval status:

(A)  when such medication is procured, ordered, stored, distributed,

prescribed, dispensed, or administered, or a combination thereof, by a person

duly licensed under the laws of this State, as long as the licensee's actions

conform to the essential standards of acceptable and prevailing practice for the

licensee's profession; or

(B)  when such medication is used by an individual.

* * * Medical Malpractice * * *

Sec. 2.  8 V.S.A. chapter 129 is amended to read:

CHAPTER 129.  INSURANCE TRADE PRACTICES

* * *

§ 4722.  DEFINITIONS

* * *

(4)(A)  "Abusive litigation" means  litigation or other legal action to

deter, prevent, sanction, or punish any person engaging in legally protected

health care activity by:

(i)  filing or prosecuting any action in any other state where

liability, in whole or part, directly or indirectly, is based on legally protected

health care activity that occurred in this State, including any action in which

liability is based on any theory of vicarious, joint, or several liability derived

therefrom; or

(ii)  attempting to enforce any order or judgment issued in

connection with any such action by any party to the action or any person acting

on behalf of a party to the action.

(B)  A lawsuit shall be considered to be based on conduct that

occurred in this State if any part of any act or omission involved in the course

of conduct that forms the basis for liability in the lawsuit occurs or is initiated

in this State, whether or not such act or omission is alleged or included in any

pleading or other filing in the lawsuit.

(5)  "Legally protected health care activity" has the same meaning as in

1 V.S.A. § 150.

* * *

§ 4724.  UNFAIR METHODS OF COMPETITION OR UNFAIR OR

DECEPTIVE ACTS OR PRACTICES DEFINED

The following are hereby defined as unfair methods of competition or unfair

or deceptive acts or practices in the business of insurance:

* * *

(7)  Unfair discrimination; arbitrary underwriting action.

(A)  Making or permitting any unfair discrimination between insureds

of the same class and equal risk in the rates charged for any contract of

insurance, or in the dividends or other benefits payable thereon, or in any other

of the terms and conditions of such contracts.

* * *

(F)(i)  Discriminating against a health care provider, as defined by

18 V.S.A. § 9496, or adjusting or otherwise calculating a health care provider's

risk classification or premium charges on the basis that:

(I)  the health care provider provides or assists in the provision

of legally protected health care activity that is unlawful in another state;

(II)  another state's laws create potential or actual liability for

that activity;

(III)  abusive litigation against a provider concerning legally

protected health care activity resulted in a claim, settlement, or judgement

against the provider; or

(IV)  the license of the provider has been disciplined in any way by another state based solely on the provider's provision of legally protected health care activity.

(ii)  For purposes of this subdivision (F), it shall not be unfairly discriminatory nor an arbitrary underwriting action against a health care provider if the risk classifications, premium charges, or other underwriting considerations are based on factors other than those listed in subdivision (i) of this subdivision (F).

* * *

* * * Insurance Coverage * * *

Sec. 3.  8 V.S.A. § 4088m is added to read:

§ 4088m.  COVERAGE FOR GENDER-AFFIRMING HEALTH CARE

SERVICES

(a)  Definitions.  As used in this section:

(1)  "Gender-affirming health care services" has the same meaning as in 1 V.S.A. § 150.

(2)  "Health insurance plan" means Medicaid and any other public health care assistance program, any individual or group health insurance policy, any hospital or medical service corporation or health maintenance organization subscriber contract, or any other health benefit plan offered, issued, or renewed for any person in this State by a health insurer as defined by 18 V.S.A. § 9402. For purposes of this section, health insurance plan includes any health benefit

plan offered or administered by the State or any subdivision or instrumentality of the State.  The term does not include benefit plans providing coverage for a specific disease or other limited benefit coverage, except that it includes any accident and sickness health plan.

  (b)  Coverage.

    (1)  A health insurance plan shall provide coverage for gender-affirming health care services that:

        (A)  are medically necessary and clinically appropriate for the individual's diagnosis or health condition; and

        (B)  are included in the State's essential health benefits benchmark plan.

    (2)  Coverage provided pursuant to this section by Medicaid or any other public health care assistance program shall comply with all federal requirements imposed by the Centers for Medicare and Medicaid Services.

    (3)  Nothing in this section shall prohibit a health insurance plan from providing greater coverage for gender-affirming health care services than is required under this section.

  (c)  Cost sharing.  A health insurance plan shall not impose greater coinsurance, co-payment, deductible, or other cost-sharing requirements for coverage of gender-affirming health care services than apply to the diagnosis and treatment of any other physical or mental condition under the plan.

Sec. 4.  8 V.S.A. § 4099e is added to read:

§ 4099e.  COVERAGE FOR ABORTION AND ABORTION-RELATED

　　　　　　SERVICES

  (a)  Definitions.  As used in this section:

　　(1)  "Abortion" means any medical treatment intended to induce the

termination of, or to terminate, a clinically diagnosable pregnancy except for

the purpose of producing a live birth.

　　(2)  "Health insurance plan" means Medicaid and any other public health

care assistance program, any individual or group health insurance policy, any

hospital or medical service corporation or health maintenance organization

subscriber contract, or any other health benefit plan offered, issued, or renewed

for any person in this State by a health insurer as defined by 18 V.S.A. § 9402.

For purposes of this section, health insurance plan shall include any health

benefit plan offered or administered by the State or any subdivision or

instrumentality of the State.  The term shall not include benefit plans providing

coverage for a specific disease or other limited benefit coverage, except that it

shall include any accident and sickness health plan.

  (b)  Coverage.  A health insurance plan shall provide coverage for abortion

and abortion-related care.

  (c)  Cost sharing.  The coverage required by this section shall not be subject

to any co-payment, deductible, coinsurance, or other cost-sharing requirement

or additional charge, except:

(1)  to the extent such coverage would disqualify a high-deductible

health plan from eligibility for a health savings account pursuant to 26 U.S.C.

§ 223; and

(2)  for coverage provided by Medicaid.

Sec. 5.  STATE PLAN AMENDMENT

The Agency of Human Services shall seek a state plan amendment from the

Centers for Medicare and Medicaid Services or federal authorities if needed to

allow Vermont's Medicaid program to provide coverage consistent with this

act.

* * * Professional Regulation * * *

Sec. 6.  3 V.S.A. § 129a is amended to read:

§ 129a.  UNPROFESSIONAL CONDUCT

(a)  In addition to any other provision of law, the following conduct by a

licensee constitutes unprofessional conduct.  When that conduct is by an

applicant or person who later becomes an applicant, it may constitute grounds

for denial of a license or other disciplinary action.  Any one of the following

items or any combination of items, whether the conduct at issue was

committed within or outside the State, shall constitute unprofessional conduct:

* * *

(7)  Willfully making or filing false reports or records in the practice of

the profession, willfully impeding or obstructing the proper making or filing of

reports or records, or willfully failing to file the proper reports or records, or

willfully providing inaccurate health or medical information to a patient,

including purposeful misrepresentation of a patient's health status.

* * *

    (29)  Providing or claiming to provide services or medications that are

purported to reverse the effects of a medication abortion.

* * *

    (f)(1)  Health care providers.  Notwithstanding subsection (e) of this section

or any other law to the contrary, no health care provider who is certified,

registered, or licensed in Vermont shall be subject to professional disciplinary

action by a board or the Director, nor shall a board or the Director take adverse

action on an application for certification, registration, or licensure of a

qualified health care provider, based solely on:

        (A)  the health care provider providing or assisting in the provision of

legally protected health care activity; or

        (B)  a criminal, civil, or disciplinary action in another state against the

health care provider that is based solely on the provider providing or assisting

in the provision of legally protected health care activity.

    (2)  Definitions.  As used in this subsection:

        (A)  "Health care provider" means a person who provides

professional health care services to an individual during that individual's

medical care, treatment, or confinement.

(B)  "Health care services" means services for the diagnosis,

prevention, treatment, cure, or relief of a physical or mental health condition,

including procedures, products, devices, and medications.

(C)  "Legally protected health care activity" has the same meaning as

in 1 V.S.A. § 150.

Sec. 7.  26 V.S.A. § 1354 is amended to read:

§ 1354.  UNPROFESSIONAL CONDUCT

* * *

(d)(1)  Health care providers.  Notwithstanding any other law to the

contrary, no health care provider who is certified, registered, or licensed in

Vermont shall be subject to professional disciplinary action by the Board, nor

shall the Board take adverse action on an application for certification,

registration, or licensure of a qualified health care provider, based solely on:

(A)  the health care provider providing or assisting in the provision of

legally protected health care activity; or

(B)  a criminal, civil, or disciplinary action in another state against the

health care provider that is based solely on the provider providing or assisting

in the provision of legally protected health care activity.

(2)  Definitions.  As used in this subsection:

(A)  "Health care provider" means a person who provides

professional health care services to an individual during that individual's

medical care, treatment, or confinement.

(B)  "Health care services" means services for the diagnosis,

prevention, treatment, cure, or relief of a physical or mental health condition,

including procedures, products, devices, and medications.

(C)  "Legally protected health care activity" has the same meaning as

in 1 V.S.A. § 150.

* * * Pregnancy Centers * * *

Sec. 8.  9 V.S.A. chapter 63, subchapter 11 is added to read:

Subchapter 11.  Pregnancy Services Centers

§ 2491.  FINDINGS; LEGISLATIVE INTENT

(a)  Findings.  The General Assembly finds that:

(1)  Centers that seek to counsel clients against abortion, often referred to

as crisis pregnancy centers or limited-services pregnancy centers, have become

common across the country, including in Vermont.  Accurate information

about the services that a limited-services pregnancy center performs, in

addition to forthright acknowledgement of its limitations, is essential to enable

individuals in this State to make informed decisions about their care.  This

includes individuals being informed of whether they are receiving services

from a licensed and qualified health care provider at a limited-services

pregnancy center, as this allows individuals to determine if they need to seek

medical care elsewhere in order to continue or terminate a pregnancy.

(2)  Although some limited-services pregnancy centers openly

acknowledge in their advertising, on their websites, and at their facilities that

they neither provide abortions nor refer clients to other providers of abortion

services, others provide confusing and misleading information to pregnant

individuals contemplating abortion by leading those individuals to believe that

their facilities offer abortion services and unbiased counseling.  Some limited-

services pregnancy centers have promoted patently false or biased medical

claims about abortion, pregnancy, contraception, and reproductive health care

providers.

(3)  False and misleading advertising by centers that do not offer or refer

clients for abortion is of special concern to the State because of the time-

sensitive and constitutionally protected nature of the decision to continue or

terminate a pregnancy.  When a pregnant individual is misled into believing

that a center offers services that it does not in fact offer or receives false or

misleading information regarding health care options, the individual loses time

crucial to the decision whether to terminate a pregnancy and may lose the

option to choose a particular method or to terminate a pregnancy at all.

(4)  Telling the truth is how trained health care providers demonstrate

respect for patients, foster trust, promote self-determination, and cultivate an

environment where best practices in shared decision-making can flourish.

Without veracity in information and communication, it is difficult for

individuals to make informed, voluntary choices that are essential to one's

sense of personal agency and autonomy.

(5)  Advertising strategies and educational information about health care options that lack transparency, use misleading or ambiguous terminology, misrepresent or obfuscate services provided, or provide factually inaccurate information are a form of manipulation that disrespects individuals, undermines trust, broadens health disparity, and can result in patient harm.

(b)  Intent.

(1)  It is the intent of the General Assembly to ensure that the public is provided with accurate, factual information about the types of health care services that are available to pregnant individuals in this State.  The General Assembly respects the constitutionally protected right of each individual to personal reproductive autonomy, which includes the right to receive clear, honest, and nonmisleading information about the individual's options and to make informed, voluntary choices after considering all relevant information.

(2)  The General Assembly respects the right of limited-services pregnancy centers to counsel individuals against abortion, and nothing in this subchapter should be construed to regulate, limit, or curtail such advocacy.

§ 2492.  DEFINITIONS

As used in this subchapter:

(1)  "Abortion" means any medical treatment intended to induce the termination of, or to terminate, a clinically diagnosable pregnancy except for the purpose of producing a live birth.

(2)  "Client" means an individual who is inquiring about or seeking

services at a pregnancy services center.

(3)  "Emergency contraception" means any drug approved by the U.S.

Food and Drug Administration as a contraceptive method for use after sexual

intercourse, whether provided over the counter or by prescription.

(4)  "Health information" means any oral or written information in any

form or medium that relates to health insurance or the past, present, or future

physical or mental health or condition of a client.

(5)  "Limited-services pregnancy center" means a pregnancy services

center that does not directly provide, or provide referrals to clients for,

abortions or emergency contraception.

(6)  "Pregnancy services center" means a facility, including a mobile

facility, where the primary purpose is to provide services to individuals who

are or may be pregnant and that either offers obstetric ultrasounds, obstetric

sonograms, or prenatal care to pregnant individuals or has the appearance of a

medical facility.  A pregnancy services center has the appearance of a medical

facility if two or more of the following factors are present:

(A)  The center offers pregnancy testing or pregnancy diagnosis, or

both.

(B)  The center has staff or volunteers who wear medical attire or

uniforms.

(C)  The center contains one or more examination tables.

(D)  The center contains a private or semiprivate room or area containing medical supplies or medical instruments.

(E)  The center has staff or volunteers who collect health information from clients.

(F)  The center is located on the same premises as a State-licensed medical facility or provider or shares facility space with a State-licensed medical provider.

(7)  "Premises" means land and improvements or appurtenances or any part thereof.

§ 2493.  UNFAIR AND DECEPTIVE ACT

(a)  It is an unfair and deceptive act and practice in commerce and a violation of section 2453 of this title for any limited-services pregnancy center to disseminate or cause to be disseminated to the public any advertising about the services or proposed services performed at that center that is untrue or clearly designed to mislead the public about the nature of services provided. Advertising includes representations made directly to consumers; marketing practices; communication in any print medium, such as newspapers, magazines, mailers, or handouts; and any broadcast medium, such as television or radio, telephone marketing, or advertising over the Internet such as through websites and web ads.  For purposes of this chapter, advertising or the provision of services by a limited-services pregnancy center is an act in commerce.

(b)  Health care providers certified, registered, or licensed under Title 26 of

the Vermont Statutes Annotated who are employed by, contracted to provide

services for or on behalf of, or volunteer to provide services at a limited-

services pregnancy center shall be responsible for conducting and providing

health care services, information, and counseling at the center.  The failure of a

health care professional certified, registered, or licensed under Title 26 of the

Vermont Statutes Annotated to conduct or to ensure that health care services,

information, and counseling at the limited-services pregnancy services center

are conducted in accordance with State law and professional standards of

practice may constitute unprofessional conduct under 3 V.S.A. § 129a and

26 V.S.A. § 1354.

(c)  The Attorney General has the same authority to make rules, conduct

civil investigations, and bring civil actions with respect to violations of

subsection (a) of this section as provided under subchapter 1 of this chapter.

* * * Reports; Interstate Compacts * * *

Sec. 9.  18 V.S.A. § 9405 is amended to read:

§ 9405.  STATE HEALTH IMPROVEMENT PLAN; HEALTH RESOURCE

ALLOCATION PLAN

* * *

(b)  The Green Mountain Care Board, in consultation with the Secretary of

Human Services or designee, shall publish on its website the Health Resource

Allocation Plan identifying Vermont's critical health needs, goods, services,

and resources, which shall be used to inform the Board's regulatory processes,

cost containment and statewide quality of care efforts, health care payment and

delivery system reform initiatives, and any allocation of health resources

within the State.  The Plan shall identify Vermont residents' needs for health

care services, programs, and facilities; the resources available and the

additional resources that would be required to realistically meet those needs

and to make access to those services, programs, and facilities affordable for

consumers; and the priorities for addressing those needs on a statewide basis.

The Board may expand the Plan to include resources, needs, and priorities

related to the social determinants of health.  The Plan shall be revised

periodically, but not less frequently than once every four years.

* * *

(3)  The Board shall receive and consider public input on the Plan at a

minimum of one Board meeting and one meeting of the Advisory Committee

and shall give interested persons an opportunity to submit their views orally

and in writing.

(4)  The Board shall include reproductive health care services and

gender-affirming health care services, as those terms are defined in 1 V.S.A.

§ 150, in its Plan analysis.

(5)  As used in this section:

(A)  "Health resources" means investments into the State's health care

system, including investments in personnel, equipment, and infrastructure

necessary to deliver:

* * *

Sec. 9a.  AGENCY OF HUMAN SERVICES; STATE HEALTH

ASSESSMENT; COMMUNITY PROFILES

The Agency of Human Services shall work with LGBTQA+ community

stakeholders and health care providers during the upcoming State Health

Assessment and Community Profiles community engagement processes to

explore barriers to equitable access to gender-affirming health care services, as

defined in 1 V.S.A. § 150.

Sec. 10.  BOARD OF MEDICAL PRACTICE; OFFICE OF PROFESSIONAL

REGULATION; INTERSTATE COMPACTS; REPORT

On or before November 1, 2025, the Office of Professional Regulation, in

consultation with the Board of Medical Practice, shall submit a report to the

House Committee on Health Care and the Senate Committee on Health and

Welfare with findings and recommendations for legislative action to address

any concerns regarding the State's participation, or contemplated participation,

in interstate licensure compacts as a result of the provisions of this act,

including the State's participation in the Nurse Licensure Compact pursuant to

26 V.S.A. chapter 28, subchapter 5 and the Interstate Medical Licensure

Compact pursuant to 26 V.S.A. chapter 23, subchapter 3A.

Sec. 10a.  26 V.S.A. chapter 56 is amended to read:

## CHAPTER 56.  OUT-OF-STATE TELEHEALTH LICENSURE &

## REGISTRATION AND INTERSTATE COMPACTS

### Subchapter 1.  Out-of-State Telehealth Licensure and Registration

* * *

### Subchapter 2.  Interstate Compacts; Health Care Provider Compacts

### § 3071.  HEALTH CARE PROVIDER COMPACTS; DIRECTION TO

### VERMONT REPRESENTATIVES

(a)  The General Assembly finds that a state's prohibition of or limitation on the provision of gender-affirming health care services or reproductive health care services, or both, as defined by 1 V.S.A. § 150, prohibits health care providers from following health care best practices and is a failure on the part of the state to provide health care services that are medically necessary and clinically appropriate for its residents.  Therefore, it is the General Assembly's intent to protect the ability of professionals licensed, certified, or registered in Vermont, and professionals from other member states seeking to practice a profession in Vermont pursuant to an interstate compact or agreement, to have the benefit of compacts and agreements while at the same time engaging in, providing, or otherwise facilitating, personally or professionally, gender-affirming health care and reproductive health care services.

(b)  Vermont's representative or delegate for an interstate compact or agreement related to health care shall seek an amendment or exception to the

language, rules, directives, or bylaws of the compact or agreement, as

necessary, so that if a licensee is disciplined by another state solely for

providing or assisting in the provision of gender-affirming health care services

or reproductive health care services that would be legal and meet professional

standards of care if provided in Vermont, the compact or agreement does not

require that Vermont take professional disciplinary action against the licensee.

* * * Emergency Contraception * * *

Sec. 11.  26 V.S.A. chapter 36, subchapter 1 is amended to read:

Subchapter 1.  General Provisions

* * *

§ 2022.  DEFINITIONS

As used in this chapter:

* * *

(22)  "Emergency contraception" means any drug approved by the U.S.

Food and Drug Administration as a contraceptive method for use after sexual

intercourse, whether provided over the counter or by prescription.

§ 2023.  CLINICAL PHARMACY; PRESCRIBING

* * *

(b)  A pharmacist may prescribe in the following contexts:

* * *

(2)  State protocol.

(A)  A pharmacist may prescribe, order, or administer in a manner

consistent with valid State protocols that are approved by the Commissioner of

Health after consultation with the Director of Professional Regulation and the

Board and the ability for public comment:

* * *

(ix)  emergency prescribing of albuterol or glucagon while

contemporaneously contacting emergency services; ~~and~~

(x)  tests for SARS-CoV for asymptomatic individuals or related

serology for individuals by entities holding a Certificate of Waiver pursuant to

the Clinical Laboratory Amendments of 1988 (42 U.S.C. § 263a)<u>; and</u>

<u>(xi)  emergency contraception</u>.

* * *

Sec. 11a.  26 V.S.A. § 2077 is added to read:

<u>§ 2077.  EMERGENCY CONTRACEPTION; VENDING MACHINES</u>

<u>(a)  A retail or institutional drug outlet licensed under this chapter or a</u>

<u>postsecondary school, as defined in and subject to 16 V.S.A. § 176, may make</u>

<u>over-the-counter emergency contraception and other nonprescription drugs or</u>

<u>articles for the prevention of pregnancy or conception available through a</u>

<u>vending machine or similar device.</u>

<u>(b)  Notwithstanding any provision of subsection 2032(h) of this chapter to</u>

<u>the contrary, the Board may adopt rules in accordance with 3 V.S.A. chapter</u>

<u>25 to regulate the location, operation, utilization, and oversight of the vending</u>

machines and similar devices described in subsection (a) of this section in a

manner that balances consumer access with appropriate safeguards for theft

prevention and safety.

* * * Higher Education; Health Care Services * * *

Sec. 12.  16 V.S.A. chapter 78 is added to read:

CHAPTER 78.  ACCESS TO REPRODUCTIVE AND GENDER-

AFFIRMING HEALTH CARE SERVICES

§ 2501.  DEFINITIONS

As used in this chapter:

(1)  "Gender-affirming health care readiness" means each institution's

preparedness to provide gender-affirming health care services to students or

assist students in obtaining gender-affirming health care services, including

having in place equipment, protocols, patient educational materials,

informational websites, and training for staff; provided, however, that gender-

affirming health care readiness may include the provision of gender-affirming

health care services.

(2)  "Gender-affirming health care services" has the same meaning as in

1 V.S.A. § 150.

(3)  "Institution" means the University of Vermont or a college in the

Vermont State College system.

(4)  "Reproductive health care services" has the same meaning as in

1 V.S.A. § 150.

(5)  "Reproductive health care readiness" means each institution's preparedness to provide reproductive health care services to students or assist students in obtaining reproductive health care services, including having in place equipment, protocols, patient educational materials, informational websites, and training for staff; provided, however, that reproductive health care readiness may include the provision of reproductive health care services.

(6)  "Telehealth" has the same meaning as in 26 V.S.A. § 3052.

§ 2502.  GENDER-AFFIRMING HEALTH CARE AND REPRODUCTIVE

HEALTH CARE READINESS; REPORTS

(a)  Each institution shall report to the Agency of Human Services annually, on or before November 1, on the current status of its gender-affirming health care and reproductive health care readiness, including:

(1)  whether the institution has an operational health center on campus;

(2)  whether the institution employs health care providers on campus;

(3)  the types of gender-affirming health care services and reproductive health care services that the institution offers to its students on campus and the supports that the institution provides to students who receive those services;

(4)  the institution's efforts to assist students with obtaining gender-affirming health care services and reproductive health care services from licensed health care professionals through telehealth;

(5)  the institution's proximity to a hospital, clinic, or other facility that

provides gender-affirming health care services or reproductive health care

services, or both, that are not available to students on campus;

(6)  the information that the institution provides regarding facilities that

offer gender-affirming health care services and reproductive health care

services that are not available to students on campus, including information

regarding the scope of the services that are available at each such facility; and

(7)  the availability, convenience, and cost of public transportation

between the institution and the closest facility that provides gender-affirming

health care services or reproductive health care services, or both, and whether

the institution provides transportation.

(b)  On or before January 31 of each year, the Agency of Human Services

shall compile the materials submitted pursuant to subsection (a) of this section

and report to the House Committees on Education, on Health Care, and on

Human Services and the Senate Committees on Education and on Health and

Welfare on the status of gender-affirming health care and reproductive health

care readiness at Vermont's institutions.

Sec. 13.  GENDER-AFFIRMING HEALTH CARE AND REPRODUCTIVE

HEALTH CARE READINESS; IMPLEMENTATION

Each institution shall submit its first report on the status of its gender-

affirming health care and reproductive health care readiness as required under

16 V.S.A. § 2502(a) to the Agency of Human Services on or before November

1, 2023, and the Agency shall provide its first legislative report on or before

January 31, 2024.

* * * Prohibition on Disclosure of Protected Health Information * * *

Sec. 14.  18 V.S.A. § 1881 is amended to read:

§ 1881.  DISCLOSURE OF PROTECTED HEALTH INFORMATION

PROHIBITED

(a)  As used in this section:

(1)  "Business associate" has the same meaning as in 45 C.F.R.

§ 160.103.

(2)  "Covered entity" ~~shall have~~ has the same meaning as in 45 C.F.R.

§ 160.103.

(3)  "Legally protected health care activity" has the same meaning as in

1 V.S.A. § 150.

~~(2)~~(4)  "Protected health information" ~~shall have~~ has the same meaning

as in 45 C.F.R. § 160.103.

(5)  "Telehealth" has the same meaning as in 26 V.S.A. § 3052.

(b)  A covered entity or business associate shall not disclose protected

health information unless the disclosure is permitted under the Health

Insurance Portability and Accountability Act of 1996 (HIPAA).

(c)  In order to protect patients and providers who engage in legally

protected health care activity, a covered entity or business associate shall not

disclose protected health information related to a legally protected health care

activity for use in a civil or criminal action; a proceeding preliminary to a civil

or criminal action; or a probate, legislative, or administrative proceeding unless

the disclosure meets one or more of the following conditions:

(1)  The disclosure is authorized by the patient or the patient's

conservator, guardian, or other authorized legal representative.

(2)  The disclosure is specifically required by federal law, Vermont law,

or rules adopted by the Vermont Supreme Court.

(3)  The disclosure is ordered by a court of competent jurisdiction

pursuant to federal law, Vermont law, or rules adopted by the Vermont

Supreme Court.  An order compelling disclosure under this subdivision shall

include the court's determination that good cause exists to require disclosure of

the information related to legally protected health care activity.

(4)  The disclosure is to be made to a person designated by the covered

entity or business associate and will be used solely in the defense of the

covered entity or business associate against a claim that has been made, or

there is a reasonable belief will be made, against the covered entity or business

associate in a civil or criminal action; a proceeding preliminary to a civil or

criminal action; or a probate, legislative, or administrative proceeding.

(5)  The disclosure is to Vermont's Board of Medical Practice or Office

of Professional Regulation, as applicable, in connection with a bona fide

investigation in Vermont of a licensed, certified, or registered health care

provider or a bona fide investigation of whether an individual who is not

licensed, certified, or registered to practice a health care profession in Vermont

engaged in unauthorized practice in this State, whether in person or through

telehealth.

(6)  The disclosure is to the Vermont Department of Health or the

Vermont Department of Disabilities, Aging, and Independent Living, or both,

in connection with a bona fide investigation of a licensed health care facility in

Vermont.

* * * Effective Dates * * *

Sec. 15.  EFFECTIVE DATES

(a)  This section, Sec. 1 (definitions), Sec. 2 (medical malpractice), Secs. 6

and 7 (unprofessional conduct), Sec. 8 (pregnancy services centers), Secs. 9,

9a, and 10 (reports and analyses), Sec. 11a (emergency contraception; vending

machines), Secs. 12 and 13 (gender-affirming health care and reproductive

health care readiness; reports), and Sec. 14 (prohibition on disclosure of

protected health information) shall take effect on passage.

(b)  Secs. 3 and 4 (insurance coverage) shall take effect on January 1, 2024

and shall apply to all health insurance plans issued on and after January 1,

2024 on such date as a health insurer offers, issues, or renews the health

insurance plan, but in no event later than January 1, 2025.

(c)  Sec. 5 (state plan amendment) shall take effect on January 1, 2024,

except that the Agency of Human Services shall submit its request for approval

of Medicaid coverage of the services prescribed in Sec. 4 of this act, if needed,

to the Centers for Medicare and Medicaid Services on or before July 1, 2023,

and the Medicaid coverage shall begin on the later of the date of approval or

January 1, 2024.

(d)  Sec. 10a (interstate compacts; state representatives) shall take effect on

July 1, 2023.

(e)  Sec. 11 (emergency contraception) shall take effect on or before

September 1, 2023, on such date as the Commissioner of Health approves the

State protocol.

Date Governor signed bill:  May 10, 2023

# EXHIBIT B

# ABORTION PILL REVERSAL

- Call the hotline 877.558.0333
- An on-call Healthcare Professional will ask you some basic questions to see if a reversal is possible.
- The Healthcare Professional will then connect you with a doctor or medical provider in your area to start treatment if that is your choice.

# EXHIBIT C

## October 2023 Google Posts

| Date | Post Content | Graphic |
|---|---|---|
| **Oct 4** | *"I took several pills and I'm still pregnant."*<br>*"I only took the first dose (Mifeprex) and changed my mind."*<br><br>Even if an abortion has already begun, give us a call. We can still help you talk through your options and give you information on abortion pill reversal protocols if you choose to continue your pregnancy. No one should take away your reproductive choices.<br><br>If you've taken multiple pills or packs of misoprostol and have not had heavy bleeding or passed the fetus, call us right away. | <br>• Mifeprex<br>• Misoprostol<br>• Abortion pill reversal*<br>• Pregnant<br>• Pills<br>• Bleeding<br>• Multiple pills<br>• Reproductive choices** |
| **Oct 11** | *When did I conceive?* Calculating a possible due date is difficult when most women do not know when they ovulated or the exact day they had unprotected sex.<br><br>If you are looking for pregnancy help or abortion information, we're here for you.<br><br>Because we do not profit from any decision you make, you can talk through your options without pressure or coercion.<br><br>Although our center does not provide the abortion pill or procedures, we can answer any questions you have about side effects, what to expect, and offer support after an abortion. | <br>• Ovulation<br>• Conceive<br>• Abortion Pill<br>• Unprotected sex<br>• Calculator<br>• Due Date<br>• Side effects |
| **Oct 18** | Some of the top questions we hear from women are:<br><br>• *How far along am I? How do I calculate my due date?*<br>• *How much does an abortion cost at a clinic?*<br>• *Where can I get a free pregnancy test or ultrasound?*<br>• *How early can pregnancy be detected?*<br>• *Is the abortion pill by mail safe?*<br><br>If you think you may be pregnant or have had a positive home test, contact us today for free consultations and reproductive health services. | <br>• Cost<br>• Clinic<br>• Pill by mail<br>• Pregnancy test<br>• Ultrasound<br>• "How early can pregnancy be detected?"<br>• Safe<br>• Due date<br>• "How long do you bleed |

| | | |
|---|---|---|
| | | after the abortion pill."<br>● Free<br>● Reproductive health** |
| **Oct 25** | Pregnancy or PMS symptoms can often be similar. Feeling tired or nauseous? Sore breasts? Having to pee more than normal? Light spotting? These early pregnancy signs can show up even before a missed period.<br><br>Whether your pregnancy was planned or unplanned, we're your first step. If you think you may be pregnant, contact us today for a free pregnancy test at our center. If positive, we can explore your next steps, including why having an ultrasound matters, information on abortion and reproductive health choices, adoption, parenthood, and more. | <br>● PMS<br>● Pregnancy Symptoms<br>● Test<br>● Pregnancy Signs<br>● Pregnant<br>● Missed Period<br>● Planned<br>● Parenthood<br>● Abortion<br>● Adoption<br>● "What is abortion"<br>● Ultrasound<br>● Reproductive health** |

*Praise God! Abortion pill reversal is trending right now at number 10! We've never seen it this high. Please pray these posts do not get flagged. (Note: Women are also searching for things about multiple pill packs and kits.)

**There is a spike in searches for reproductive health clinics. While we cannot show up for abortion clinic searches through Google Business anymore, centers *can* and do show up for reproductive health or clinic terms when optimized.