UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


NATIONAL INSTITUTE OF FAMILY AND LIFE :
ADVOCATES, ASPIRE TOGETHER, INC.      :
d/b/a/ ASPIRE NOW; BRANCHES PREGNANCY :
RESOURCE CENTER, INC.,                :
                                      :
          Plaintiffs,                 :
                                      :
v.                                    :    Case No. 2:23-cv-229
                                      :
CHARITY CLARK, SARAH COPELAND HANZAS, :
KEVIN RUSHING, MARK LEVINE,           :
INDIVIDUAL MEMBERS OF THE VERMONT     :
BOARD OF MEDICAL PRACTICE, INDIVIDUAL :
MEMBERS OF THE VERMONT STATE BOARD OF :
NURSING, and COURTNEY BOWERS          :
                                      :
          Defendants.                 :


**OPINION AND ORDER**

## I. Introduction

Plaintiffs, pro-life pregnancy services centers (limited service pregnancy centers or "LSPCs"), challenge two recently-enacted provisions of Vermont law. One regulates their advertising and another extends the Vermont standards of medical practice to cover non-licensed healthcare providers at the LSPCs if the LSPCs also employ licensed healthcare providers. The Court concludes that Plaintiffs have standing to challenge both provisions. It also concludes that Plaintiffs have stated a plausible claim for violation of their First Amendment rights. However, the Court concludes that the relevant statutes are not

unconstitutionally vague. Accordingly, Defendants' amended motion to dismiss (ECF No. 49) is **granted** in part and **denied** in part.

## II.  Factual and Procedural Background

### A.  Factual Background

Limited service pregnancy centers based in Vermont filed this lawsuit challenging two provisions of Vermont law which restrict their ability to advertise and provide unlicensed medical services free from professional regulation.

Plaintiff National Institute of Family and Life Advocates ("NIFLA") is a religious non-profit composed of member pregnancy centers. ECF No. 47 at 3. NIFLA's mission is "to empower the choice for life by equipping pregnancy centers with legal counsel and support." *Id.* at 4. "Some of NIFLA's Vermont members provide medical services" such as ultrasounds or sonograms, while all offer free services such as pregnancy tests, counseling, "information concerning pregnancy options, and material support to new mothers." *Id.* There are eight pro-life pregnancy centers in Vermont, seven of which are NIFLA members. *Id.* at 12.

Plaintiffs Aspire Now ("Aspire") and Branches Pregnancy Resource Center ("Branches") are Vermont LSPCs and NIFLA members. Both are "faith-based not-for-profits duly incorporated under the laws of Vermont." *Id.* at 6. They provide free services

to pregnant women, including counseling, but neither provide abortions or "emergency contraception." *Id.* at 7. Aspire's offerings include "pregnancy options counseling, parenting classes, post-abortion support, sexual risk avoidance counseling, and healthy relationship coaching." *Id.* at 5. Branches provides "pregnancy tests, peer counseling, information about abortion procedures and risks, information about abortion alternatives, abstinence education, post-abortion support, [and] parenting classes." *Id.* at 7. Both Branches and Aspire provide material support for pregnant women in the form of "baby and maternity items." *Id.*

The two LSPCs offer some distinct services and interact differently with Vermont medical licensing regimes. Aspire offers medical services to pregnant women including "STD testing, pregnancy testing, [and] ultrasounds." *Id.* at 5. Licensed nurses provide all pregnancy tests, ultrasounds, and STD tests. Aspire's medical director is Dr. Jessica Whelan, a naturopathic physician licensed in Vermont. She reviews all ultrasounds and meets with "at-risk patients" and patients interested in learning about natural family planning. *Id.* at 6. Non-licensed medical staff provide peer counseling, support, and educational services at Aspire. *Id.*

Branches, on the other hand, "is not currently a medical clinic and does not provide medical services," although it

3

intends to become a medical clinic in 2025. *Id.* at 8. It does not provide medical services such as "ultrasounds, sonograms, or prenatal care." *Id.* Branches does offer over-the-counter urine pregnancy tests, provided by (apparently non-licensed) staff members and used by clients alone in Branches' bathroom. *Id.* Branches also collects "pregnancy-related information" including "the date of the client's last period, whether she has had previous pregnancies and how many, whether she has had previous miscarriages and how many, and whether she has had previous abortions and how many." *Id.* at 9.

Plaintiffs state that NIFLA's Vermont members "advertise their services through handouts and brochures, newspaper or magazine ads, television commercials, social media, and other online ads." *Id.* at 4. Aspire and Branches advertise their services through brochures, television commercials, social media, and their websites. *Id.* at 5. Both websites offer disclaimers indicating that the organizations do not support abortion. Aspire's says "[w]e do not refer or perform any services that harm the viability of life," *id.* at 6, while Branches' states "Branches Pregnancy Resource Center does not offer or refer for pregnancy terminations or birth control. Information is provided as an educational service and should not be relied on as a substitute for professional and/or medical advice." *Id.* at 7.

4

Defendants ("the State") are high-level Vermont state officials charged with enforcing Vermont's consumer protection laws and medical practice standards. *Id.* at 9-11.

**B.   The Statutory Landscape**

Plaintiffs challenge two provisions in Vermont Senate Bill No. 37 (S.B. 37), which was signed into law on May 10, 2023. ECF No. 47 at 2. The first is called the "advertising provision." It prohibits "unfair and deceptive" acts in commerce by LSPCs,[1] including dissemination of information to the public any "advertising about the services or proposed services performed at that center that is untrue or clearly designed to mislead the public." 9 V.S.A. § 2493(a). The subsection on legislative intent explains that "accurate information about the services that a limited-services pregnancy center performs . . . is essential to enable individuals in this State to make informed decisions about their care." 9 V.S.A. § 2491(a)(1).

---

[1] The term "pregnancy services center" is defined to mean "a facility, including a mobile facility, where the primary purpose is to provide services to individuals who are or may be pregnant and that either offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant individuals or has the appearance of a medical facility." 9 V.S.A. § 2492(6). The statute also provides a list of factors relevant to whether a pregnancy services center "has the appearance of a medical facility." 9 V.S.A. § 2492(6)(A-F). The term "limited-services pregnancy center" is defined to mean "a pregnancy services center that does not directly provide, or provide referrals to clients for, abortions or emergency contraception." 9 V.S.A. § 2492(5). The advertising provision only applies to LSPCs. 9 V.S.A. § 2493(a).

The Advertising Provision does not explicitly define what it means for an advertisement to be misleading. However, the statement of findings and legislative intent states that some LSPCs "provide confusing and misleading information to pregnant individuals contemplating abortion by leading those individuals to believe that [the LSPCs] offer abortion services and unbiased counseling," and that some LSPCs have promoted "patently false or biased medical claims about abortion." 9 V.S.A. § 2491(a)(2). Such misleading advertising is "of special concern to the State because of the time-sensitive and constitutionally protected nature of the decision to continue or terminate a pregnancy." 9 V.S.A. § 2491(a)(3). The advertising provision is enforced by the Vermont Attorney General ("AG"). 9 V.S.A. § 2493(c). Private consumers may also sue for equitable relief, money damages, attorney's fees, and exemplary damages. 9 V.S.A. § 2461(b).

The second challenged provision is called the "provider regulation." It requires that licensed health care providers[2] that work or volunteer at LSPCs "shall be responsible for conducting and providing health care services, information, and counseling at the center." 9 V.S.A. § 2493(b). It also states that licensed health care professionals at LSPCs must "conduct

---

[2] A health care provider is "a person who provides professional health care services to an individual during that individual's medical care, treatment, or confinement." 26 V.S.A. § 1354(d)(2)(A).

or [] ensure that health care services, information, and counseling at the limited-services pregnancy services center are conducted in accordance with State law and professional standards," or else face sanction for unprofessional conduct. *Id.* Notably, S.B. 37 also amends the standards for professional conduct to specify that "[p]roviding or claiming to provide services or medications that are purported to reverse the effects of a medication abortion" constitutes unprofessional conduct. 3 V.S.A. § 129a(a)(29).

The Board of Medical Practice has the authority to investigate charges of unprofessional conduct against any individual practicing as a medical doctor ("M.D."). 26 V.S.A. § 1353(2); *Id.* § 1311-13. It may also hold hearings and issue formal reprimands, revoke licenses, or impose financial penalties. *Id.*; *id.* § 1374(b)(1)(A). The Office of Professional Regulation, housed by the Secretary of State, enforces the professional standards against other licensed health care providers. 3 V.S.A. § 129(a). It may also hold hearings, revoke licenses, and impose financial penalties. 3 V.S.A. § 129.

## C.  **Procedural History**

Plaintiffs filed the instant lawsuit on July 25, 2023. The State filed a motion to dismiss on September 25, 2023, which was mooted by Plaintiffs' Amended Complaint filed on November 7, 2023. The State filed an amended motion to dismiss on December

18, 2023, pursuant to Federal Rules of Civil Procedure 12(b)(1)
and 12(b)(6). That motion is now ripe.

### III. Discussion

The State's motion to dismiss argues that "Plaintiffs lack
standing to challenge the advertising provision because they
have not alleged that they would like to make false or deceptive
advertisements," and have not alleged that their "unlicensed
staff do anything that would violate any laws or any health care
professional's standard of practice." ECF No. 49 at 2-3. The
State also seeks to dismiss the case on the merits for various
First Amendment reasons, detailed below.

### A.   Legal Standard

Federal Rule of Civil Procedure 12(b)(1) provides that a
party may assert a court's lack of subject-matter jurisdiction
in a motion. Here, the State asserts that the Court does not
have subject-matter jurisdiction because Plaintiffs have not
demonstrated injury-in-fact sufficient to confer Article III
standing. *See Diaz v. United States Dep't of Hous. & Urb. Dev.*,
No. 23-397, 2024 WL 1005562, at *1 (2d Cir. Mar. 8, 2024). A
federal court lacks subject matter jurisdiction — and therefore
cannot consider a lawsuit's merits — unless three constitutional
standing requirements are met. *See Food & Drug Admin. v. All.
for Hippocratic Med.*, No. 23-235, 2024 WL 2964140, at *6 (U.S.
June 13, 2024) ("The fundamentals of standing are well-known and

8

firmly rooted in American constitutional law."). First, the plaintiff must have suffered an "injury in fact," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), that is "concrete, particularized, and actual or imminent," *Citizens United to Protect Our Neighborhoods v. Vill. of Chestnut Ridge, New York*, 98 F.4th 386, 391 (2d Cir. 2024). Second, that injury must be "fairly traceable" to the defendant's challenged conduct. *Spokeo*, 578 U.S. at 338. And third, it must be "likely" that the injury will be "redressed by a favorable judicial decision." *Id.* As "[t]he party invoking federal jurisdiction," Plaintiffs bear the burden of establishing Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Standing inquiries take on unique contours when plaintiffs challenge the constitutionality of statutes prior to enforcement. As a threshold matter, Article III does "not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). While "action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution," if that action is "effectively coerced" by a reasonable threat of prosecution, a plaintiff may still demonstrate standing. *Id.* The Second Circuit has explained that it presumes "that the

government will enforce the law so long as the relevant statute
is recent and not moribund." *Hedges v. Obama*, 724 F.3d 170, 197
(2d Cir. 2013). In brief, "[a] plaintiff may bring a pre-
enforcement challenge to a statute by alleging an intention to
engage in a course of conduct arguably affected with a
constitutional interest, but proscribed by a statute, and there
exists a credible threat of prosecution thereunder." *Brokamp v.
James*, 66 F.4th 374, 388 (2d Cir. 2023) (citing *Susan B. Anthony
List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Plaintiffs' merits arguments are evaluated under the
familiar Rule 12(b)(6) standard which requires a plaintiff to
allege "enough facts to state a claim for relief that is
plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." *Id.* "To state a plausible claim, the
complaint's '[f]actual allegations must be enough to raise a
right to relief above the speculative level.'" *Nielsen v. AECOM
Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*,
550 U.S. at 555).

In deciding a motion to dismiss filed under Rule 12(b)(6),
a court must accept the factual allegations in the complaint as
true and draw all reasonable inferences in the plaintiff's

favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, a court need not accept as true "[l]egal conclusions, deductions or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## B.   Standing

### 1. Standing to Challenge the Advertising Provision

Plaintiffs have adequately pleaded standing to challenge the advertising provision. Traceability and redressability are not disputed. The only question is whether Plaintiffs have suffered (or are at risk of suffering) an "injury in fact." *Spokeo,* 578 U.S. at 338.

The Second Circuit has emphasized that "[a] plaintiff must allege something more than an abstract, subjective fear that his rights are chilled in order to establish a case or controversy. But a real and imminent fear of such chilling is enough." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (internal citations omitted). The parties dispute whether Plaintiffs' fear is "abstract and subjective" or "real and imminent." *Cf. Knife Rts., Inc. v. Vance,* 802 F.3d 377, 384 (2d Cir. 2015) (credible threat of prosecution cannot rest on fears that are "imaginary or speculative").

Plaintiffs have a real fear of imminent prosecution under the advertising provision. They have plausibly stated that LSPCs

advertise their services in a way that could fall within the
ambit of the advertising provision. First, Plaintiffs note that
Aspire uses "search engine optimization [for] terms 'abortion'
and 'clinic'" to access patients, ECF No. 52 at 7 – a practice
that a letter signed by several state AGs (including Vermont AG
Charity Clark) called "false advertising [] to lure women to
[LSPCs]." ECF No. 52-4 at 5. Plaintiffs also note that they
provide information specifically linking abortion to negative
consequences such as infertility, post-abortion syndrome,
anxiety, and depression. ECF No. 52 at 8; 52-5 at 2; 52-6 at 2.
The same AGs' letter calls those causal claims "misleading
information." ECF No. 52-4 at 5. And finally, the Branches
webpage invites visitors to contact Branches to "learn more
about abortion procedures" without specifying what it means to
"learn more" or what those "abortion procedures" are. ECF No. 52
at 6; ECF No. 52-7 at 2. Drawing all inferences in favor of
Plaintiffs, as the Court must at this stage of the litigation,
such an invitation could plausibly be considered "misleading."
It focuses on women considering abortions – with the intent of
dissuading them from pursuing that course – without revealing
Branches' intent to provide that perspective.[3]

---

[3] The parties dispute whether the statute imposes a subjective or
objective standard for evaluating "misleading advertising." *See*
ECF No. 52 at 7. Because Plaintiffs have plausibly alleged AG
Clark's intent to police several of their practices under the

Additionally, Plaintiffs have provided evidence indicating that AG Clark campaigned on a platform of using Vermont's consumer protection statutes – ostensibly including the advertising provision at issue in this case – to regulate LSPCs. ECF No. 52 at 3. They provide multiple documents in support of this proposition, including what appears to be an interview with Clark indicating that she intends to "use the Consumer Protection Act to create a safe harbor for people seeking abortion care, . . . [and] will institute a no-tolerance policy on deception and misinformation about abortion medicine and access to abortion providers." ECF No. 52-2 at 4. Plaintiffs also provide a copy of the Vermont AG's Office's written testimony on the advertising provision which expresses concern over misleading information regarding abortion services, and expresses support for a measure that would bring "advertising or the provision of services by a limited services pregnancy center under the powers given to the Attorney General." ECF No. 52-3 at

---

statute, the Court need not resolve that question of statutory construction at this stage of the litigation. Additionally, Plaintiffs state that they fear prosecution under the advertising provision for distributing information regarding the abortion reversal drug. ECF No. 47 at 18-19. The State responds that this does not violate the advertising provision because Plaintiffs do not purport to provide the service themselves. ECF No. 49 at 8. Because the Court concludes that Plaintiffs have a credible fear of prosecution under the statute for other practices, it need not resolve whether providing information about the abortion reversal pill could constitute false or misleading advertising under the advertising provision.

2. This contributes to the plausible inference that AG Clark intends to use the advertising provision to regulate marketing by LSPCs. *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010) ("If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred."). While public statements are not dispositive for the standing analysis, several courts have held that plaintiffs can prove that they have standing through defendants' "actions and [] public statements in the media." *Little Arm Inc. v. Adams*, 13 F. Supp. 3d 893, 906 (S.D. Ind. 2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing after petitioner was warned twice to stop allegedly protected speech and told that he would be prosecuted)).

Several other considerations beyond Plaintiffs' practices and Clark's statements militate in favor of finding standing at this stage of the litigation. First, the advertising provision specifies that LSPCs are subject to regulation. While that may be constitutionally benign, the limited scope of the statute reveals a narrow legislative intent to address a specific problem posed by LSPCs, contributing to the idea that it might be enforced against LSPCs. And the fact that this statute was recently passed also indicates that the State intends to enforce it. *Cf. Hedges*, 724 F.3d at 197 (explaining that courts

14

generally presume that statutes will be enforced so long as the statute is recent and "not moribund"). That prosecution has not yet commenced is irrelevant: the concern is self-censorship, "a harm that can be realized even without an actual prosecution." *Walsh*, 714 F.3d at 689; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 307-10 (2d Cir. 2023) (holding that plaintiff had standing to challenge a gun licensing regime because he self-regulated allegedly protected activity). Finally, the Second Circuit has noted that it does not matter for standing purposes whether a law imposes criminal or civil penalties; the threat of civil penalties can inhibit speech just as criminal ones do. *Id.* at 690 (citing *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)). Plaintiffs have standing to challenge the advertising provision. *Food & Drug Admin.*, 2024 WL 2964140, at *7 ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy [] the injury in fact [requirement].")

## 2. Standing to Challenge the Provider Regulation

Plaintiffs Aspire and NIFLA have standing to challenge the provider regulation. Branches does not, for the reasons outlined below. Here, too, the only issue is injury-in-fact.

First, taking the facts in the Amended Complaint as true, Plaintiffs have alleged that Aspire is an LSPC that employs a licensed health care professional, placing it within the ambit

of the statute. *See* ECF No. 47 at 6. The next question is whether Aspire has "more than an abstract, subjective fear that" it will face sanction under the statute. *Walsh*, 714 F.3d at 689. As noted above, a "real and imminent fear of [rights chilling] is enough." *Id.*

Counsel for the State suggested at oral argument that Plaintiffs have not alleged standing because they presented "an unreasonable interpretation of the statute." ECF No. 64 at 9. Plaintiffs interpret the statute to mean that the licensed provider must be the "primary agent conducting and providing the relevant services, information, and counseling." ECF No. 52 at 10. The State argues that "responsible" providers at LSPCs must ensure that all health services are provided in accordance with state standards for professional conduct and may "incur consequences" if they are not. *See* ECF No. 49 at 9-10. The State offers a better interpretation of the statute, but the Court concludes that Plaintiffs nonetheless have standing.

There is support for the position that the statute requires licensed health care providers working at LSPCs to directly provide all of the health care services at the LSPC. For instance, the statute states that licensed health care providers "shall be responsible for conducting and providing health care services." 9 V.S.A. § 2493(b). This language – "responsible for conducting and providing" – implies that licensed health care

16

providers should be the ones to conduct and provide the services themselves. ECF No. 52 at 10-11 (citing *Dubin v. United States*, 599 U.S. 110, 121 (2023) (ambiguous terms in a statute must be "construed in light of the terms surrounding them")). Plaintiffs also argue that because many of the professional standards of practice do not deal with actual provision of services (such as 3 V.S.A. § 129a(14), which requires that a licensed provider report a "change of name, e-mail, or mailing address to the Office of Professional Regulation"), the statute must oblige the licensed provider to personally conduct or provide the services. They argue that it would be illogical to require non-licensed providers to adhere to these administrative requirements. *Id.*

But the State's interpretation of the provider regulation – that it obliges licensed providers to oversee or manage the provision of services by unlicensed providers – is a better read of the statute. While active verbs such as "conducting" and "providing" typically indicate personal responsibility, they could also easily mean general responsibility for the conduct of the LSPCs. For instance, saying that the Secretary of State is "responsible" for "conducting" American foreign policy does not mean that the Secretary must conduct all foreign policy activities himself. It instead means that he will be responsible for the execution of American foreign policy, and may ultimately be liable for failure to appropriately exercise that mandate

17

even when carried out by subordinates. This conclusion is bolstered by the second sentence of the provider regulation, which states that licensed health care professionals may be liable for unprofessional conduct if they fail to "ensure that health care services, information, and counseling at the [LSPCs] are conducted in accordance with" relevant standards. 9 V.S.A. § 2493(b). The verb "ensure" indicates indirect or supervisory authority. Finally, this language also defeats Plaintiffs' argument that the statute obliges non-licensed providers to adhere to illogical administrative requirements. The statute requires that licensed providers "ensure that health care services, information, and counseling" are conducted in accordance with state law, requiring adherence to the regulations governing provision of services rather than every regulation on the books.

Even under this read of the statute, though, Aspire's licensed providers may still reasonably fear imminent prosecution under the provider regulation if an unlicensed provider does something contrary to the rules of professional conduct. Therefore, the question is whether Aspire has plausibly stated that it conducts (or plans to conduct) health care services in a manner contrary to Vermont standards of professional conduct so as to reasonably fear prosecution.

The Court concludes that it has. As counsel for the State noted at oral argument, the issue presents a difficult question of "when medical services begin and advocacy ends" because legitimate advocacy may become conduct punishable under the statute when directed at a patient as part of a medical service. ECF No. 64 at 8. For instance, the statute does not condone prosecuting dissemination of information regarding negative consequences associated with abortion – information that the State may believe to be false – when it is distributed as part of a broader public education or advocacy campaign. 9 V.S.A. § 2493(b) (regulating only "health care services, information, and counseling"). However, if Plaintiffs distribute that same information during pregnancy counseling, they might be prosecuted under the provider regulation.[4] *Id.*; s*ee also* 3 V.S.A. § 129a(a)(28)(prohibiting licensed providers from "[e]ngaging in conduct of a character likely to deceive, defraud, or harm the public."); ECF No. 47 at 24 (stating that the provider regulation may govern "discuss[ing] a client's pregnancy" or "provid[ing] her with a list of possible complications of abortion").

Plaintiffs have provided several exhibits demonstrating the type of information that they provide to patients regarding

---

[4] The Court expresses no opinion on whether such a prosecution would be constitutional.

abortion: description of "post-abortion syndrome" (including guilt, anxiety, numbness, and suicidal thoughts), ECF No. 52-5, 6, "emotional/psychological complications" relating to abortion, ECF No. 52-7 at 3, and literature comparing "the morning-after pill" to an abortion, ECF No. 52-8 at 6-7. While the State has not overtly claimed that any of these practices violate the provider regulation, the AGs' letter labels "post-abortion syndrome" and purported emotional harm related to abortion as "misleading information." ECF No. 52-4 at 5. The Court draws the reasonable inference that Plaintiffs provide this type of information as part of their medical practice and that the State may prosecute them for it. *Id.* The question of "the actual medical services" that Plaintiffs provide, ECF No. 64 ay 8, and how those interact with the provider regulation, can be explored through discovery.

Additionally, as with the advertising provision, the recent passage and narrow focus of the provider regulation provides support for the notion that the State plans to enforce this provision. Because the provider regulation singles out licensed providers at LSPCs, the Court draws the "reasonable inference" that the State perceives a problem with how licensed providers at LSPCs provide services and intends to use the statute to remedy that. *Cf. Hedges*, 724 F.3d at 197 (courts presume statutes will be enforced so long as the statute is recent and

"not moribund"); *Antonyuk*, 89 F.4th at 334 (explaining that "'credible threat of prosecution' is a 'quite forgiving' requirement that sets up only a 'low threshold' for a plaintiff to surmount.") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).

Plaintiffs have plausibly alleged that Aspire fears prosecution resulting from expression of its views on abortion during the provision of medical services. Accordingly, Plaintiffs have alleged Aspire's "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and have standing.[5] *Brokamp*, 66 F.4th at 388.

Branches does not have standing to challenge the provider regulation. Plaintiffs concede that Branches does not employ a licensed healthcare provider. The provider regulation makes clear that it applies to health care providers who are "employed by" or volunteer at LSPCs. 9 V.S.A. § 2493(b). The Court agrees with the State that "[t]he provider regulation simply does not regulate centers with no licensed health care provider, volunteers, or staff." ECF No. 49 at 11. Recognizing this, Plaintiffs state that Branches "is in the process of becoming a medical clinic, but that transition will not happen until 2025."

---

[5] The contours of this alleged constitutional interest will be analyzed in greater detail in the "merits" discussion below.

ECF No. 47 at 8. They state that Branches has an idle ultrasound machine and a closet "in which it hopes to store medical supplies in the future." *Id.* But Branches has not stated precisely when it plans to become a licensed medical clinic, and has not taken concrete steps towards hiring a licensed medical professional (at least according to the Amended Complaint). *See generally* ECF No. 47 at 7-9. Therefore, the Court cannot conclude that Branches faces "imminent" injury resulting from the statute. *Citizens United to Protect Our Neighborhoods*, 98 F.4th at 395; *Lujan*, 504 U.S. at 564 (standing requires more than "some day intentions"). Because the statute only regulates individuals at LSPCs that employ licensed healthcare providers, Branches does not have standing to challenge the provider regulation.

NIFLA has alleged that several of its member organizations provide medical services "under the direction of a licensed Vermont physician." ECF No. 47 at 4. The Second Circuit has explained that an organization may claim standing on behalf of its members "by showing that (1) 'its members would otherwise have standing to sue in their own right,' (2) 'the interests it seeks to protect are germane to the organization's purpose,' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' *Citizens United to Protect Our Neighborhoods*, 98 F.4th

at 395 (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977)). For the detailed reasons regarding Aspire, outlined above, NIFLA has preliminarily satisfied prong (1). It has also stated that the interests at issue in this case – the rights of LSPCs, specifically – are "germane" to its purpose. ECF No. 47 at 3 (stating that NIFLA's purpose is to "develop[] a network of life-affirming ministries in every community across the nation"). And NIFLA's individual members do not need to be party to the suit to vindicate the claim asserted (violation of the LSPCs' free speech rights)[6] or relief requested (declaratory and injunctive relief). NIFLA has standing to challenge the provider regulation.

## C. The Merits

### 1. Commercial Speech

Defendants argue that the advertising provision only prohibits false and misleading commercial speech, which is not protected by the First Amendment, and accordingly ask the Court to dismiss Plaintiffs' Complaint. For the following reasons, that request is denied.

The threshold issue is whether the restricted speech is commercial in the first place.

---

[6] To the extent that the presence of member LSPCs in the lawsuit might assist in vindication of those alleged rights, Aspire's party presence mitigates that concern.

"The propriety of distinguishing commercial from noncommercial speech in evaluating a First Amendment claim derives from Supreme Court precedents affording the former only 'a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values.'" *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)). Commercial speech is generally defined as "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Courts have explained that this definition is a "starting point," and try to give effect to "a 'common-sense distinction between commercial speech and other varieties of speech." *Arix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014)). This is a fact-specific inquiry. *First Resort, Inc. v. Herrera,* 860 F.3d 1263, 1272 (9th Cir. 2017).[7]

---

[7] Plaintiffs state that *First Resort* is inconsistent with *Transportation Alternatives, Inc. v. City of New York*, 340 F.3d 72, 75-76 (2d Cir. 2003). *Transportation Alternatives* involved a regulation obliging organizations with corporate sponsorships to pay a special fee. The Second Circuit concluded that the regulation did not govern purely commercial speech. But that ordinance did not purport to regulate provision of services, and had a much broader scope than the statute at issue in this case. *Transportation Alternatives* does not govern the outcome here.

The Supreme Court has focused on three factors in evaluating whether speech is commercial: whether the speech is an advertisement, whether it references a particular product, and whether there is an economic motivation underlying the speech. *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983).[8] It has also counseled that commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

Plaintiffs have plausibly alleged that the speech restricted by the advertising provision is not merely commercial. The first *Bolger* prong goes in favor of the State; the statute limits its purview to "advertising about the services or proposed services performed at the center." 9 V.S.A. § 2493(a). The advertising provision's narrow scope – applying only to "advertising about the services or proposed services" at the LSPC – makes it seem like the statute targets only speech that is aimed at proposing a commercial transaction. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. at 67-68 ("[A]dvertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded

---

[8] *Bolger* counseled that while none of these factors are dispositive, the presence of all three "provides strong support" for the characterization of speech as commercial. *Bolger*, 463 U.S. at 67 n.14.

noncommercial speech.") (quoting *Central Hudson*, 447 U.S. at 563
n.5).[9]

However, drawing all plausible inferences in favor of
Plaintiffs, prongs two and three from *Bolger* both counsel
against concluding that the LSPCs' speech is purely commercial,
at least for purposes of the motion to dismiss. Several courts
have concluded that medical clinics promote specific products.
*See Am. Acad. Of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th
Cir. 2004); *First Resort*, 860 F.3d at 1272 (noting that a San
Francisco city ordinance advertised "limited medical services
offered by LSPCs."). However, the Vermont statute does not
regulate Plaintiffs' advertising with reference to a specific
product – rather, it focuses on which entities are advertising,
and requires that all of their advertisements conform to certain
standards. This seems to regulate LSPCs rather than a particular
service that they provide.

Finally, it is not clear whether economic motive undergirds
Plaintiffs' activities – so for purposes of the motion to
dismiss, the Court concludes that it does not. It is undisputed

---

[9] As support that this speech is commercial, the State notes the
statute's explanation that "[f]or purposes of this chapter,
advertising or the provision of services by a limited-services
pregnancy center is an act in commerce." 9 V.S.A. § 2493(a).
This is irrelevant to the commercial speech inquiry, and instead
simply indicates that violations of § 2493 are governed by 9
V.S.A. § 2453, which prohibits "unfair or deceptive acts or
practices in commerce."

that Plaintiffs provide services free of cost, and it is difficult to categorize solicitations as "proposed transactions" when the target audience is not charged. *See Nat'l Inst. Of Fam. And Life Advs. V. Raoul*, 2023 WL 5367336 at *9 (N.D. Ill. 2023) ("In short, there is no commercial transaction in these interactions."). As the Fourth Circuit explained, "[a] morally and religiously motivated offering of free services cannot be described as a bare 'commercial transaction.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018); *see also Riley v. Nat'l Fed. Of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988) ("The solicitation of charitable contributions is protected speech.").[10] Consequently, although the advertising provision plainly regulates only advertising, the statute's regulation based on actor rather product combined with the LSPCs'

---

[10] This is an issue that requires additional factual development. The Court is mindful that LSPCs provide services that trade off with other services, arguably placing their solicitations in a commercial context. *See First Resort*, 860 F.3d at 1273 (noting that "the solicitation of a non-paying client base directly relates to an LSPC's ability to fundraise" which can generate income, leading to economic motive notwithstanding the fact that services were provided for free); *Mother & Unborn Baby Care of N. Tex., Inc. v. State*, 749 S.W.2d 533, 537-38 (Tex. App. 1988) (finding that an LSPC engaged in commerce for purposes of a state statute notwithstanding that they did not collect fees for services). There are allegations in the Amended Complaint that support this view of Plaintiffs' operations. *See* ECF No. 47 at 12 (noting that LSPCs provide counseling services at lower costs than other pregnancy centers).

ostensible lack of economic motivation for speech requires the preliminary conclusion that the regulated speech is not purely commercial.

Because Plaintiffs' regulated speech is not commercial, the advertising provision is subject to heightened scrutiny. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 113 (2d Cir. 2017) ("In contrast to the strict scrutiny applied to, for example, core political speech restrictions, the *Central Hudson* test for commercial speech restrictions is a form of intermediate scrutiny."). Strict scrutiny permits speech restrictions only when the government proves that its restrictions "are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The State submits that the advertising provision is "narrowly tailored to serve compelling state interests." ECF No. 49 at 18. Specifically, it argues that the advertising provision serves to protect consumers "against unfair and deceptive business practices, including false advertising," and submits that the legislature specifically found that LSPCs frequently make false and misleading claims. ECF No. 49 at 18-19. This may be the case, but narrow tailoring is a factual question that is best evaluated with a more developed evidentiary record. *See, e.g.*, *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738,

28

753 (2d Cir. 2000) (remanding for the district court to conduct "the extremely fact-specific analysis required for the narrow tailoring inquiry"). The legislature's rationale for the law and the fit of the law to the relevant social problem are factual questions that the Court will address at later stages of litigation.

## 2. Professional Speech

The State next argues that the provider regulation is a restriction on professional conduct that incidentally burdens speech and therefore receives "intermediate scrutiny or less." ECF No. 49 at 13. The Supreme Court considered this issue in a 2018 case involving these same plaintiffs. *Nat'l Inst. of Fam. & Life Advocs.* ("*NIFLA*") *v. Becerra*, 585 U.S. 755, 768 (2018). In *NIFLA*, the Court noted that while "professional speech" is not categorized as a type of speech entitled to reduced First Amendment protection, *id.* at 768, states have broader authority to regulate speech of professionals than non-professionals in two circumstances: first, when states require that professionals disclose "factual, noncontroversial information" in their commercial speech,[11] and second, when states regulate professional conduct "even though that conduct incidentally

---

[11] The provider regulation does not impose a disclosure requirement. This category of acceptable professional speech regulation is accordingly inapplicable.

involves speech." *Id* at 756. In support of this second point, the Court cited with approval prior decisions regulating professional conduct such as state rules limiting lawyers' communication with potential clients, *Ohralik*, 436 U.S. at 449; state regulation of malpractice by professionals, *NAACP v. Button*, 371 U.S. 415, 438 (1963); and state requirements that doctors performing abortions must provide information "in a manner mandated by the State" about the risks of this medical treatment, *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992), overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *see also Tingley v. Ferguson*, 47 F.4th 1055, 1074 (9th Cir. 2022), cert. denied, 144 S. Ct. 33 (2023).

In concluding that states may regulate professional conduct that incidentally burdens speech, the *NIFLA* Court noted that while "drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it." *NIFLA*, 585 U.S. at 769. It also noted that "[a]s with other kinds of speech, regulating the content of professionals' speech 'pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* at 771 (citing *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994)). This is especially true in the medical field, where "doctors help patients make

deeply personal decisions, and their candor is crucial." *Id.*
(citing *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293,
1328 (11th Cir. 2017) (en banc) (Pryor, J., concurring)).

Post-*NIFLA*, several cases have upheld restrictions on
professional conduct even when that conduct includes some
speech. *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214, 1226 (11th Cir. 2022) (upholding a statute
requiring a license to practice as a dietician or nutritionist
even when the restrictions also covered "nutrition counseling");
*Capital Assoc. Indus., Inc. v. Stein*, 922 F.3d 198, 207-08 (4th
Cir. 2019) (upholding a ban on the practice of law by non-
lawyers). The central question here is whether the provider
regulation governs speech or conduct.

The Court concludes that while the statute primarily
regulates conduct, its burden on speech may be more than
"incidental" for two reasons.

First, the provider regulation makes licensed providers
responsible for the (non-professional) speech/conduct of others.
The statute seeks to regulate the speech of non-professionals –
unlicensed medical providers – by treating them as professionals
even when they would not otherwise be subject to state licensing
regimes if they worked anywhere else. Importantly, the covered
non-professional conduct includes speech: as Plaintiffs note,
"health information" is defined to include "any oral or written

information in any form that relates to . . . the past, present, or future physical or mental health or condition of a client." 9 V.S.A. § 2492(4). Drawing all inferences in favor of the Plaintiffs, the provider regulation could make licensed providers responsible for any conversation between an unlicensed provider and a patient at an LSPC when that conversation at all relates to the health of the patient.

The specific issue is with the narrow category of individuals who are made accountable for non-licensed speech: licensed providers who work at LSPCs. This suggests content (and viewpoint) discrimination. The law does not make all licensed providers at pregnancy clinics responsible for ensuring that health care services, information, and counseling comply with Vermont law. Instead, it singles out LSPCs for that treatment, subjecting the conduct *and* speech of medical service providers with particular views to heightened burdens. This could trigger heightened scrutiny. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27-28 (2010) (stating that when a law governing conduct regulates a message, First Amendment principles apply).

The second problem with the provider regulation is that it restricts the conduct (and speech) of non-licensed individuals. In some ways, this is perfectly benign: licensing requirements only work if people without licenses are restricted from taking

certain actions. *Cf. Capital Assoc. Indus.*, 922 F.3d at 907
("Licensing laws inevitably have some effect on the speech of
those who are not (or cannot be) licensed."). In *Capital
Associated Industries*, the relevant statutory scheme precluded
corporations from practicing law without a license. *Id.* at 202.
But this rule was applied without reference to the type of law
that was practiced. Here, on the other hand, non-licensed
individuals are exempt from medical professional standards in
two circumstances: (1) if they work at any clinic other than an
LSPC; or (2) if they work at an LSPC that does not employ a
licensed provider. This under-inclusivity raises questions about
whether the provider regulation is actually a conduct regulation
or a licensing scheme directed at restraining speech.

While the *NIFLA* Court concluded that legislatures may
regulate professional conduct when that restriction incidentally
burdens speech, the provider regulation makes professionals
responsible for the expressive conduct of others. *NIFLA* does not
address that issue. It also does not stand for the principle
that the government may regulate non-professional speech under
the pretense that it is regulating professional speech.
Accordingly, the State's motion to dismiss is denied with
respect to its professional speech argument.

**3. Overbreadth**

The next issue is whether either provision is substantially overbroad "judged in relation to the statute's plainly legitimate sweep."[12] *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The Supreme Court has explained that "[t]he first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 292 (2008). Only then can the court determine whether the statutes regulates "a substantial amount of protected expressive activity." *Id.* at 297. Whether a statute is overbroad is a question of law, but requires preliminary determination of whether the covered activity is protected speech (which intersects with the commercial and professional speech issues). Because there are fact questions regarding the statute's legitimate scope, it would be premature for the Court to evaluate the overbreadth issue. Accordingly, the State's motion to dismiss Plaintiffs' overbreadth claim is denied.

### 4. Content/viewpoint discrimination

The parties dispute whether either provision constitutes content or viewpoint discrimination. Content-based laws, which "target speech based on its communicative intent," are

---

[12] The Amended Complaint asserts that both provisions are overbroad. ECF No. 47 at 26, 27. The Amended Motion to Dismiss claims that neither statute is overbroad. ECF No. 49 at 15-16. Plaintiffs' response does not address the overbreadth issue, and instead focuses on vagueness arguments.

"presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Viewpoint discrimination is a particularly insidious form of content discrimination, taking place when the government targets "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Even an apparently content-neutral regulation can be deemed content-based if "there is evidence that an impermissible purpose or justification" underpins it. *Reed*, 576 U.S. at 164. Content-neutral restrictions that incidentally burden speech are constitutional if they (1) advance important governmental interests unrelated to the suppression of free speech and (2) do not burden substantially more speech than necessary to further those interests. *Clementine Co., LLC v. Adams*, 74 F.4th 77, 88 (2d Cir. 2023) (quoting *Turner*, 520 U.S. at 189).

It is challenging to discern whether the instant laws are content-based or content-neutral. On the one hand, the advertising provision regulates LSPCs' advertisements without reference to the content of the advertisements. This makes it different from classic content-discrimination cases, in which the law allows or disallows speech based on the subject discussed. *See, e.g.*, *Reed*, 576 U.S. at 169 ("[A] law banning

the use of sound trucks for political speech – and only
political speech – would be a content-based regulation, even if
it imposed no limits on the political viewpoints that could be
expressed."). The advertising provision only considers whether
the restriction is false or deceptive, 9 V.S.A. § 2493(a), which
is a determination that can – in a sense – be made without
reference to the content contained in the advertisement because
it focuses solely on the binary question of whether consumers
would think the advertisement promotes a service or product that
it does not. On the other hand, evaluating whether an
advertisement is false or deceptive clearly requires
consideration of its content (what it offers) and whether it is
a faithful and non-misleading representation of the services
provided. Regardless, it is well-established that the government
may enact "content-based restrictions on false or misleading
commercial messages." *In re Orthopedic Bone Screw Prods.*, 193
F.3d 781, 792 (3d Cir. 1991). This reinforces the importance of
the (unresolved) threshold question: whether Plaintiffs'
advertisements are commercial.

The provider regulation is facially content-neutral. It
prevents LSPCs that employ licensed health care providers from
providing services that do not comply with the Vermont standards
of professional conduct, without reference to the content of the
message espoused.

36

But the Court concludes that Plaintiffs have plausibly alleged that both regulations may be viewpoint-based. They target LSPCs for regulation, situating Plaintiffs differently from other clinics. ECF No. 52 at 13.[13] *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.").

The State argues that the advertising provision is not viewpoint discriminatory because it simply closes a loophole. It states that Vermont's general consumer protection statute does not apply to LSPCs because they "usually provide their services for free." ECF No. 49 at 2, 20-21. It therefore argues that the advertising provision was necessary to prevent LSPCs from engaging in deceptive advertising simply because they do not collect payment from clients. *See, e.g.*, *Raoul*, 2023 WL 5367336 at *2 (explaining that Illinois' consumer protection statute already applied to LSPCs, but the legislature decided to target LSPCs again, counseling in favor of speech regulation). The Court is unwilling to credit this assertion at the motion to

---

[13] The Ninth Circuit held that a similar regulation was not viewpoint discrimination because whether applied depended on "the services offered, not on the particular views espoused or held by the clinic." *First Resort*, 860 F.3d at 1277. This logic is inapplicable here, given the substantial legislative history indicating that this law intends to restrict pregnancy centers with moral or religious opposition to abortion.

dismiss phase, when it must draw all reasonable inferences in favor of Plaintiffs. *Chambers*, 282 F.3d at 152.  Additionally, that argument is insufficient to defeat Plaintiffs' viewpoint discrimination claim: it still does not explain why the advertising provision applies solely to LSPCs instead of all clinics that do not charge for their services, which are presumably equally un-restricted by the Vermont consumer protection statute.

The same rationale applies to the provider regulation. Abortion-providing pregnancy centers are not subject to the same standards of professional conduct as LSPCs. Essentially, this means that non-licensed healthcare providers at LSPCs must adhere to a different set of standards than non-licensed providers elsewhere, which discriminates based on the viewpoint held by those providers.

Finally, the State argues that its regulations survive any level of scrutiny. It says that the advertising provision is narrowly tailored to support a legitimate state interest in protecting consumers, ECF No. 49 at 20, as well as its interest in "ensuring that the choice to have or terminate a pregnancy is 'well informed.'" *Id.* (citing *Gonzalez v. Carhart*, 550 U.S. 124, 159 (2007)). It also submits that the provider regulation supports the legitimate state interest in ensuring that patients "receive clear, honest, and nonmisleading information about the

individual's reproductive options," ECF No. 49 at 22, as well as its interest in "protecting the legitimacy or its licensed professions." ECF No. 49 at 22-23. Again, it states that unlicensed providers at LSPCs pose a special threat to this interest, justifying its regulation. The State's narrow tailoring argument requires additional factual development. *Brewer*, 212 F.3d at 753. If LSPCs are a threat to public safety, the State may justify its regulations with a more developed factual record at summary judgment.

## 5. Void for Vagueness

Finally, the parties dispute whether the statute is unconstitutionally vague. Statutes are unconstitutionally vague when they do not specify "incriminating fact[s]" — or, in other words, when culpability is based on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). A statute can be impermissibly vague for two reasons: first, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; and second, if it authorizes or encourages arbitrary and discriminatory enforcement. *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). While it is generally true that "a facial vagueness challenge will

39

succeed only when the challenged law can never be validly applied," *Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014) (citing *Vill. of Hoffman Estates*, 455 U.S. at 495), facial vagueness challenges in the First Amendment context may proceed when the challenged regulation "reaches a substantial amount of constitutionally protected conduct." *Farrell*, 449 F.3d at 496.[14]

There are considerations in this case that both augment and diminish the due process concerns at play in the vagueness analysis. The Second Circuit has explained that "vagueness in the law is particularly troubling when First Amendment rights are involved," due to concern with a statute's "literal scope" reaching protected expression. *Id.* (citing *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). But vagueness is less troubling in civil statutes than in criminal ones, "because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). Vagueness in economic regulation is also more tolerable than vagueness in other contexts, because "the regulated enterprise may have the ability to clarify the meaning of the

---

[14] Plaintiffs assert that their challenge is a prospective as-applied challenge, but they seek to have the entire statute declared unconstitutional prior to enforcement. This is a facial challenge. It would be an as-applied challenge if the Court had a set of facts on which to consider the constitutionality of a prosecution.

regulation by its own inquiry, or by resort to an administrative process." *Id.* at 498.

Plaintiffs' central issue with the advertising provision is the term "mislead." Courts have long held that consumer protection statutes which prohibit false and misleading advertising, or similar terms, provide sufficient notice to survive vagueness challenges. *See, e.g., United States v. Cent. Adjustment Bureau, Inc.*, 823 F.2d 880, 881 (5th Cir. 1987) ("Use of the term "deceptive" does not make the Act unconstitutionally vague on its face.").[15] In another case — albeit not dealing with the term "misleading" — the Second Circuit upheld a consumer protection law and explained that "statutes and regulations [ ] are not impermissibly vague simply because it may be difficult to determine whether marginal cases fall within their scope." *United States v. Sun & Sand Imports, Ltd., Inc.*, 725 F.2d 184, 187 (2d Cir. 1984). So too here. The fact that some advertisements may be close calls does not mean

---

[15] Plaintiffs state that other federal courts have struck down laws prohibiting misleading political advertisements as unconstitutionally vague. ECF No. 52 at 24. The cases they cite deal with judicial misconduct and, while they disapprove of the term "misleading," are inapposite to this litigation. *Id.* (citing *Winter v. Wolnitzek*, 168 F. Supp. 3d 673, 700 (E.D. Ky. 2016); *Kishner v. Nev. Standing Comm. On Jud. Ethics & Election Pracs.*, No. 2:10-cv-01858, 2010 WL 4365951, at *6 (D. Nev. Oct. 28, 2010)).

that a state may not regulate false or misleading advertisements generally.

The VCPA in particular has a history of judicial construction and approval. The Vermont Supreme Court has explained that a statement is misleading under the VCPA if it is "likely to mislead a reasonable consumer." *Lofts Essex, LLC v. Strategic Floor & Decor Inc.*, 2019 VT 82 ¶ 32; see also *Ehlers v. Ben & Jerry's Homemade Inc.*, No. 2:19-CV-00194, 2020 WL 2218858, at *5 (D. Vt. May 7, 2020). And there is a long history of judicial interpretation of 9 V.S.A. § 2453, which governs consumer fraud actions (and which allows for an action under the advertising provision at issue in this case). The Vermont Supreme Court has explained that "[t]o prevail on a [VCPA] claim, one must show that: (1) there was a representation, practice, or omission likely to mislead the consumer; (2) the consumer interpreted the message reasonably under the circumstances; and (3) the misleading effects were" material. *Lang McLaughry Spera Real Est., LLC v. Hinsdale*, 2011 VT 29, ¶ 32. This history of judicial construction provides people of ordinary intelligence with a reasonable opportunity to understand what conduct is prohibited, and guards against arbitrary and discriminatory enforcement. *Farrell*, 449 F.3d at 485.

Plaintiffs also challenge the provider regulation as unconstitutionally vague. They state that it fails to define health care information, services, and counseling, all of which must be provided "in accordance with State law and professional standards of practice" under penalties of professional misconduct. 9 V.S.A. § 2493(b); *see* ECF No. 52 at 24-26. But they note that Title 9 of the Vermont code elsewhere defines several of these terms. As noted above, health information is defined as "any oral or written information in any form or medium that relates to health insurance or the past, present, or future physical or mental health or condition of a client." ECF No. 52 at 22 (quoting 9 V.S.A. § 2492(4)). And "health care services" are defined as "services for the diagnosis, prevention, treatment, cure, or relief of a physical or mental health condition, including procedures, products, devices, and medications." ECF No. 52 at 25 (quoting 3 V.S.A. § 129a(f)(2)(B); 26 V.S.A. § 1354(d)(2)(B)). Plaintiffs argue that these definitions are also unconstitutionally broad, allowing for arbitrary enforcement.

The Court disagrees. These are commonplace restrictions on professional speech that apply to healthcare professionals broadly. Plaintiffs argue that the definition of health information is so broad as to encompass a "biblical definition of personhood," ECF No. 52 at 25, but this does not pose a

vagueness issue: a broad statute that requires licensed
professionals to adhere to certain procedures when disseminating
health information both provides notice of the regulated conduct
and provides adequate parameters for non-arbitrary enforcement.
The same is true of the "health care services" definition, which
might encompass offering a pregnancy test, ECF No. 52 at 25-26 —
but there is no vagueness issue with that so long as state
standards make clear what must be done when offering such a
service, which Plaintiffs have not contested. Indeed, 26 V.S.A.
§ 1354 outlines 39 specific ways in which providers may conduct
professional misconduct, and 3 V.S.A. § 129a(a) offers 29 more.
This robust and detailed statutory scheme limits the broad of
health care services and information, and holistically requires
that actions in those domains comply with the standards of
professional conduct.

Plaintiffs also argue that the provider regulation is vague
as to whether it "requires licensed health care providers to
personally provide or conduct all health care services,
information, and counseling" and "whether it subjects pregnancy
centers without any licensed providers to penalties." ECF No. 52
at 26. The Court disagrees, for the reasons outlined above. In
brief, the statute makes licensed providers "responsible" for
providing these services, and the ensuing sentence — which
explains how the provision could be violated — makes clear that

44

this responsibility entails "conduct[ing] or [ ] ensur[ing that] . . . services are conducted in accordance with" State law and standards of professional practice. 9 V.S.A. § 2493(b). The verb "ensure" makes clear that the licensed providers at LSPCs are responsible for supervising and monitoring the provision of services, not that they are responsible for providing those services themselves.

### IV. Conclusion

For the foregoing reasons, the Court **grants** the State's motion to dismiss (ECF No. 49) as to Plaintiffs' vagueness claim (Count IV). That motion is otherwise **denied.**

DATED at Burlington, in the District of Vermont, this 14th day of June, 2024.


/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge